UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
NORMA BALBUENA, on behalf of herself and all others
similarly situated,

                      Plaintiffs,

         -against-

JOHN MATTINGLY, individually and as Commissioner;
H. AURELIA JEMMOTT, individually and as Reviewer;       05-Civ-2986 (TPG)
RAFAEL ORTIZ, JR., individually and as Borough Director;
VERONICA CHEVRESTT, individually and as caseworker;
CARMEN DEL VALLE, individually and as supervisor;
EPISCOPAL SOCIAL SERVICES;
ROBERT GUTHEIL, individually and as director;
CARMEN SANTANA, individually and a supervisor;
LOURDES FALCON, individually and as caseworker;
ZORAIDA NEGRON, individually and as social worker;
CITY OF NEW YORK; and JOHN JOHNSON, as
Commissioner;

                      Defendants.
--------------------------------------------------------------------X
 A.C. and H.C., by their next friend Barbara Weiner,
individually and on behalf of all others similarly situated,

                      Plaintiffs,

         -against-

JOHN MATTINGLY, in his official capacity as
Commissioner of the New York City Administration
for Children's Services; and JOHN JOHNSON, in his
official capacity as Commissioner of the New York
State Office of Children and Family Services;

                      Defendants.
--------------------------------------------------------------------X

# TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Statutory and Regulatory Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Facts pertaining to A.C. and H.C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

POINT I:     THE FIRST AMENDED COMPLAINT
            STATES A CAUSE OF ACTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    A.      Plaintiff Children had a Constitutionally Protected Liberty
            Interest in Maintaining a Family Relationship with their
            Aunt, who was also their Kinship Foster Mother  . . . . . . . . . . . . . . . . . . . . . . . 17

        1.      A Liberty Interest Arises from a Combination of
                Biological Ties and Close Family Relationship . . . . . . . . . . . . . . . . . . . 18

        2.      The Plaintiff Children's Aunt did not Waive the
                Family's Mutual Liberty Interest by Signing a
                Foster Care Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    B.      The Independent Review Protocol Fails to Provide
            Plaintiff Children with Due Process of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    C.      Plaintiff Children were "Seized" Under the Fourth Amendment. . . . . . . . . . . . 25

POINT II:    THE PLAINTIFF CHILDREN HAVE STANDING
            TO BRING THIS ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

POINT III:   PLAINTIFF CHILDREN DO NOT SEEK DAMAGES
            AGAINST THE STATE DEFENDANT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## PRELIMINARY STATEMENT

This case challenges the constitutionality of procedures governing the removal of children from the care of relatives when those relatives are the children's foster parents ("kinship foster parents").  Plaintiff children allege that defendant Commissioner of the New York City Administration for Children's Services ("ACS") has a pattern and practice of removing children from their kinship foster parents on an emergency basis even though true emergencies do not exist.  This pattern and practice results from the failure of ACS and defendant Commissioner of the New York State Office of Children and Family Services ("OCFS") to define what constitutes an "emergency" for purposes of making or approving an emergency removal of children from kinship foster parents.

Additionally, the plaintiff children allege that neither ACS nor OCFS have adopted substantive guidelines governing the circumstances in which a non-emergency removal of children from kinship foster care may be made.  As a result, children in kinship foster care are denied substantive due process when they are removed from the care of their relatives on a non-emergency basis without a sufficiently high showing that their relatives' care is inadequate.

Finally, the plaintiff children allege that the ACS hearing procedures that are available to to challenge the removal of children from their relatives, and the State regulation pursuant to which they were adopted, violate procedural due process in numerous ways.  For example, they:

- fail to ensure that a timely pre-removal hearing is held in all non-emergency cases

- fail to ensure that  a prompt post-removal hearing is held when an emergency would make a pre-removal hearing impracticable;

3

- fail to ensure that a child or his or her law guardian receives timely or adequate notice of the removal of the child from a kinship foster parent, or of the scheduling of a hearing;

- fail to ensure that hearings comport with the basic elements of procedural due process, including the right of the kinship foster parent or the child to offer and challenge evidence, to compel the production of documents and testimony, and to confront adverse witnesses; and

- exclude the child from the hearing except at the discretion of the hearing officer.

These procedures are wholly inadequate to provide plaintiff children with procedural due process and protect their substantive due process rights under the Fourteenth Amendment of the United States Constitution. Additionally, they allow for an unreasonable "seizure" under the Fourth Amendment of the Constitution.

The State defendant moves to dismiss the children's complaint, arguing that (1) A.C. and H.C. have not demonstrated a violation of their alleged Constitutional rights in the removal process, and have not, therefore, stated a cause of action; (2) pursuant to Article III of the Constitution of the United States and Federal Rule of Civil Procedure ("F. R. Civ. P.") Rule 12(b)(1), the plaintiff children lack standing to bring such an action in any event; and (3) pursuant to the Eleventh Amendment to the Constitution of the United States and Fed. R. Civ. P. 12(b)(1), the court lacks subject matter jurisdiction as to any damages claim against the State defendant.

The motion should be denied in its entirety. First, the complaint states a cause of action because (a) the plaintiff children have a constitutionally protected liberty interest in maintaining a

4

family relationship with their kinship foster parents; (b) the procedures for challenging removals from kinship foster care established by the City defendant and ratified by the State defendant deny plaintiff children procedural due process; and (c) the plaintiff children were "seized" by State actors, and this seizure was unreasonable under the Fourth Amendment. Second, the plaintiff children have standing to bring this action as they have suffered an "injury in fact." Third, the plaintiff children are not seeking damages from the State defendant, and so the Eleventh Amendment is inapplicable.

## PROCEDURAL HISTORY

The original complaint, filed by Norma Balbuena, purportedly on her own behalf and on behalf of the children A.C. and H.C., was filed on March 18, 2005. On April 5, 2005, the City defendant moved by Order to Show Cause to dismiss that complaint for, *inter alia*, failure to state a claim upon which relief could be granted. (ECF Document #11.)[1] On April 7, the Court granted the City's motion as to any "attempt to resolve the future care of the infants in question," but denied the motion as to the constitutional claims which might form the basis of a "ruling or declaration which will give guidance in future cases." April 7, 2005, Transcript (Document #15).

Also on April 7, 2005, because of possible conflicts of interest between Ms. Balbuena and the minor children, The Legal Aid Society was substituted as counsel for A.C. and H.C.

**Plaintiff Norma Balbuena**

Thereafter, on June 3, 2005, plaintiff Norma Balbuena, on her own behalf and on behalf of similarly situated kinship foster parents, moved to certify a class of kinship foster parents and a

---

[1] Like the State defendant, the City defendant argued that the plaintiffs had not alleged a cognizable constitutional claim. This Court rejected that claim in a ruling from the bench on April 7, 2005.

class of kinship foster children  (Document # 17).  Ten days later, on June 13, the State defendant

moved to dismiss the original Complaint.  (Document # 22.).  Pursuant to endorsed

correspondence with the Court, plaintiff Norma Balbuena's motion for class certification is

presently being held in abeyance while the State Defendant's motion to dismiss her complaint is

decided.  (Document # 31.)

On July 22, plaintiff Norma Balbuena opposed the State Defendant's Motion to Dismiss.

(Document # 43.)

**Plaintiffs A.C. and H.C.**

On June 20, 2005, the children A.C. and H.C., by their next friend Barbara Weiner, now

represented by The Legal Aid Society, filed their own complaint in this matter.  Because it is the

second Complaint in the case, this first Complaint by the children was denominated an "Amended

Complaint."  (Document # 33.)   That same day, the plaintiff children moved to certify a class of

similarly situated minor foster children. (Document # 27.)

On July 15, 2005, in order to correct certain technical errors, the plaintiff children filed a

motion for Leave to File a Second Amended Complaint. (Document # 34.)

Three days later, on July 18, 2005, the State defendant moved to dismiss the plaintiff

children's First Amended Complaint.  (Document # 37.)  Pursuant to a so-ordered stipulation, the

plaintiff children's motion for class certification is presently being held in abeyance while the

State Defendant's motion to dismiss is briefed and decided.  (Document # 40.)

On July 22, the State defendant opposed plaintiff children's motion for Leave to File

Second Amended Complaint (Document #  42), and plaintiff children filed their Reply

Memorandum in Further Support of their motion on July 29.  (Document # 45.)  The City

6

defendant does not oppose the children's motion for leave to file a Second Amended Complaint, and that motion has now been fully briefed.

## STATUTORY AND REGULATORY FRAMEWORK

### Article 10 of the Family Court Act

In New York State, responsibility for the protection of children rests with the State and with local child protective agencies. OCFS oversees the local child protective agencies, including ACS in New York City. ACS and other local agencies may, in turn, assign case management functions to various private social services agencies with whom they contract. In the case of plaintiff children A.C. and H.C., ACS assigned case management functions to Episcopal Social Services (hereinafter "Episcopal").

The New York State Family Court Act (the "Act") establishes procedures for protecting children from injury or mistreatment and "safeguard[ing] their physical, mental, and emotional well-being." F.C.A. § 1011. Pursuant to the Act, if a child protective agency has "reasonable cause" to believe that a child faces "imminent danger to . . . life or health," it may seek a court order to take the child into protective custody. F.C.A. § 1022(a). If there is not enough time to obtain a court order, the agency may take or keep the child in protective custody without court order. F.C.A. § 1024(a).

Under the Act, when a local child protective agency removes a child from the home, the Family Court must direct the agency to conduct an investigation to locate suitable relatives of the child with whom she might stay. F.C.A. § 1017.1. Once a suitable relative is located, the Family Court either places the child directly with the relative ("direct placement"), or it remands the child to the commissioner of the child protective agency for placement with that relative. F.C.A. §

7

1017.2(a)(i,ii).  If the child is remanded to the commissioner for placement with a relative, the court also orders the commissioner to conduct a twenty-four hour home study of the relative, and then approve the relative as a foster parent or, if not appropriate to do so, report that fact to the court "forthwith."  F.C.A. § 1017.2(a)(ii).

Nothing in the Act precludes the Family Court from directing that a child shall reside with a relative who is not a certified foster parent. Likewise, nothing in the Act requires the removal of a child from a relative who is not a certified foster parent. Indeed, the Act specifically authorizes the Family Court to direct that a child shall reside with a relative, whether or not the relative is an approved foster parent. F.C.A. § 1017.1(b).  Therefore, relatives and children have independent liberty interests in their family relationship that are not dependent upon whether ACS approves or disapproves a relative's request to be approved as a foster parent.

### Department of Social Services Regulations

New York State Department of Social Services regulations are promulgated pursuant to New York State Social Services Law §§ 20(3)(d), 34(3)(f), and 378. They govern the removal of children from foster parents and provide for notice and an opportunity for the foster parent to be heard.  18 N.Y.C.R.R. § 443.5.  The regulations provide that, except in circumstances where immediate removal is necessary in order to protect the health and safety of the child, the local social services official or private agency must provide the foster parent with written notice at least ten days prior to the planned removal of the child. 18 N.Y.C.R.R. § 443.5(a)(1).  The notice must advise the foster parent that she can request a "conference" with the child protective agency to learn the reasons for the proposed removal, and she may challenge the proposed removal at the conference.  Additionally, the notice must state that the foster parent may bring a representative

8

with her to the conference. 18 N.Y.C.R.R. § 443.5(a)(2).

Unlike Family Court proceedings, in which the child has a right to representation and to be heard, the regulations governing removal of children from foster parents do not provide for notice to the child who is to be removed from a home, or to the child's law guardian.  Pursuant to F.C.A. §1016, a law guardian is appointed to represent children in every case in which abuse or neglect is alleged, because the legislature has determined that children have an independent interest in the outcome of the proceedings that is separate from the interest of parents or foster parents.  The regulations, however, fail to require notification to the child's law guardian.[2]

Once requested, the conference must take place within ten days. The local social services official must send written notice of the date, time, and place of the conference to the foster parent and to the private agency at least five days prior to the date the conference will be held.  18 N.Y.C.R.R. § 443.5(b).

Once a request for a conference has been made, the child may not be removed from the foster family home prior to the date of the planned removal or until at least three days after the notice of decision is sent, whichever is later.  18 N.Y.C.R.R. § 443.5(d).

### The Independent Review Protocol

A.    <u>Removing Children from the Foster Home</u>

Pursuant to 18 N.Y.C.R.R. § 443.5(a)(3), ACS promulgated the Independent Review Protocol attached as Exhibit A to the First Amended Complaint.  In the case of a planned removal

---

[2]The State defendant's argument, at page 18 of his Memorandum, that "there is no Federal or State law right to have a law guardian appointed in the administrative foster home removal process" fails to mention that children who are the subject of a foster home removal hearing already have appointed counsel under F.C.A. §1016.

from foster parents within the five boroughs of New York City, the Independent Review Protocol requires that foster parents must receive notice of the proposed removal at least ten days in advance of the action. A Form CS-701D, entitled "Notice for Removal of Child(ren) From a Foster Home," is to be used for this purpose. There is no requirement that a child or his or her representative receive notice. The Protocol further provides for an "Independent Review" at which a foster parent may meet with the agency and challenge the proposed removal. Procedures for issuing the Form CS-701D and holding an Independent Review are set forth in the Protocol.

Removals of foster children must be done on notice to the foster parent, "except where the health or safety of the child[ren] requires that the child[ren] be removed immediately from the foster family home." I.R. Memo at ¶ II.A. There are no guidelines, standards, requirements, policies or other guidance, however, on removing children from the foster home in non-emergency circumstances. Agencies are left to decide for themselves when they may remove children from kinship foster homes if there is no emergency present.

On the back of Form CS-701D, the section titled "Independent Review" summarizes rules for requesting and participating in the Independent Review. The form notice states that the foster parent may bring a representative, and if the representative is an attorney, then the agency might also bring an attorney.

The I.R. Memo states that foster parents have three options when faced with the planned removal of a foster child: (1) request a Foster Care Agency Conference, (2) request an Independent Review, and (3) request a New York State fair hearing. I.R. Memo at ¶ II.B. A foster parent may request any or all of the options in sequence or simultaneously. I.R. Memo at ¶¶ III.A, V.C.

In the case of an emergency removal of foster children, a form CS-701D must be provided

10

to the foster parent at the time of the removal or as soon as is practicable thereafter.  I.R. Memo at ¶ II.A.2.  A foster parent whose foster child was removed on an emergency basis may challenge the action after the removal at an Independent Review, a fair hearing, or both.  I.R. Memo at ¶¶ II.A.2, V.C.

The I.R. Memo provides that notice to the law guardian of an Independent Review is optional.  There is no requirement that a child or his or her representative receive timely or adequate prior notice of an Independent Review requested by a foster parent.  I.R. Memo at ¶ IV.C.

      B.     <u>Conducting the Independent Review</u>

The procedures to be used at an Independent Review are set forth in the ACS Independent Review Memo at ¶ IV.  The Memo notes that the Independent Review must be held within ten days of being requested. Id. at A. Upon information and belief, however, Independent Review hearings are frequently scheduled for or adjourned by the agency to a date later than ten days from the date of request.

Attendance at the Independent Review is mandatory for the foster parent and an agency representative who has knowledge of the case, though if an agency representative is not able to attend within the ten-day time frame, "the Reviewer will use his/her discretion about how to proceed in consultation with ACS Division of Legal Services." Id.

ACS' Office of Confidential Investigations (OCI) has 60 days to complete an investigation into suspected child abuse or maltreatment, including suspected child abuse and maltreatment by a foster parent in the foster home. If OCI is conducting an investigation of a foster parent who requests an Independent Review of a removal based on the same allegations being investigated by

OCI, the Review will go forward within ten days even if the OCI report is not completed.  Id.

If the Independent Review Officer's decision differs from the recommendation of an OCI report, the ACS Office of Advocacy will review its decision with OCI and the Commissioners of the respective offices, and a final decision will be reached.  I.R. Memo at ¶ V.A.

The Independent Review is a social work conference.  I.R. Memo at ¶ IV.D.  It is not a legal proceeding.  Id. at ¶ IV.D.1.  The rules of evidence do not apply.  Id.  The role of a representative at the Review is limited:

- While the foster parent may bring an attorney, the attorney may not question attendees.  I.R. Memo at ¶ IV.E.2.

- The attorney may not object to questions posed to the foster parent.  Id. at ¶ IV.D.2.

- The attorney may only ask questions by posing them first to the Review Officer, who will decide whether the question will be asked.  Id. at ¶ IV.E.3.

- The attorney does not have a right to "discovery."  Id. at ¶ IV.F.  The Reviewer alone decides what documents, if any, participants at the Review are entitled to receive.  Id.

- The Reviewer may accept documents at the review and not disclose them to other participants where "confidentiality would prohibit disclosure."  Id.

The Review Officer must issue a decision within five days of the review.  I.R. Memo at ¶ IV.D.  The decision whether to permit a child to attend the Independent Review, and to present evidence, is left to the sole discretion of the Review Officer.

## FACTS PERTAINING TO A.C.  AND H.C.

On October 3, 2003, A.C. was born with a positive toxicology for cocaine.  ACS

12

took custody of the child and commenced a child protective proceeding against her parents under Article 10 of the Family Court Act. At the initial appearance, Family Court ordered A.C. remanded to the Commissioner of ACS, for placement with her paternal aunt, Norma Balbuena. ACS assigned case management duties to Episcopal, which acted on behalf of and reported to ACS in this matter. Since plaintiff Norma Balbuena was not a foster parent at the time her niece was placed with her, her home was investigated and "approved" for the child. Episcopal thereafter provided initial and ongoing foster parent training to Ms. Balbuena.

A year after A.C. was placed with Ms. Balbuena, her sister H.C. was born and also placed into foster care with Ms. Balbuena. The siblings remained in foster care together with Ms. Balbuena until December 1, 2004. On that day, Episcopal case workers received a report from the State Central Register ("SCR"), the hotline for child abuse and maltreatment, that Ms. Balbuena was not adequately caring for A.C. and H.C., or for her own children. Episcopal went to Ms. Balbuena's home, immediately removed A.C. and H.C. without court order and without providing a 10-day notice, and placed them in a foster home with non-relatives. Episcopal did not remove Ms. Balbuena's own children. Episcopal did not provide a ten-day notice to the children's law guardian.

No emergency condition required the children's immediate removal. There was no reason that Episcopal could not have provided a 10-day notice in this case to both the foster parent and the children's legal representative.

Ms. Balbuena objected to the removal of the children and requested an Independent Review that same day. The Review, which is supposed to be scheduled within ten days, was scheduled for twelve days later, on December 13, 2004.

13

Although the Decision After Independent Review must be issued no later than five days after the Review, the Decision in this case was issued on December 29, 2004, sixteen days after the Independent Review, and 28 days after the children were removed and placed with strangers.

The Decision in Ms. Balbuena's case sustained Episcopal's actions in removing the children. Ms. Balbuena disagreed with the decision and consulted an attorney. On February 28, 2005, she requested a State administrative "fair hearing" to challenge the Decision After Independent Review.

The fair hearing was commenced 29 days later, on March 29, 2005, or 118 days after the children were removed. The hearing was continued to May 16 and May 20, 2005, for additional testimony. The hearing was ultimately concluded; a decision upholding the removal was issued on August 9, 2005.

As of the date of the Decision After Fair Hearing, 250 days had passed since the children were removed from Ms. Balbuena's care.

14

**ARGUMENT**

**POINT I**

**THE FIRST AMENDED COMPLAINT
STATES A CAUSE OF ACTION**

The State defendant's contention that the children fail to state a cause of action lacks

merit.  The Civil Rights Act creates a cause of action against "any person who, acting under color

of state law, causes an individual to suffer from a constitutional deprivation."  42 U.S.C. § 1983.

In Moore v. City of East Cleveland, 431 U.S. 494 (1977), the United States Supreme Court found

a  cause of action where a grandmother was deprived of her constitutional right to maintain a

family relationship with her grandson.  In Rivera v. Marcus, 696 F.2d 1016 (2d Cir. 1982), the

Second Circuit found a cause of action where a half-sister was deprived of her constitutional right

to maintain a family relationship with her siblings.  And in Duchesne v. Sugarman, 566 F.2d 817,

832 (2d Cir. 1977), the Court of Appeals held that a mother had a cause of action where her

children were detained in foster care without due process.

A Complaint should  not be dismissed unless "it appears beyond doubt that the plaintiff

can prove no set of facts in support of his claim which would entitle him to relief."  Conley v.

Gibson, 355 U.S. 41 (1957).  The Court must assume the truth of the factual allegations and

construe the complaint generously, drawing all reasonable inferences in favor of the plaintiff.

Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088 (2d Cir.1995); Neshewat v. Salem, 365 F.

Supp.2d 508 (S.D.N.Y, 2005); Savitsky v. Mazzella, No. 98 Civ. 9051, 2004 WL 2454120, at *3

(S.D.N.Y. Nov.1, 2004) (citing Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d

Cir.1993)).  The issue is not "whether a plaintiff will ultimately prevail"; rather, it is "whether the

claimant is entitled to offer evidence to support the claims." <u>Scheuer v. Rhodes</u>, 416 U.S. 232 (1974).

Plaintiff children allege that they have been deprived of a liberty interest – the right to maintain a family relationship with their aunt Norma Balbuena – in violation of the Procedural and Substantive Due Process guarantees of the Fourteenth Amendment to the United States Constitution.  For more than two decades, the law of this Circuit has been that "children of custodial relatives possess a liberty interest in preserving the stability of their family and, accordingly, that they are entitled to due process protections when the government decides to remove them from the family environment." <u>Johnson v. City of New York</u>, 2003 WL 1826122 (S.D.N.Y. 2003) (<i>citing</i> <u>Rivera v. Marcus</u>, 696 F2d. 1016 (2d Cir. 1982)).  These decisions echo the United States Supreme Court's holding in  <u>Moore v. City of East Cleveland</u>, in which the court held that "the Constitution protects the sanctity of the [extended] family." 431 U.S. at 503. For reasons set forth in Points A and B below, the plaintiff children have alleged a cognizable constitutional claim under the standards articulated in these cases.

The plaintiff children also allege that their "seizure" by child protective workers acting under color of  state law was unreasonable under the Fourth Amendment to the United States Constitution.  This claim, too, alleges a constitutionally cognizable claim.  <u>See</u> <u>Kia P. v. McIntyre</u>, 235 F.3d 749, 762-3 (2d Cir. 2000) (child's removal from parent by hospital found to be a "seizure" within the meaning of the Fourth Amendment).  For reasons set forth in Point C below, the plaintiff children state a claim of unlawful seizure under the Fourth Amendment.

According, the amended complaint should not be dismissed, and the plaintiff children should be permitted to offer evidence in support of their claims.

A.    **Plaintiff Children Had a Constitutionally Protected Liberty Interest in Maintaining a Family Relationship with their Aunt, who was also their Kinship Foster Mother**

The question whether plaintiff children can possess a liberty interest in living together with their extended family has been answered by the United States Supreme Court in the affirmative. Moore v. City of East Cleveland, 431 U.S. 494 (1977) (finding a liberty interest in a grandmother's right to live with grandson; declaring unconstitutional housing ordinance which excluded occupancy by certain family members). In Moore, the Court wrote: "[o]urs is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition." Id. at 504-05; see also Prince v. Massachusetts, 321 U.S. 158, 166 (1944) (discussing aunt's right to freedom from State interference in rearing her niece, noting that "[t]here is a "private realm of family life which the State cannot enter"); Rivera v. Marcus, 696 F.2d 1016 (2d Cir. 1982) (custodial half-sister has liberty interest in maintaining bonds with her siblings).

The proposition is also established that a child can have a liberty interest in living with her foster parent, if that foster parent happens also to be a blood relation. Rivera v. Marcus, *supra* (custodial half-sister who is also a foster parent has liberty interest in caring for siblings placed with her through foster care); Johnson v. City of New York, 2003 WL 1826122 (S.D.N.Y. 2002) (custodial grandmother who is also a foster parent has liberty interest in caring for her foster grandchildren); Harley v. City of New York, 36 F. Supp. 2d 136, 140 (E.D.N.Y. 1999), *aff'd* 208 F. Supp. 3d 203 (2d Cir. 2000) ("Children of custodial relatives like Lucille Harley possess a liberty interest in preserving the stability of their family, and, under *Rivera*, they are entitled to

17

due process protections when the State decides to remove them from the family environment").

These cases stand in distinct opposition to those concerning the rights of <u>non</u>-kinship foster parents. Unlike foster parents with biological relationships to their foster children, <u>non</u>-relative foster parents have relationships to the children that arise only out of a contract. <u>See</u> <u>Rodriguez v. McLoughlin</u>, 214 F.3d 328, 337 (2d Cir. 2000) (no liberty interest found where non-kinship foster parent sought to maintain family with unrelated foster child, because unlike biological relationships, which have constitutional protection, non-kinship foster care has origins in State contract).

**1.    <u>A Liberty Interest Arises from a Combination of Biological Ties and Close Family Relationship.</u>**

The State defendant would nonetheless have this Court view the instant case as "novel" and somehow distinguishable from all relevant controlling case law. This case is not novel. Rather, it is the position the State defendant urges this Court to take which is novel. The State defendant cites not one case, nor does it cite any other authority, for its insupportable claim that kinship foster parents and children do not have a liberty interest in their mutual family relationship. As the Court will see, there is ample judicial precedent to guide the Court in deciding plaintiff children's claims in their favor.

First, the State defendant essentially argues that case law requires the Court to find that the children lack a liberty interest in their kinship foster family because they were not living with their aunt prior to a foster care agreement. This patently absurd argument completely ignores the biological relationship between Ms. Balbuena and her nieces. In making this argument, the State seems to believe that it is not the biological relationship between children and their relative

caretakers that gives rise to a liberty interest, but rather only the duration of their residence together. This contention is completely wrong.[3]

In making this claim, the State defendant notes with disapproval one distinguishing characteristic of the instant case from the case of <u>Rivera</u>: while the children in Rivera had lived with their half-sister prior to entering foster care, A.C. and H.C. had not established a family relationship with their aunt until *after* coming into foster care. Contrary to defendant's mistaken conclusion, however, this difference, if it exists at all, suggests even greater reason for finding that the children possessed a liberty interest in maintaining a family relationship with their aunt.

First, of course, the timing of A.C. and H.C.'s entry into foster care was not of their own choosing: It was not the children's decision to come into foster care days after their birth, rather than years after birth, as did the children in <u>Rivera</u>. Second, the timing of the foster care relationship does not weaken the blood ties the children share with their aunt, which were present from the moment the children were born. As plaintiff Norma Balbuena notes in her Opposition to the State's Motion to Dismiss her Complaint, the State defendant "did not create the biological relationship, and he cannot destroy it." Balbuena Mem. at 13. (Document # 43.) Third, the reason Ms. Balbuena was sought out as a foster parent for the children in the first place was *because* she is biologically related to the children: ACS is *required*, pursuant to F.C.A. § 1017, to locate "suitable relatives" with whom the children might be placed. As the Supreme Court stated in <u>Smith v. OFFER</u>, the nature of New York State's foster care program is to "'provide[] substitute

---

[3] The State also has its facts wrong. A.C. came to live with her aunt nearly a week before the contract for foster care was executed. See, Exhibit 12 to Kubitschek Declaration in Opposition to the State Defendant's Motion to Dismiss, dated July 22, 2005 (Document # 44). However, this factual issue is immaterial to the legal rights at issue.

*family care* . . . for a child when his own family cannot care for him . . . .'" 431 U.S. 816, 823

(1977) (emphasis added). To thereafter discount the biological relationship *because the foster*

*care contract has been signed* is to turn the tables on the kinship resource and subjugate her

biological ties to the foster care contract. Nothing could be further from the purpose behind

F.C.A. §1017's mandate to seek out relatives of foster children, and nothing could be further from

the holding of Rivera.

      Most importantly, however, the central inquiry in Rivera was whether the children's

kinship foster parent "should be treated for purposes of procedural due process as a natural parent

or a foster parent." Rivera at 1017. The Rivera court looked *first* to the foster parent's biological

ties to her siblings and then to other factors, including to the foster parent's role as a "surrogate

mother" to the children. Id. at 1018. Because A.C. and H.C. went to live with Ms. Balbuena as

newborns immediately upon discharge from the hospital, and never lived with their biological

parents even for a night, their aunt Norma Balbuena was the *only* parent, surrogate or otherwise,

A.C. and H.C. had ever known. Under a Rivera analysis, because of the children's biological ties

and the aunt's role as a "surrogate mother" to the children, the children's aunt should be treated

more like a natural parent than a foster parent for the purposes of procedural due process analysis.

      Defendant would have this Court unnaturally narrow the application of Rivera to only

those cases in which a child's relationship with her custodial relative pre-dated the foster care

agreement. This argument would arbitrarily remove legal protections from children placed in

foster care as newborns, and ignores the plain language of Rivera.

      The case at bar is plainly distinguishable from Rodriguez v. McLoughlin, 214 F.3d 328, in

which the Second Circuit found no liberty interest in a foster parent's relationship with a

biologically <u>unrelated</u> foster child.  In that case, the Court found that any emotional ties that may develop between an unrelated foster parent and foster child " 'have their origins in an arrangement in which the State has been a partner from the outset.' " <u>Id.</u> at 337, *citing* <u>Smith v. OFFER</u>, 431 U.S. at 845-46.  While the State was indeed a partner at the outset of A.C. and H.C.'s placement with Ms. Balbuena (since it arranged for the children to live with her), it cannot be said that their family ties have their origins in that State-created arrangement, since A.C. and H.C., unlike the child in <u>Rodriguez</u>, are related by blood to their aunt. As noted above, the State, which has statutorily recognized the superiority of kinship foster care placements, sought out Ms. Balbeuna because she was already related to the children.  And as noted by the Supreme Court in <u>Moore v. City of East Cleveland</u>, "[w]hether or not such a household is established because of personal tragedy," once it is made, "the choice of relatives in this degree of kinship to live together may not lightly be denied by the State."  431 U.S. at 505-06.

Similarly, the case at bar is wholly distinguishable from <u>Smith v. OFFER</u>, on which the State defendant inexplicably, yet heavily, relies.  In <u>OFFER</u>, *non*-kinship foster parents alleged a liberty interest in their unrelated foster children.  The Supreme Court found that unlike "the usual understanding of 'family' [which] implies biological relationships," foster parents who are unrelated to their foster children by blood owe their origins to State contract law.  <u>OFFER</u>, 431 U.S. at 843.

The State defendant's repeated reliance on <u>OFFER</u> can best be explained as the product of a fundamental misunderstanding of the nature of plaintiffs' claims.  Plaintiffs do not make the claim - as defendant mistakenly reports - "that foster children have a constitutionally protected liberty interest..." Def. Mem. at 13.  Rather, plaintiffs allege that <u>kinship</u> foster children have a

constitutionally protected liberty interest.  Defendant cannot wish away the word "kinship" and change the case into one he would prefer to litigate.  His reliance on non-kinship cases is accordingly misplaced and fatally flawed.

> **2.**    **The Plaintiff Children's Aunt Did Not "Waive" the Family's Mutual Liberty Interest by Signing a Foster Care Agreement.**

In citing to N.Y. Soc. Serv. L. § 400, which provides that a "social services official may remove such [foster] child from such... family home and make such disposition of such child as is provided by law," State Def. Mem. at 13, the State defendant suggests that Ms. Balbuena waived her right to object to the removal of the children in her care when she signed a foster care contract. State Def. Mem. at 13.  This argument was squarely rejected by Rivera, which held that "there is no evidence in the record to even remotely suggest that Mrs. Rivera intentionally and intelligently waived her due process rights when she signed the foster care agreement . . . [a]ccordingly, we reject this waiver argument."  Rivera, 696 F.2d at 1026.  The argument is no more persuasive now, and it should be rejected here, as well.

**B.    The Independent Review Protocol Fails to Provide Plaintiff Children with Due Process of Law.**

After a liberty interest has been established, the question turns to what level of process is due.  Mathews v. Eldridge, 424 U.S. 319, 332-33 (1976); Goldberg v. Kelly, 397 U.S. 254, 262-63 (1970); Rivera v. Marcus, 696 F.2d at 1026-27.

Certain basic principles are beyond dispute.  "Due process fundamentally requires that the aggrieved party be provided with an opportunity to be heard " 'at a meaningful time and in a meaningful manner.' " Mathews v. Eldridge. 424 U.S. at 333 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)); Grannis v. Ordean, 234 U.S. 385, 394 (1914); Rivera v. Marcus, 696 F.2d

at 1026-27.  In Mathews v. Eldridge, the Supreme Court set forth its three-part test for the

"meaningfulness" of process.  The Court must look to:

> First, the private interest that will be affected by the official action;
> second, the risk of an erroneous deprivation of such interest through
> the procedures used, and the probable value, if any, of additional or
> substitute procedural safeguards; and finally, the Government's
> interest, including the function involved and the fiscal and
> administrative burdens that the additional or substitute procedural
> requirement would entail."

424 U.S. at 335.  Applying those factors here, it is clear that the Independent Review Process fails

to furnish the plaintiff children with any of the elements of due process of law before depriving

them of their liberty interest in their kinship foster family.

As discussed above, the "private interest" affected by the official state action in this case –

that of the plaintiff children in maintaining a family relationship with their aunt – is exceptionally

substantial.  As the Supreme Court noted in Moore v. City of East Cleveland, "the institution of

the family is deeply rooted in this Nation's history and tradition.  It is through the family that we

inculcate and pass down many of our most cherished values, moral and cultural."  Id. at 503-504.

The Second Circuit in Rivera v. Marcus noted that"[t]he private interest at stake" for kinship

foster parents "is substantial.  Mrs. Rivera and the Ross children seek protection from state action

which threatens the integrity and stability of their familial relationship.  This important interest

has consistently been recognized and afforded far-reaching due process protection."  696 F.2d at

1027.  See also Johnson v. City of New York, 2003 WL 1826122 at 7 ("[p]laintiffs have a

substantial private interest" in protecting their kinship foster family "from adverse state action.")

The "risk of erroneous deprivation" is also significant in the instant case.  In Duchesne v.

Sugarman, 566 F.2d. at 828 n26, the Second Circuit noted that "the 'fact specific' nature of the

determination of the fitness of a [caretaker] presents a grave risk of erroneous deprivation when the action of the state is not promptly reviewed." As the <u>Rivera</u> court noted, limited pre-termination procedures increase the risk of erroneous deprivation. <u>See</u>, <u>Rivera v. Marcus</u>, 696 F.2d at 1027. Here, ACS's Independent Review is the only available pre-removal remedy when children are removed on a non-emergency basis. When ACS determines a situation to be an emergency, there is no pre-removal review at all. ACS limits its Independent Review procedures in many of the same ways that the State of Connecticut did in <u>Rivera</u>: here, the foster parent alleges she was denied the right to "bring legal counsel to the removal hearing," the foster parent was not allowed to "confront or cross-examine adverse witnesses," and the hearing officer is a "Department employee[]." <u>See</u>, <u>Rivera</u>, 696 F.2d at 1027.

And while the procedures for the foster parent may be deficient, they are wholly missing as to the foster child. A foster child has *no* right to participate in a pre or post-removal hearing. The decision whether to permit the child to participate is left completely to the discretion of the hearing officer. Furthermore, the child has *no* right to receive notice of the hearing, timely or otherwise. If the child (or his or her law guardian) does happen to receive timely notice and is permitted to appear, the child has no right to present or cross-examine witnesses and no right to subpoena witnesses or documents. It is simply unfathomable that this process could pass consti-tutional muster as to the plaintiff foster children. The Independent Review Protocol, and the State regulation pursuant to which it was promulgated, simply do not extend any protections whatso-ever to the plaintiff children.

Finally, there is almost no "state burden" in providing constitutionally adequate process to the plaintiff children or their foster parent. Indeed, the State defendant does not even argue that

24

providing increased due process would negatively impact the public fisc.  See Goldberg v. Kelly, 397 U.S. at 265.  In the case of non-emergency removals, the State need only require the City defendant to refrain from removing a foster child from her kinship foster home until her administrative remedies are exhausted, including participation in a State Fair Hearing, when a foster child (or parent) requests one.  No additional expense would be incurred in delaying the removal from a kinship foster parent until after she has already completed her appeal process.  In the case of emergency removals, the State need only provide the same post-deprivation fair hearings it already provides to kinship foster parents to kinship foster *children*, but within an expedited time frame, in order to comply with the requirement that an opportunity to be heard be held at a "meaningful time."

Alternatively, ACS could amend its hearing procedures to provide constitutionally adequate protections for children, including the right to receive notice of the hearing, to appear, to present witnesses and evidence, to cross-examine adverse witnesses, and to compel the production of witnesses and documents.  These same procedures are required by the Constitution in the context of welfare "fair hearings."  Goldberg v. Kelly, 397 U.S. 254 (1970).  No less should be required here.

**C.     Plaintiff Children were "Seized" Under the Fourth Amendment**

The Fourth Amendment applies to removals of children in "civil child-abuse or maltreatment" investigations.  Kia P. v. McIntyre, 235 F.3d 749, 762 (2d Cir.2000) (citing Tenenbaum v. Williams, 193 F.3d 581 (2d Cir. 1999)).  The State cites no law in support of its conclusory statement that the Fourth Amendment should not apply to child abuse or maltreatment investigations when the subject of the investigation is the child's kinship foster parent.  From the

perspective of the child, the circumstances of a removal from a kinship foster home are more akin than not to a removal from a custodial parent. While the State may view the child as being in the custody of ACS or the authorized agency from the time the child enters foster care, the child sees him or herself as residing with family, deepening attachments to the kinship foster parents.

The State defendant argues that a child is not "seized" in a Constitutional sense when he or she is removed from one foster home and replaced into another foster home, because a child is seized only once per case: when she is removed from her parent during the initial phase of a child abuse investigation. Any subsequent change of foster home, the State defendant argues, is merely the agency's exercise of discretion granted to it under Social Services Law § 400. The State defendant's "one seizure per foster care case" argument has already been considered and flatly rejected by the Second Circuit in Kia P. There, after being removed from her parent at the hospital (the first seizure), a child was "seized anew" even though she continuously remained at the same hospital, when a change in circumstances rendered private hospital a "state actor." Id. at 762.

"A 'seizure' occurs where, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" Kia P. v. McIntyre, 235 F.3d at 762 (quoting United States v. Mendenhall, 446 U.S. 544 (1980) (plurality opinion of Stewart, J.)). The definition of "seizure" contains an undeniably subjective aspect. Given this definition, the fact that a seizure can occur when there is no change in physical location or custody, as in Kia P., renders even stronger the conclusion that a change in physical custody away from a kinship foster home would also constitute a seizure.

Despite the fact that the State assumes legal custody of a child residing in kinship foster

26

care, the child's blood relationship with her foster parent leaves intact an expectation that the state will not interfere with that relationship except in a manner consistent with the Fourth Amendment and the child's privacy interests. Certainly if the child were in the relative's custody under a custody order, that privacy interest would exist.  The child's expectation of privacy does not diminish merely because the child arrived in her relative's home after State intervention in the parent-child relationship.

The critical inquiry is whether a particular seizure is unreasonable, and therefore unconstitutional.  The Second Circuit has declined to endorse specific method of determining whether the seizure of a child during a child abuse or maltreatment investigation is reasonable.  In deciding both Tenenbaum and Kia P., the court deemed it unnecessary to address "[w]hether such a seizure requires probable cause, or whether it is subject to a 'less stringent reasonableness requirement' due to the 'special needs' of child protection agencies, or whether a seizure must be justified by 'exigent circumstances.'" Kia P., 235 F.3d at 762 (citing Tenenbaum, 193 F.3d at 603-05).  See also People United for Children, Inc. v. City of New York, 108 F. Supp. 2d 275, 300 (S.D.N.Y. 2000) (exception to the warrant requirement permits the seizure of a child without a warrant or consent where officials "have reason to believe that life or limb is in immediate jeopardy"(citations omitted);  Tenenbaum v., Williams, 862 F. Supp. 962, 974 n. 6 (E.D.N.Y. 1997) (citing van Emrik v. Chemung County Department of Social Services, 911 F.2d 863, 867 (2d Cir. 1990)) (Fourth Amendment concerns implicated because no "probable cause " for an arrest and no risk that child's condition would change during time required to obtain a court order); Doe v. Connecticut Department of Children and Youth Services, 712 F. Supp. 277, 284 (D. Conn. 1989) ("The emergency removal of John Doe required 'probable cause' to believe that

he was in immediate physical danger from his surroundings and that removal was necessary to insure his safety."), affirmed 911 F.2d 868 (2d Cir. 1990).

Regardless which test is applied, however, the effectuation of an emergency removal of a kinship foster child from his or her home in the absence of a true emergency can never be considered reasonable. The State defendant violates the Fourth and Fourteenth Amendments in condoning the City defendant's practices.

## POINT II

### THE PLAINTIFF CHILDREN HAVE STANDING TO BRING THIS ACTION.

The minor children unquestionably have standing to commence this action. The children, having been removed by government officials  from the home of loving family members and transferred to the care of strangers, suffered an "injury in fact" for purposes of Article III.

The Supreme Court has defined an injury-in-fact as "an invasion of a legally protected interest [that] is (a) concrete and particularized, ... and (b) actual and imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Because the children's legally protected interest in maintaining a family relationship with their kinship foster parents was invaded when caseworkers summarily removed them from Ms. Balbuena's care, they have suffered an injury-in-fact.

Discussing Article III's injury-in-fact requirement, this Court has previously noted that sudden, involuntary separation from a child's caretaker is "a significant source of stress and emotional trauma, especially for young children." Nicholson v. Scoppetta, 344 F.3d 154, 174 (2d Cir. 2003). The Second Circuit went on to observe that removing children following family

28

trauma (in the <u>Nicholson</u> case, this trauma was domestic violence) "may actually intensify the trauma of the violence by removing the child's best coping mechanism, the parent, and encouraging feelings of self-blame." <u>Id</u>; <u>see also</u> <u>Kia P. V.McIntyre</u>, 235 F.3d 749 (2d Cir. 2000) ("children have a ... constitutionally protected liberty interest in 'not being dislocated rom the emotional attachments that derive from the intimacy of daily [family] association,'" *citing*, <u>Duchesne v. Sugarman,</u> 566 F.2d at 825, *quoting* <u>OFFER</u>, 431 U.S. at 844). In any event, the State does not even dispute that A.C. and H.C. suffered an "injury in fact."

The State appears to argue that only the foster parent of the minor children may file a complaint to redress that injury. Aside from the contradiction inherent in the State's opposing positions – it argues that the children may be represented by separate counsel because of a possible conflict of interest, but that counsel may not act on their behalf – the State defendant's tortured argument mocks at once the children's right to counsel, their lawyers' ethical canons, their Next Friend's fiduciary obligations, and the so-Ordered substitution of counsel stipulation, *signed by the State defendant*, dated April 7, 2005.

First, the State defendant simply ignores Fed. R. Civ. P. 17(c), which provides that:

> Whenever an infant or incompetent person has a representative, such as a general guardian, committee, conservator, or other like fiduciary, the representative may sue or defend on behalf of the infant or incompetent person. An infant or incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem.

[Emphasis added.] The words "may sue by" do not limit infant plaintiffs to responding to the Complaints of others, as defendant would have this Court find, but encompass filing complaints and bringing lawsuits on their own behalf, as the plain meaning of the words indicate. Since

A.C. and H.C. have sued by their Next Friend Barbara Weiner, they have the right to file their own Complaint. See also, Ad Hoc Committee of Concerned Teachers v. Greenburgh #11 Union Free School District, 873 F.2d 25 (2d Cir. 1989) (Next Friend had standing to bring suit to enforce students' constitutional rights to racially balanced educational setting).

As for the State defendant's announcement that "it is dubious" whenever the representative of a foster child "appears to align the infant's interest . . . against the agencies responsible for care of the foster child," Def. Memo at 9, as the Second Circuit noted in Greenburg #11, supra, "it is unrealistic to expect that New York City's Human Resources Administration would express any great enthusiasm for suing the District." The same holds true here, since it is unrealistic to assume that the agencies responsible for care of the plaintiff children would have sued either the City which subcontracts their services, or the State defendant, to enforce their constitutional rights. In any event, that those agencies did not seek to enforce the children's rights speaks for itself.

The State defendant also ignores the multitude of ethical canons and disciplinary rules which not only permit but require the zealous and independent representation of clients, without regard to their status as minors. See, e.g., New York State Bar Association's Lawyer's Code of Professional Responsibility, DR 7-101 (Representing a Client Zealously), DR 5-105 (Conflict of Interest; Simultaneous Representation), and DR 5-107 (Avoiding Influence by Others than the Client). Failure to file a Complaint would certainly not be countenanced by the New York State Lawyer's Code, but to do so solely because a guardian whose interests may diverge from the children's interests has already filed a Complaint, is unimaginable. The State defendant also misconstrues the meaning of quoted Footnote 44 from Smith v.

30

OFFER, on which it relies heavily, purportedly for the proposition that adults in this case, i.e.,

the foster parents, already "represent the best interests of the children." See, Def. Mem. In

Support of Mot. To Dismiss, at 8-9; Smith v. OFFER, 431 U.S. 816 (1977). First, unlike this

case, OFFER did not concern the rights of kinship foster parents at all. It has no bearing on this

action. Second, this case is not about "the best interests of the children," which are to be decided

in Family Court, not Federal Court. This case is about the constitutional right of minor children

to maintain close family relationships with their relatives.

Next, although the OFFER Court did note, in dicta, that "it would be most imprudent to

leave entirely to court-appointed counsel the choices that neither the named foster children nor

the class they represent are capable of making for themselves" Id. at 841(emphasis added), it did

not hold, as defendant invites this Court to do, that the children may not file a separate Complaint

or prosecute the action separately. In OFFER, the question was whether the foster parents could

assert the rights of the foster children in *addition* to the children's assertion of their own rights,

not *instead* of the children's assertion of their own rights. Seeking specifically to "forestall any

possibility of conflict between [foster children's] interests and the interests asserted by foster

parents," the District Court in OFFER had appointed separate counsel for the foster children.

Id. at 821. It did not preclude the foster children from bringing their own Complaint or from

prosecuting the action independently (nor could it have). The Court should reject the State

defendant's invitation to do so now.

31

**POINT III**

**PLAINTIFF CHILDREN DO NOT SEEK DAMAGES
AGAINST THE STATE DEFENDANT**

As set forth earlier in their  Reply Memorandum in Further Support of the Plaintiff

Children's Motion for Leave to File a Second Amended Complaint (Document # 45), to the extent

the drafting of the Fourth Request for Relief of the First Amended Complaint failed explicitly to

exclude defendant Johnson from plaintiffs' damages claim, plaintiffs herein affirmatively state

that they are not seeking damages against the State defendant.  Plaintiffs seek only injunctive

relief against the State defendant.

## CONCLUSION

For all of the forgoing reasons, plaintiffs request that this Court deny the State defendant's Motion to Dismiss the First Amended Complaint.

Dated:  New York, New York
             August 19, 2005


                              Respectfully submitted,


                              THE LEGAL AID SOCIETY
                              STEVEN BANKS, Esq., Attorney-in-Chief
                              TAMARA STECKLER, Esq., Attorney-in-Charge, Juvenile
                                    Rights Division
                              NANCY ROSENBLOOM, Esq., (NR1275), Interim Director,
                                    Special Litigation and Law Reform Unit
                              THERESA MOSER, Esq., of Counsel
                              LOUIS SARTORI, Esq. (LSS0011), of Counsel

                              ADRIENE HOLDER, Esq., Attorney in Charge, Civil Division
                              SCOTT ROSENBERG, Esq., (SAR5579), Director of Litigation,
                                    Civil Division
                              JENNIFER BAUM, Esq. (JB4030), of Counsel
                              199 Water Street, 3d Floor
                              New York, New York 10038
                              212-577-3300