# EXHIBIT 1

he Family Court of the State

of New York, County of _New York_

at _60 Lafayette St._

on _February 8, 2005_

**PRESENT:**

HON. _Jody Adams_
        **JUDGE**        AC & HC

~~IN THE MATTER OF~~

_Administration for Children's Svcs_
                **Petitioner**

Docket No. _N - 13199/04_

ACS# 5330702

**ALL PURPOSE SHORT ORDER**

**vs.**

Miosohs Castillo

Rolando Balbuena
        **Respondent**

ORDERED:

All Visitation between Norma Balbuena and
the Subject Children ▓▓▓ and ▓▓▓ and
▓▓▓ is to be Suspended immediately.

**ENTER:**

_Jody Adams_

**JUDGE OF THE FAMILY COURT**

JODY ADAMS
J.F.C.

# EXHIBIT 2

53IJBAL1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    NORMA BALBUENA, individually, et al.,

4                 Plaintiffs,

5           v.                          05 Civ. 2986 TPG

6    JOHN MATTINGLY, individually, et al.,

7                 Defendants.

8    ------------------------------x

9

10

11

12                                      March 18, 2005
                                        4:55 p.m.
13

14

15

16

17   Before:

18                   HON. THOMAS P. GRIESA,

19                                      District Judge

20

21

22

23

24

25

53IJBAL1

1

2

3                                    APPEARANCES

4

5    LANSNER & KUBITSCHEK,
          Attorneys for plaintiffs
6    BY:   CAROLYN A. KUBITSCHEK, Esq.
          DAVID J. LANSNER, Esq.
          ALLEGRA A. CHAPMAN, Esq.
7                          Of counsel

8

9    FREDERICK J. MAGOVERN,
          Attorney for defendants
10

11

12
     MICHAEL A. CARDOZO,
13   Corporation Counsel for the
     City of New York
14        100 Church Street
          New York, New York  10007
15   EAMOUN F. FOLEY,
          Assistant Corporation Counsel
16

17

18   THE LEGAL AID SOCIETY
     BY:   LOUIS S. SARTORI,
19        Attorney-in-Charge
          JUVENILE RIGHTS DIVISION
20

21

22

23

24

25

53IJBAL1

1   what I see as a conflict that plaintiff's counsel has in this

2   matter.  They purport to represent both the adult plaintiff and

3   the two children here.  There has been a determination to

4   remove these children that was concurred in by the children's

5   law guardian.

6          In addition, the law guardian moved in the Family

7   Court in February of this year to suspend visitation by the

8   plaintiff here for these two children, which was granted by the

9   Family Court.  I think in those circumstances, there is a very

10  real conflict between the interests of the children here and

11  the adult plaintiff.

12          MR. LANSNER:  May I respond.

13          MR. SARTORI:  Louis Sartori, from the Legal Aid

14  Society Human Rights Division.

15          We have been assigned legal guardinas for these

16  children in state court.  It is true, as Mr. Foley says, we do

17  support at this time the removal of those children and we did

18  make an application to have visits suspended between plaintiff

19  and our clients based on the information that was reported to

20  us.

21          THE COURT:  Why couldn't the aunt at least visit?

22          MR. SARTORI:  The concern that was raised at the time,

23  your Honor, was that during two supervised visits, there were

24  two incidents that caused us a great deal of concern.  During

25  one, during the change of the child's diaper, one of the

53IJBAL1

1  plaintiff's daughters used a clean dress from inside the

2  child's diaper bag the current foster mother had placed there,

3  wiped the child, and returned that dress to the diaper bag with

4  the feces on it.

5          On a second visit, I believe one week or two weeks

6  later, after being told by the caseworker that the child had

7  just eaten and not to give the child food, the child was given

8  chicken, french fries and soda, and that child subsequently did

9  throw up.  We were concerned because of those issues, this

10  child at the time was 15 months.  The other child is, as you

11  heard, is very young in years and so that was our concern.

12          THE COURT:  The other child is younger than 15?

13          MR. SARTORI:  Yes.

14          THE COURT:  The 15-month child's name?  The name is?

15          MR. SARTORI:  Is ▓▓▓  *HC*

16          THE COURT:  ▓▓▓  *HC*

17          MR. SARTORI:  Correct.

18          THE COURT:  And the younger one is ▓▓▓  *HC*

19          MR. SARTORI:  ▓▓▓  *HC*

20          THE COURT:  Both girls?

21          MR. SARTORI:  That's correct.

22          THE COURT:  The younger one is how many months?

23          MR. SARTORI:  Born on ▓▓▓▓▓▓ so I believe she

24  is four months at this point.

25          THE COURT:  What is the situation of the new home?

# EXHIBIT 3



**ADMINISTRATION FOR CHILDREN'S SERVICES**
OFFICE OF ADVOCACY/DIVISION OF COMMUNITY AFFAIRS
150 WILLIAMS ST. – 1st FLOOR
NEW YORK, N.Y. 10038

John B. Mattingly
*Commissioner*

Anne Williams-Isom
*Special Counsel/*
*Associate Commissioner*

Viviane DeMilly
*Director, Office of Advocacy*

|  |  |
|---|---|
| In the matter of the Independent Review of | **DECISION** |
|  | **AFTER** |
| **NORMA BALBUENA** | **INDEPENDENT** |
|  | **REVIEW** |

**EPISCOPAL SOCIAL SERVICES**

Hereinafter called  " The Agency"

An Independent Review was held at <u>150 William Street, New York City</u> on December 13, 2004

before H. Aurelia Jemmott, Independent Review Officer, at which the Foster Parent and

representatives of the agency appeared. The appeal is from a determination by the Agency

relating to children in Foster Care Placement in this home, in that the agency did issue a

Notice of Removal and removed ▓▓▓▓ and ▓▓▓▓▓▓▓ from this home.

An opportunity to be heard having been accorded all interested parties and the evidence

having been taken and due deliberation having been had, it is hereby found:

**001**

December 29, 2004

## ATTENDEES

Norma Balbuena          Foster Mother
Nicaury Balbuena        Cousin
Lourdes Falcon          Episcopal Social Services/Caseworker
Carmen Santana          Episcopal Social Services/Supervisor

## REASON FOR THE INDEPENDENT REVIEW

This appeal is from a determination made by Episcopal Social Services relating to ███████
█████ DOB ███████2003, and ██████████████ DOB ███████████2004.  The
children were removed by the agency due to living conditions within the foster home. The
foster parent opposes the removal of the children and requested this Independent Review.

## PLACEMENT HISTORY

The agency reported that the children resided in the kinship foster home of their paternal aunt
Ms. Norma Balbuena. ███████ has resided with Ms. Balbuena since birth. █████████ resided in
the home for approximately one week after her birth. The children's goal is return to parent.

## ACCOUNT OF AGENCY

The agency reported that the Occupational Therapist made seven visits to the home and
reported that the home was unkempt. It was reported that there were cigars on the floor, dirty
laundry all over the apartment, candles were burning and there was no food in the home.
███████ was not appropriately dressed or ready for therapy. The agency reported that ████y is
a special needs child that suffers from Respiratory Distress Disorder due to premature birth,
she is underweight, her muscles are weak and she is developmentally delayed. The agency
reported that ████████ began receiving therapy services in November of 2004. She receives
Occupational Therapy twice a week, Speech Therapy once a week and Physical Therapy
once a week.

The agency stated that there are people staying in the home that are unknown to the agency
and are not cleared by the State Central Registry (SCR). Ms. Santana, the agency supervisor,
stated that the therapist reported to the agency worker that there are many people staying in
the home and they interfere with ███████ therapy.  The therapist also reported to the agency
that upon arrival ███████ is sometimes left in the care of teenagers and the foster mother was
not available. ████ has been left primarily in the care of Nicaury, Ms. Balbuena's eighteen-
year-old daughter. The agency stated that Nicaury, the foster mother's eighteen-year-old is her
back up. The agency is not satisfied with this because of Nicaury's age and ███████ special

• Page 2

needs. The therapist reported to the agency that at one session the foster mother's thirteen-year-old daughter, L▉ M▉ signed the session form. Ms. Falcon, the agency worker, reported that the due to furniture congestion in the home there is inadequate space for therapy sessions. She stated that ▉does not have educational toys to stimulate her and at times lie in the crib all day. The agency stated that the therapist has addressed these issues with the family and the condition remains the same.

The agency reported that visits to the home were made once a month and they were always announced. The home was observed to be clean and organized. Ms. Falcon stated that the foster mother always had candles on top of the table but she stated that they were only lit when the family went to sleep and in the morning she would blow them out. The agency stated that they addressed this safety issue with the foster mother.

The agency reported that Ms. Balbuena resides in a four-bedroom apartment with her three children. N▉ age eighteen, L▉ M▉ age thirteen and J▉ G▉ age fifteen. ▉ shares the room with Nicaudy and Lisa Maria. ▉sleeps in a crib in Ms. Balbuena's bedroom. J▉ has his own room. The agency reported that the fourth bedroom is supposed to be empty but at the last visit a man was staying there. At the last agency visit a couple was observed to be sleeping in the home. The couple is unknown to the agency and not cleared by the State Central Registry. The agency stated that their homefinding department has informed the foster mother that all persons residing the household must be known to the agency and cleared by the SCR. The agency stated that the foster mother had a sister living there who refused to be cleared and moved out of the home. The agency reported that it has been one year since ▉was placed in the home and the homestudy is not complete because the foster mother has failed to submit all the necessary documentation. The agency submitted copies of letters that were sent to the foster parent requesting the needed information.

The children are presently placed together in a non-kinship foster home and have adjusted well.

## ACCOUNT OF THE FOSTER MOTHER

Ms. Balbuena, who is Spanish speaking stated that she has cared for ▉ since birth and has treated her like a daughter. The foster mother stated that if the agency had advised her of their concerns she would have corrected the situation. The foster mother stated that there is food in her home and she cooks for the child. She stated that the child has toys.

The foster mother stated that she has a lot of friends, and they are considered family. She stated that her husband's niece was staying in the home for a few days. The foster parent stated that her apartment is very large. She stated that if she had known about the SCR clearance she would not have allowed her to stay in the home. The foster mother denies that other adults reside in her apartment. Ms. Balbuena stated that the agency spoke to her about the candles and she corrected the situation. She stated that if the therapist had spoken to her

● Page 3

**003**

about not having sufficient space, she would have corrected it. The foster mother stated that she was not aware that the thirteen-year-old had signed the papers and the therapist should not have accepted the signature. The foster mother states that she goes back to bed after sending the children off to school. She does not work and is at home most of the time unless she has an errand and will leave the child home. Nicaury is at home and does not attend school.

The foster mother stated that her sister Yveliz Balbuena lives in the neighborhood and that she is willing to submit an SCR clearance for the purpose of being considered as a "back-up" person for Ms. Balbuena.

The foster mother stated that she could not submit the medical for her thirteen-year-old daughter because she had her period and could not be examined.

Ms. Balbuena stated that her husband's niece moved out because she obtained her own apartment and not because she didn't want to be cleared.

## ACCOUNT OF THE OFFICE OF CONFIDENTIAL INVESTIGATION /OCI

Subsequent to the Review the Review Officer spoke to the OCI supervisor Mr. Ernesto Silva, Jr. who stated that the case was called in by the agency on December 1, 2004 the same date the children were removed. The case is presently under investigation by OCI and a determination is pending.

## CONCLUSION

The Review Officer fully understands the concerns of the agency regarding the care and the safety of the children in the foster home. The conditions of the foster home as reported by the agency and the therapist are also a concern for the Review Officer. ░░░░ 's in need of physical and occupational therapy. The therapist who provides these services found it difficult to provide these services because of the condition of the home. All children, especially those with special needs, need and have a right to live in a safe, clean and orderly environment.

The Review Officer is also concerned about the reports of people in the home that are unknown to the agency and have not been cleared by them. This is a potentially dangerous situation for the children that could possibly cause them serious harm.

by all accounts, suffers from significant developmental delays. She is in need of and deserves adult supervision. The report that the foster mother's thirteen-year-old daughter signed the therapist report is troubling. It is also troubling that Ms. Balbuena left the children in the care of teenagers while ░░░ received therapy. It is important for the adults in a child's life to be involved with and knowledgeable about the services that their child is receiving.

● Page 4

004

December 29, 2004

The Review Officer understands and can fully appreciate that children placed with family members can be difficult. It is understandable that kinship foster parents often feel that a City agency is interfering with their family. However, kinship foster parents must abide by the same rules and regulations as non-kinship foster parents.

The agency had concerns about the missing medicals and documents to complete the homestudy. The Review Officer understands that the agency has made several attempts to complete the homestudy by sending letters requesting the missing documentation and requesting the documentation from the foster mother. The agency requested the documentation on several occasions and the foster mother failed to regard the importance of these documents in order to complete her homestudy. The foster mother was given the opportunity to address some of the concerns at the Review and she was unclear or evasive in her responses. The foster mother stated that if some of these concerns were brought to her attention by the therapist they would have been corrected. This case is under investigation by OCI and a determination is still pending.

The Review Officer must consider what it is in the best interest of the children. For the above reasons, this Review Officer has decided that ▮▮▮▮ and ▮▮▮▮▮ should not be returned to home of Ms. Norma Balbuena. The foster parent has the right to appeal this decision under Section 400 of the New York State Social Service Law. This appeal must be made within sixty (60) days of the Independent Review Decision. This appeal must be made in writing to:

**Bureau of Special Hearings**
**P.O. Box 1930**
**Albany, New York 12201**

Respectfully Submitted,

H. Aurelia Jemmott, MSW
Independent Review Officer
December 29, 2004

CC:

Lourdes Falcon
Carmen Santana
Stephanie Davis, Esq.

● Page 5

005

# EXHIBIT 4

**STATE OF NEW YORK**
**OFFICE OF CHILDREN AND FAMILY SERVICES**

In the Matter of the Appeal of

     **NORMA BALBUENA**

**DECISION**

**FH #** ▆▆▆▆▆

from a determination by Episcopal Social Services
to remove foster children from her home

| | |
|---|---|
| Before: | Sallie A. Farrow<br>Administrative Law Judge |
| Held At: | New York State Office of<br>Children and Family Services<br>163 West 125ᵗʰ Street<br>New York, New York 10027<br>March 29, 2005, May 16, 2005,<br>May 20, 2005 and May 31, 2005 |
| Parties: | New York City Administration for<br>Children's Services<br>220 Church Street<br>New York, New York 10013<br>No Appearance |

Episcopal Social Services
305 Seventh Avenue
New York, New York 10001
By: Frederick J. Magovern, Esq.
    111 John Street, Suite 1509
    New York, New York10038

Norma Balbuena
▆▆▆▆▆▆▆▆
New York, New York ▆▆▆
By: David J. Lansner, Esq. and
    Allegra A. Chapman, Esq.
    Lansner & Kubitschek
    325 Broadway – Suite 201
    New York, New York 10007

NORMA BALBUENA                         2

## JURISDICTION

Episcopal Social Services (Agency), an authorized child care agency, removed [redacted] A.C.

and [redacted] H.C. from the foster care home of Norma Balbuena (the Appellant).

Pursuant to § 400 of the Social Services Law (SSL), any person who is aggrieved by a

Social Services official's determination to remove a child from a foster care placement in a

family home may appeal that determination to the New York State Office of Children and

Family Services (Office). The Appellant requested this hearing to contest the removal of [redacted] A.C.

[redacted] and [redacted] (the Children) from her foster home. H.C.

## FINDINGS OF FACT

An opportunity to be heard having been afforded the parties and evidence having been

considered, it is hereby found:

1.     [redacted] A.C., (born [redacted] 2003 – three months premature with a positive

toxicology for drug) was placed in the Appellant's kinship foster home at birth and [redacted] H.C.

(born [redacted] 2004) was placed in the Appellant's home one week after birth.  The

Appellant is the paternal aunt of the children.

2.     Due to premature birth, [redacted] A.C.'s lungs were underdeveloped.  The Agency

employed a health professional who made daily visits to the Appellants home to administer

injections and to monitor the baby's development.  After a while, the visits were reduced to three

times a week.

3.     The Agency closely monitored [redacted] A.C. and determined that she was severely

developmentally delayed, had problems gaining weight, and suffers from bronchial pulmonary

dysphasia.

NORMA BALBUENA                        3

4.    During June of 2004, at eight months old, the Agency's Early Intervention Program evaluated **[A.C.]** in the presence of the Appellant, to assess her levels of functioning and adaptive skills. It was determined that **[A.C.]** has severe overall developmental delays and that she requires physical, occupational, and speech therapies (the Therapies).

5.    The Agency, including its Early Intervention Program staff and physician (Dr. Rodriguez) worked together with the Appellant to evaluate **[A.C.]** and to put in place necessary Therapies. During the evaluation phase the Appellant participated in and appeared to understand the importance of the Therapies and that she was a necessary party.

6.    The Appellant was given the option of in-home therapy sessions or of taking **[A.C.]** to a facility for therapy. The Appellant chose in-home therapy sessions.

7.    Ms. Robertson, an occupational therapist specializing in pediatrics, has been practicing occupational therapy for 18 years. She was hired by the Agency to provide **[A.C.]**'s occupational therapy (OT). Beginning in November 2004, Ms. Robertson provided half hour therapy sessions for **[A.C.]** twice a week – on Tuesdays at 11:00 am and on Thursdays at 3:00 pm. At the initial consultation, she met with the Appellant to establish a schedule and marked the dates of her sessions with **[A.C.]** on the calendar hanging on the Appellant's wall.

8.    After completing seven sessions, Ms. Robertson reported to the Agency that she has grave concerns about **[A.C.]** and her home environment. She explained that **[A.C.]** has muscle weakness and does not use the left side of her body. From her observations, it appears that **[A.C.]** spends most of the day in bed. Therapy sessions are scheduled for late morning and at three in the afternoon, however, whenever she arrives everyone in the home is sleeping and she spends ten minutes of the therapy session "getting into the home, waking up people and waiting for various family members "to figure out which bed **[A.C.]** is in." (Agency Exhibit

08/08/2005 11:02 FAX

**NORMA BALBUENA**                                    6

removal determination.

19.    On December 13, 2004 the New York City Administration for Children's Services conducted an Independent Review and in its Decision After Independent Review dated December 29, 2004, affirmed the Agency's removal determination. The Appellant requested this hearing to contest that removal determination.

20.    The New York City Administration for Children's Services (ACS), Child Protective Services (CPS) – Office of Confidential Investigations (OCI), also investigated the report. (Agency Exhibits # 3 and 4). As a result, OCI made a determination to "indicated" the maltreatment report against the Appellant for "inadequate guardianship" of [redacted] A.C. OCI also recommended that the Agency close the Appellant's home on an involuntary basis and that the Agency refrain from further placement of children in the Appellant's home. (Agency Exhibits # 3 and 4).

## ISSUE

Was the determination to remove [redacted] A.C. and [redacted] H.C. (the Children) from the Appellant's foster care home a proper exercise of discretion?

## DISCUSSION

The removal of the Children from the Appellant's foster home was not arbitrary or capricious and was a proper exercise of discretion.

The New York City Administration for Children's Services and other authorized agencies have the legal responsibility for the well being of foster children in their custody and may make appropriate placements in order to discharge this responsibility.   SSL §400 provides:

1.    When any child shall have been placed in an institution or in a family home by a social services official, the social services official may remove such child from such institution or family home and make such disposition of such child as is provided by law. . .

NORMA BALBUENA                    7

2.   Any person aggrieved by such decision of a social services official may appeal to the department pursuant to the provisions of section twenty-two of this chapter.

SSL §383(2) provides:

2.   The custody of a child placed out or boarded out and not legally adopted or for whom legal guardianship has not been granted shall be vested during his minority, or until discharged by such authorized Agency from its care and supervision, in the authorized agency placing out or boarding out such child and any such authorized agency may in its discretion remove such child from the home where placed or boarded.

Since removal of foster children is within the discretion of ACS and other authorized child care agencies, only if a removal is found to be an abuse of that discretion will the removal be reversed by an administrative hearing decision.

A.C. ████ was born three months premature on ████ 2004 and about five days later she was discharged from the hospital into her paternal aunt, the Appellant's, care. At the time, the Appellant, a stay-at-home mom, had three minor children, N████ J. ████ and L. ████ who were 17, 14, and 12 years old, respectively.

A.C The Agency hired a health professional to monitor ████ s development and to administer injections for her underdeveloped lungs. In the beginning, the health professional visited the Appellant's home daily. After a period of time, the number of scheduled visits decreased to three days per week.

A.C At approximately two months old, ████ was hospitalized for 25 days due to a viral infection. Shortly after she was released, tubes were placed in her ears on an outpatient basis.

A.C At eight months old, the Agency case worker referred ████ to its Early Intervention A.C Program due to concerns regarding her overall development and it was determined that ████ was globally delayed. At eight ½ months her test results showed her development to be between

NORMA BALBUENA                                    8

3-5 months, except for communication (between 6-7 months). Her lowest scores were for motor skills which were at 3 months. According to the report she has low muscle tone causing her movements to be disorganized and awkward – she cannot reach for items and find her mouth without assistance. The Agency recommended, physical, occupational and speech therapies for the child.

The Agency reviewed the evaluations with the Appellant (Appellant Exhibits A-F), and hired the necessary therapists for the ████ A.C . Scheduled visits for occupational therapy began in early November 2004. Lauren Robertson a pediatric specialist, who has been practicing occupational therapy for 18 years, was employed to provide the occupational therapy. At the initial appointment, the Appellant whose primarily language is Spanish and Ms. Robertson whose primary language is English, with the aid of 18 year old N████[2] who is bilingual, set a schedule for half hour session, two times each week, on Tuesdays at 11:00 am and on Thursdays at 3:00 pm. Before hiring Ms. Robertson, the Agency attempted to locate a Spanish speaking OT for ████ A.C. however none were available. (Transcript pp. 117-18)

On November 30, 2005, after her seventh visit, Ms. Robertson contacted the Agency to express some "grave concerns" she had regarding ████ A.C. and her living environment. The child is severely developmentally delayed. Ms Robertson had been providing her OT therapy for four weeks, however, when she arrived the Appellant and child were never ready to start the therapy session. Each time about ten minutes or ⅓ of the scheduled therapy session had to be used to get into the home, wake up people, and to wait for family members "to figure out what bed ████ A.C. is in." The complaint also alleged that ████ A.C. and family members were still in bed even

---

[2] At the time 18 year old N████ lived with the Appellant. She was not working or attending school. She was still living in the home at the time of the removal, but at the time of this hearing, N████ had moved into a homeless shelter.

NORMA BALBUENA                               9

though they had notice of the 11:00 am and 3:00 pm therapy schedule. She alleged that "literally

every time" be it 11:00 am or 3:00 pm "everyone in the household is sleeping and ████ is also

sleeping." Based on her observations, she determined that ████ spent the major portion of her

day in bed. This would not be beneficial with respect to the child overcoming her muscle

weakness. Ms. Robertson, also a pediatric feeding specialist expressed concern because the

family did not feed one year old ████ any solid food – not even cheerios. The complaint also

alleged that although the apartment was large "there is no floor space. Every room is crammed

with beds." The Appellant did not clear space for ████'s therapy. She also alleged that the

home "is infested with roaches, very dark, and filthy." In addition, Ms. Robertson reported

"there are different people taking care of ████ every time she goes, and most of them appear to

be young teens. Each time she visits the home she sees different people and she does not know

how many people actually live there." (Agency Exhibit # 1).

On the next day, December 1, 2005, in response to the complaint, two Agency case

workers, Lourdes Falcon, the Appellant's case worker and Zoraida Negron, an Agency home

finding case worker, visited the Appellant/████'s home to look into the allegations made by

the therapist.

At the hearing, Ms. Falcon testified that the Appellant lives in the Apartment with her

three teenage children, Nicaury, age 18, ████ 15 and ████, age 13. (for family Composition

see also Appellant Exhibit B). The December 1, 2005 visit was her first unannounced home

visit. She visited the home monthly, however all such visits were scheduled in advance. Ms.

Falcon would call ahead to make sure the family would be home and that "it was okay for the

foster mother to receive me." (Transcript p31 line10).

When Ms. Falcon, who speaks Spanish, arrived for the unannounced visit, her experience

08/08/2005 11:03 FAX                    OCFS SPECIAL HEARINGS                            @011

**NORMA BALBUENA**                              10

was substantially similar to that reported by the therapist, Ms. Robertson. A woman named

"Lucy" who is unknown to the Agency answered the door. Lucy introduced herself as "a friend

of the family" who was "staying over for a few days." Ms. Falcon had to wait at the door for the

Appellant. Then 18 year old N███████came to the door and the case workers again informed that

they needed to talk to the Appellant and to check the home. Next, after a wait, the Appellant

came to the door wearing a "nightgown". She began to cry when the caseworkers explained that

they needed to check the entire home -- room by room -- and to make an assessment as a follow

up regarding allegations and a complaint received by the Agency from the therapist.

 Ms. Falcon further testified that they began the assessment by viewing the Appellant's

room, it was small and furniture filled the room. A TV was on, the bed was unmade and there

was very little room to move about. Also, H.C. ████████ was asleep in a crib in the room. Next they

observed N███████ bedroom which was much larger. The TV was on, the bed was unmade and

a tall red candle was burning on top of the TV. Next, they observed J. ████'s room. The

Appellant indicated that she had been lying down with A.C. ████ in the room when the case

workers arrived. The bed was unmade and the room was very dark. Then the case workers

observed the living room which was crowded with furniture. There was a playpen with a lot of

clothes inside and on top of a table two tall candles were burning. They observed in the kitchen

another lit candle and a cigar. The case workers asked to view the fourth bedroom -- the

Appellant was reluctant to open the door. When she did, the case workers observed a sleeping

man who introduced himself as Gabriel Gonzalez. Mr. Gonzalez told the case workers that he is

not related to the Appellant, he is a friend. (Transcript p. 53 lines 9-10). Next, the case workers

checked the home for food and there was none. The Appellant opened her refrigerator, freezer

and the cabinets and nothing was there. "There was no meat at all. She didn't have no milk,

NORMA BALBUENA                       11

there was no eggs, there was no bread. In the cabinets she didn't have anything. Physically the

only thing that I saw was rice, that it was placed in a container that is used for cat litter."

(Transcript P. 54 lines 3-10)

Ms. Falcon testified that she had previous discussions with the Appellant about keeping

lit candles in the apartment. She informed the Appellant that it was not safe because while they

were asleep a fire could start, also that it was harmful to **A.C** because she has respiratory

problems. She further testified that when the home was opened, the home finder explained to

the Appellant that she is required to make the Agency aware of regular visitors and individuals

who "stay in the home" to allow the Agency an opportunity to conduct clearances.

At the hearing, the Appellant glossed over the fundamental reasons for the removal

determination. The removal was prompted by discoveries during therapy of conditions in the

home that thwarted Agency efforts to help this severely developmentally delayed child overcome

her disabilities. According to **A.C** 's evaluations her motor skills were the poorest. A Spanish

speaking OT therapist was not available. When the therapist hired by the Agency arrived for

therapy everyone was sleeping. **A.C** was never up, dressed, and ready for her sessions. The

therapist was concerned because ⅓ of the session had to be use to gain access to the child. Also,

after a month, the Appellant continued to fail to clear floor space for the therapy. There were

many people in the home, which more likely than not, was distracting for both the child and the

therapist. In addition, there was no continuity with respect to who was to work with the child

and therapist. The Appellant left that up to 18 and 13 year old daughters. Even the Appellant's

own witness, Ms. Padilla, questioned the Appellant's commitment to **A.C** 's therapy. She

testified that the Appellant did not understand about therapy. The Appellant, attempted to

explain away her nonparticipation in **A.C** 's OT by attributing it to a language barrier.

**NORMA BALBUENA**                                    12

However, when her bilingual case worker, Ms. Falcon, visited Appellant's home on the day after the complaint, December 1, 2005, the case worker's observations with respect to the home were substantially similar. It took the caseworkers a notable amount of time to get into the home; a person unknown to the Agency "Lucy" greeted them at the door and said she was "staying" in the home. Next, N███ arrived at the door. Then, after a wait, the Appellant appeared in her night clothes and explained that she was lying down. The home was crowded with furniture and there was little, if any, floor space for A.C.'s therapy. Keep in mind that it was the Appellant who chose to have the therapy conducted at home.

At the hearing, the Appellant and her witnesses focused their testimony on the candles and who was living in the Appellant's home. The Appellant testified that only one candle was burning and that she was not aware that candle burning was hazardous. Her testimony was not credited.

The Appellant and her witnesses also testified as to who was living in the Appellant's home. That testimony was conflicting. They spoke of their huge warm extended family and testified that everyone in the family gets together often, at least once a week at the Appellant's home. A lot of people visit and stay in the Appellant's home but they are family. However, at the hearing, they could not readily recall the names of the relatives – referred to individuals staying in the Appellant's home by only one name – they could not recall their full names. For instance, the Appellant testified that when A.C. was placed in her home in October of 2003, other than her immediately family, *only* her niece Marilyn lived in the home. She informed the Agency and Marilyn was cleared. However, the Appellant's niece, Beatrice Padilla, testified that "last November" a cousin – Amaryllis, her husband and their two minor children (week-ends only) lived in the Appellant's home. (Transcript pp 227-230) The Appellant denied that

NORMA BALBUENA                           13

Amaryllis' family lived in her home and added that Amaryllis is really Marilyn Vidal, she has a husband named "Vidal." The Appellant testified that she did not know the full name of her niece's husband "we just call him "Vidal." The Appellant's denial and testimony was not credited.

It is important to note that during her testimony, the Appellant's niece, Ms. Padilla[3] expressed concern regarding ████ A.C. development and her need for therapy. She appeared to believe that the Agency was not providing therapy because the Appellant was not conversant with respect to the topic. She would attempt to engage her but she felt that she did not understand about therapy. She also attempted to attribute the Appellant's lax behaviors to a language barrier. However, such is not reasonable because three months prior, the Appellant fully participated in ████ A.C. 's evaluations, appeared to understand its importance, and she decided on in-home therapy. The Appellant also had access to many Spanish speaking resources at the Agency, including ████ A.C. 's physician and case worker. The Appellant was ████ A.C. 's foster mother, and as such, there is no excuse for the Appellant's failure to cooperate and to facilitate ████ A.C. 's OT sessions.

There is consistent testimony establishing that there was a lot of people traffic in and out of the Appellant's home. Some of them were family and some of them were friends. Some visited for short periods of time and some visited for days, months, or perhaps longer[4]. Of the various individuals "staying" in the Appellant's home, she only disclosed to the Agency that Marilyn "stayed" there. In addition, there is consistent testimony that the Appellant did not follow through with ████ A.C. 's OT exercises. The family did not allow ████ A.C. to move about on ████ H.C.

---

[3] Ms. Padilla is the current kinship foster mother of ████. and ████

[4] It is unclear as to who Marilyn and Amaryllis are and as to how often or long they lived in the Appellant's home.

NORMA BALBUENA                               14

her own so that she could develop muscle strength, they carried her about and passed her from one individual to another.

Also, the Appellant, after being warned that burning candles posed a fire hazard and the smoke was harmful to ▮▮▮▮ A.C. due to her medical condition – bronchial pulmonary dysphasia, she continued to burn candles. When the case workers arrived on December 1, 2005 she had four tall candles burning in her home in various locations.

It is also important to note that the Appellant has an open "indicated" report against her in the New York State Central Register of Child Abuse and Maltreatment for inadequate guardianship of ▮▮▮▮ A.C. and that her foster home has been involuntarily closed.

## Conclusion

Based on the above it is concluded, that the Agency did not abuse its discretion when it removed ▮▮▮▮ A.C. and ▮▮▮▮ H.C. from the Appellant's home.

Legal custody of Children in foster care remains with the Agency, which is charged with the responsibility for each child entrusted to its care. A removal decision is, by statute, within the discretion of the Agency, and review herein is limited to whether the Agency's determination amounts to an abuse of that discretion. As the hearing record substantiates the legitimacy of the Agency's concerns regarding conditions in the Appellant's home, including but not limited to, many uncleared people living in Appellant's home and many large burning candles; and the Appellant's failure to cooperate with the therapist regarding ▮▮▮▮ A.C. s OT therapy – clearing floor space, having the child ready, learning the exercises, and following through – there is clearly a rational basis for the Agency's exercise of its discretion in this case. Consequently, there is sufficient evidence to establish that the Agency had grounds to remove ▮▮▮▮ A.C. and ▮▮▮▮ H.C. from the Appellant's foster care home. It was well within the Agency's discretion to do so.

**NORMA BALBUENA**                    15

It should be noted that this hearing does not determine whether the actions of the Appellant constitute maltreatment as defined by the applicable regulations. The Appellant, if she chooses, may request a review and amendment of her record by contacting the State Central Register of Child Abuse and Maltreatment.

DECISION:       The determination of Episcopal Social Services to remove A.C. and H.C. ▮▮▮▮▮ from the foster care home of Norma Balbuena was not arbitrary and capricious, and is affirmed.

This decision is made by John Franklin Udochi, Bureau of Special Hearings, who has been designated by the Commissioner to make such decisions.

DATED:  Albany, New York

    **AUG 0 9 2005**

                                   John Franklin Udochi
                                   Bureau of Special Hearings

# EXHIBIT 5

193

1

2                        STATE OF NEW YORK:
         OFFICE OF CHILDREN AND FAMILY SERVICES
3
    ------------------------------------------------
4
                 In the Matter of the Appeal
5
                            -of-
6
                       NORMA BALBUENA
7
                 EPISCOPAL SOCIAL SERVICES
8
    ------------------------------------------------
9

10

11                     MINUTES OF CONTINUED HEARING,

12            held at the offices of the NYS Department

13            of Health, 163 West 125th Street, New York,

14            New York 10027, on Monday, May 16, 2005

15            commencing at 10:26 a.m.

16

17    BEFORE:

18

19                    HON. SALLIE A. FARROW, ESQ.,

20                        Administrative Law Judge

21

22

23

24

25


              ACCU-SCRIBE REPORTING, INC. -- (212) 244-4407

194

1              APPEARANCES:

2

3                              FREDERICK J. MAGOVERN, ESQ.
                               Counsel for Episcopal Social
4                               Services
                               111 John Street
5                              New York, New York 10038

6

7                              LANSNER & KUBITSCHEK, ESQS.
                               Counsel for Norma Balbuena
8                              325 Broadway
                               New York, New York 10007
9
                               BY:  DAVID J. LANSNER, ESQ.,
10
                                        -and-
11
                                  ALLEGRA A. CHAPMAN, ESQ.,
12                                  of Counsel.

13

14     Present:
                               Elizer Balay, Spanish Interpreter
15                             Lourdes Falcon

16

17                        *   *   *   *   *

18                        P R O C E E D I N G S

19

20                        JUDGE FARROW:  On the record.

21                        Counsel, you may proceed.

22                        This is a continuation of the

23          Norma Balbuena case.  Today is May 16,

24          2005.  Counsel for the appellant is

25          proceeding with respect to the presentation

204

Padilla-direct-Chapman

1

2   removed from the apartment.  So that was

3   the call I received.

4   Q   What did she tell you the reasons?

5   A   She didn't, she said she didn't know.  When

6   I asked her she said, no, she just came and

7   just took them, just took the kids.  And

8   then she told me she went back, I think to

9   get, I think it was the milk, or she was

10  even complaining because she said when they

11  took them she, it was cold and they took

12  them without jacket.  I think N▮▮▮▮ was

13  telling me.

14          So I mean, at that time she

15  didn't tell me why it was the reason

16  because she was so concerned, so sad that

17  she didn't even explain why.  She was just

18  surprised why, what did we do.

19          And she said she didn't get

20  explanation as to why.

21  Q   Do you know where the girls went?

22  A   No.

23  Q   But you have since seen the girls?

24  A   Yes.

25  Q   And they are with you now?

ACCU-SCRIBE REPORTING, INC. -- (212) 244-4407

205

1                         Padilla-direct-Chapman

2    A    Oh, yeah.

3    Q    How is that?

4    A    They are doing great.  I mean when she came

5         to my house they were like, especially

6         ████████  I thought she was not going to

7         remember me.  But as soon as she saw me she

8         was like, (indicating).  At beginning she

9         was kind of nervous and excited and, I am

10        with someone that I know.

11                        And ████████ she was okay; she

12        didn't even cry.  They were not acting like

13        they were apart from us.  She don't look at

14        me like a stranger.  I don't know why, but

15        she may be the blood.  Because I asked the

16        therapist she act like they have been with

17        me; she said maybe because it is in the

18        blood.  I don't know, but they are okay.

19        They are doing okay.

20   Q    How long have they been with you now?

21   A    A week.

22   Q    Since they have been in your care for a

23        week have they seen Norma?

24   A    Yes.

25   Q    Where have they seen her?

# EXHIBIT 6

STATE OF NEW YORK
OFFICE OF OFFICE OF CHILDREN AND FAMILY SERVICES

In the Matter of the Appeal of:

ALICE HAYNES,

Appellant. Fair Hearing #4420465M
Jurisdiction: NEW YORK CITY

VOLUME II

TRANSCRIPT OF FOSTER CARE REMOVAL HEARING

BEFORE HONORABLE SALLIE A. FARROW,
ADMINISTRATIVE LAW JUDGE

DATE OF PROCEEDINGS:  NOVEMBER 30, 2005

**Proceedings recorded by electronic sound recording.**
**Transcript produced by OmniVerb Communications (Transcription Service)**
**764 State Street, Suite A**
**Schenectady, New York 12307-1206**
**Telephone: 518-346-4524 or 518-339-2420**

ALICE HAYNES                                                    5
Fair Hearing No.  4420465M

---

## LIST OF APPEARANCES

ALICE HAYNES

### FOR THE APPELLANT

Stacy E.  Charland, Esq.
Darius Charney, Esq.
Lansner & Kubitschek
325 Broadway, Room 201
New York, New York 10007

### FOR THE AGENCY (RESPONDENT)

Esther Berger, Esq.
New York City Administration
For Children's Services
220 Church Street
New York, New York 10013

### OTHER APPEARANCES

WITNESS KAREN BURKE

WITNESS CAROLINE GREENE

ALICE HAYNES                                              224
Fair Hearing No.  4420465M

1          APPELLANT ALICE HAYNES:  Yes.

2          DARIUS CHARNEY, ESQ.:  And how did you know that?

3          APPELLANT ALICE HAYNES:  Received notice.

4          DARIUS CHARNEY, ESQ.:  Okay.  And this is a —

5    Exhibit M, is a letter from O-C-F-S, dated August twenty-third,

6    two thousand and five, stating that the June fifteenth report was

7    unfounded.

8          ESTHER BERGER, ESQ.:  Just — — ah — M?

9          DARIUS CHARNEY, ESQ.:  M.  So, to your knowledge,

10   Miss Haynes, have any of the reports filed against you with the

11   State Office of Children and Family Services ever been determined

12   — any of the allegations in the reports been determined to be

13   true?

14         APPELLANT ALICE HAYNES:  No.

15         DARIUS CHARNEY, ESQ.:  When did you find out that

16   A-C-S was going to remove Ameena from your home?

17         APPELLANT ALICE HAYNES:  I received a call from

18   Miss Bascom, about six — or the June the seventh, oh-five.

19         DARIUS CHARNEY, ESQ.:  Okay, and at the time that

20   she called you, what did she say to you?

21         APPELLANT ALICE HAYNES:  She said that she was

22   sendin' me out a ten-day notice, concerning the removal of

23   Ameena.

24         DARIUS CHARNEY, ESQ.:  Did she ever explain to you

25   why Ameena was being removed?

ALICE HAYNES                                                    225
Fair Hearing No.    4420465M

1       APPELLANT ALICE HAYNES:    I asked her why —
2    [UNINTELLIGIBLE] — you know, and she says she didn't know.
3       DARIUS CHARNEY, ESQ.:    And when she told you that
4    she mailing a notice to, what did you say?
5       APPELLANT ALICE HAYNES:  — I told her — — ah — to
6    come, and get Ameena, today, right now.
7       DARIUS CHARNEY, ESQ.:    Why did you tell her that?
8       APPELLANT ALICE HAYNES:    Mainly because Ameena and
9    I are very-very bonded.  Ameena may not understand, the bonding
10    between us, but I do — and — [UNINTELLIGIBLE] —
11       — [COUGHING DROWNS OUT TESTIMONY] —
12       APPELLANT ALICE HAYNES:    — only get more attached
13    — and have these people come and take her, for no reason, when I
14    did not do anything wrong.
15       DARIUS CHARNEY, ESQ.:    And, — ah — when Miss — did
16    Miss — ah — Bascom in — in fact send you a notice of removal?
17       APPELLANT ALICE HAYNES:    I never received a notice
18    of removal through the mail, when Miss Bascom came, on six-ten,
19    she brought one with her, and from the time that she called me,
20    up until she arrived, my intentions was to fight —
21       DARIUS CHARNEY, ESQ.:    — did you —
22       APPELLANT ALICE HAYNES:    — for my Ameena —
23       DARIUS CHARNEY, ESQ.:    — did you ever sign that
24    notice of removal consenting to the removal?
25       APPELLANT ALICE HAYNES:    Not with my signature.    I

ALICE HAYNES                                                    226
Fair Hearing No.    4420465M

1   signed "refused to sign" and I put the name on there.

2              DARIUS CHARNEY, ESQ.:  Ah — so what day is A▇▇▇

3   actually removed from you?

4              APPELLANT ALICE HAYNES:  Six-ten, oh-five.

5              DARIUS CHARNEY, ESQ.:  When Miss Bascom called you

6   to say she was removing A▇▇▇▇ did she say it was an emergency?

7              APPELLANT ALICE HAYNES:  No.  She just said she

8   was removing — sendin' me a ten-day notice.

9              DARIUS CHARNEY, ESQ.:  Ah — now, I believe — you —

10  you discussed earlier, we discussed the — [UNINTELLIGIBLE] — of

11  the — [UNINTELLIGIBLE] — — ah — when did you — or why did you —

12  ah — — [UNINTELLIGIBLE] — the — [UNINTELLIGIBLE] —

13             APPELLANT ALICE HAYNES:  O▇▇▇▇ and D▇▇▇▇ were

14  attending Harlem High School from the time that they were like,

15  ten, eleven months old.  As I stated they are special needs

16  children, they needed the occupational therapy, they needed

17  movement, they needed things.  Okay?

18             DARIUS CHARNEY, ESQ.:  Did — alright, go ahead —

19             APPELLANT ALICE HAYNES:  — I — [UNINTELLIGIBLE] —

20             — [COUGHING DROWNS OUT TESTIMONY] —

21             APPELLANT ALICE HAYNES:  — so that if I got them

22  skates, if I got a bicycle, and took 'em out on a regular basis,

23  and helped them with move with their body, that this would help

24  them.  And it did.

25             DARIUS CHARNEY, ESQ.:  The bicycle that was in the

# EXHIBIT 7



**ADMINISTRATION FOR CHILDREN'S SERVICES**
Office of Advocacy/Division of Community Affairs
150 WILLIAM STREET – 1st FLOOR
NEW YORK, N.Y. 10038

**John B. Mattingly**
*Commissioner*

**Anne Williams-Isom**
Special Counsel/*Associate Commissioner*

**Viviane DeMilly**
*Director, Office of Advocacy*

In the matter of the Independent Review of _____          **DECISION**
                                                                    **AFTER**
                                                                    **INDEPENDENT**
                                                                    **REVIEW**

**Alice Jean Hayes**

From a determination by

Administration for Children's Services
Brooklyn DFCS

Hereinafter called "The Agency"

An Independent Review was held at 150 Williams Street, New York City on June 23, 2005 before Mina Shah, Independent Review Officer, at which the foster parent(s), and the representatives of the agency and ACS appeared. The appeal is from a determination by the agency relating to a child in foster care placement in this home, in that the agency has given the foster parent a Removal Notice and removed A▬▬▬B▬▬▬▬ from this home.

An opportunity to be heard having been accorded all interested parties and the evidence having been taken and due deliberation having been had, it is hereby found:

CS 1a
Rev. 03/02

## ATTENDEES

Alice Jean Haynes, Maternal Great Aunt/Kinship Foster Mother
Gemma Boscom, Case Worker, ACS/Brooklyn DFCS
Gary DeCrane, Supervisor, ACS/Brooklyn DFCS
Les Andra Bolton, Home Assessment Worker, ACS/Brooklyn DFCS
Irene Rendon, Case Worker, ACS/OCI
Neil Bueno, Supervisor, ACS/OCI

## REASON FOR INDEPENDENT REVIEW

This appeal is from a determination by Administration for Children's Services/Brooklyn DAFCS relating to A████B█████ DOB █████2002 in foster care placement in the kinship home of her maternal great aunt, Ms. Haynes. On June 6, 2005, the agency issued a Removal Notice to Ms. Haynes and removed A████from this home as per OCI recommendations. The foster mother objected to the removal of this child and requested this Independent Review.

## PLACEMENT HISTORY/PERMANENCY PLANNING

On September 24, 2004, A████B█████was placed in the kinship home of Ms. Haynes. Her permanency plan is adoption but this goal might be changed to return to birth parents. The agency reported that the birth mother is diligently planning for this child.

## ACCOUNT OF AGENCY

Ms. Boscom, the agency worker, stated that she received a phone call as well as an e-mail from Ms. Rendon, the OCI worker, that OCI recommended the removal of A████from the home of Ms. Haynes within a month. They did not consider this as an emergency removal. Ms. Boscom stated that when she informed Ms. Haynes about the removal, she immediately requested the removal of the child from her home because she did not want either one of them to suffer. Ms. Boscom stated that Ms. Haynes expressed to her that the child is bonded to her and it would be emotionally difficult to get more attached when she knew that soon the child would be removed from her care. Ms. Boscom and her supervisor, Mr. DeCrane stated that OCI did not make them aware of nor did they explain the reason for the recommendation of Ameena's removal from this home.

Ms. Boscom stated that during her monthly foster home visits, she has observed that the home was untidy, unsanitized and cluttered. Ms. Haynes has bikes in the living room which could pose safety concerns for the young children. Ms. Boscom stated that she has lots of books. Mr. DeCrane, the agency supervisor stated that often A████was seen dirty and with a body odor. Ms. Boscom stated that she made a recommendation for Home Making services due to Ms. Haynes' medical condition but she initially refused the services. However, she eventually agreed and a home maker was placed in the home in May of 2005.

Ms. Boscom stated that the OCI worker informed the agency worker that A████ sleeps in a stroller and she does not have a bed for the child. Upon OCI's recommendation, Ms. Haynes got a bed for A████ According to the agency, there were two OCI reports made against Ms. Haynes in April 2005.

Ms. Boscom stated that she conducted an expedited home study in September 2004. Ms. Bolton, the agency Home Finding worker, stated that on her initial visit in March 2005 to the foster home,

ACS                  Fax:212-341-2700          Mar 27 2006  15:40        P.04

she was concerned regarding the health condition of the foster mother as well as its impact on conditions of her home. She observed that Ms. Haynes' home was well furnished but untidy, cluttered and had an odor. The bathroom was very dirty. The toilet was dirty and the sink was filled with dirty water, with a ring around the sink. The refrigerator contained plenty of food and ready to eat dinner boxes. Ms. Bolton also suggested having a home attendant. Ms. Bolton stated that the home attendant services began on May 23, 2005. Ms. Bolton stated that she again visited the foster home on May 10, 2005 and the home condition was almost the same as before. Ms. Bolton stated that she was supposed to visit the foster home on June 14, 2005; however, on June 10, 2005, A████ was removed from this home. Ms. Bolton confirmed that the extended home study was never completed and this home is not certified.

Ms. Boscom stated that while A████ was in the home of Ms. Haynes, she has made a remarkable improvement in her development and she is developing age appropriately. Ameena is presently receiving Early Intervention Services from Thera-care. She also receives speech, physical and occupational therapy three times a week. Ms. Boscom stated that Ms. Haynes was complying with the needs of the child. Due to Ms. Haynes' medical condition, the agency worker was taking the child for her medical appointments.

The agency worker stated that Ameena's permanency plan is adoption but Ms. Haynes was never considered as an adoptive source for this child. A████ has been in foster care for almost three years and she needs a stable and permanent home. Ms. Boscom stated that A████ has adjusted well and has bonded to her current foster mother.

Ms. Boscom stated that there are two adopted children residing in the Haynes' home, a six year old and an eleven year old.

## ACCOUNT OF THE FOSTER PARENT

Ms. Haynes stated that despite her medical condition, two of her adopted children, who have special needs, are doing very well in her care. Ms. Haynes stated that her family is very supportive of her and her medical condition should not be a hindrance concerning the care of the foster child.

Ms. Haynes stated that there is a difference between cleanliness and the cluttered condition of the home. Ms. Haynes stated that the children have a lot of clothing, toys and books. There are three bikes for the children in her living room. She does not think that they create a safety hazard. Ms. Haynes stated that the books are in bookcases and they are out of the children's way.

Ms. Haynes stated that Ameena has no other family member who can be a resource for her. Ms. Haynes stated that Ameena was well adjusted in her care.

## ACCOUNT OF OFFICE OF CONFIDENTIAL INVESTIGATION (OCI)

Ms. Rendon, the OCI worker, stated that an initial report was made on April 12, 2005 and these allegations were unfounded for inadequate guardianship. Ms. Rendon confirmed that Ms. Haynes' home was cluttered, and has fire hazardous items stored in the home. Ms. Renon observed that the garbage bags, plastic bags, paper bags were all over the floor. Ms. Rendon stated that there was not enough meat in the freezer. She also saw Ameena sleeping in a stroller. Ms. Rendon did not see enough clothing for A████ and the bikes were still in the living room. Ms. Rendon stated that A████ was observed with no marks or bruises on her body. Ms. Rendon was concerned that Ms. Haynes may not be able to provide proper supervision to her adopted children as well as to the foster child in her home due to her poor health. Ms. Rendon is concerned that due to Ms. Haynes' poor health, she is unable to take care of the children as well as the home.

3

ACS                Fax:212-341-2700        Mar 27 2006  15:41      P. 05

Ms. Rendon stated that on May 24, 2005 and minor complaints were being reported against Ms. Haynes for inadequate guardianship and lack of food, clothing and shelter. These allegations were also unfounded; however, it was recommended that the child be removed from this home and placed in a pre-adoptive home to ensure that her child's developmental and social needs are adequately met.

## CONCLUSION

The written and oral information presented at the Independent Review indicated that the agency was justified to the removal of the child from the home of Ms. Haynes.

It appears that Ms. Haynes is complying with the needs of the child and the child was doing well in the home; however, this Review Officer is concerned about the condition of the home. It appears that Ms. Haynes' home is posing a risk to the safety of the child.

It is the understanding of this Review Officer that there were several OCI reports and that OCI unfounded the allegations; however, it was determined that it was in the best interest of the child to remove her from this home. It appears that A████████ has been in foster care for three years and she needs a stable and permanent home and Ms. Haynes' home is not a pre-adoptive home.

ACS disapproved the home of Ms. Haynes for the certification. This Review Officer does not have the authority to render a decision to re-place the foster child in an uncertified home. Therefore, A████is to remain in her current placement and not be returned to Ms. Haynes.

The foster parent, Alice Jean Haynes, has the right to appeal this decision under Section 400 of the Social Services Law and may request a New York State Fair Hearing within sixty (60) days of the date of this decision.

Write to:    Bureau of Special hearings
P.O. Box 1930
Albany, New York 12201

Mina Shah, MSW
Independent Review Officer
July 11, 2005

Cc:    J. Boscom
G. DeCrane
J. Harris III
L. Edwards
G. Whitman
I. Rendon
H. Sampson
J. Morales
J. Anthony, Esq.

4

# EXHIBIT 8

STATE OF NEW YORK
OFFICE OF CHILDREN & FAMILY SERVICES

---

In the Matter of the Appeal of

**ALICE HAYNES**

from a determination to remove a foster
child from her home

**DECISION
AFTER
HEARING**

**FH# 4420465M**

---

Before:

Sallie A. Farrow
Administrative Law Judge

Held:

New York Office of Children and
Family Services
163 West 125th Street
New York, New York 10026
November 30, 2005

Parties:

New York City Administration
For Children's Services
220 Church Street
New York, New York 10013
By: Esther Berger, Esq.

Alice Haynes
1470 Amsterdam Avenue, Apt. 12 E
New York, New York 10027
By:  Stacy E. Charland, Esq. and
     Darius Charney, Esq.
     Lansner & Kubitschek
     325 Broadway Room 201
     New York, New York 10007

ALICE HAYNES                                    2

## JURISDICTION

The New York City Administration for Children's Services (the Agency), an authorized child care agency, removed A██████ B. from the foster care home of Alice Haynes (the Appellant).

Pursuant to Section 400 of the Social Services Law any person who is aggrieved by a Social Services official's determination to remove a child from a foster care placement in a family home may appeal that determination to the New York State Office of Children and Family Services (OCFS).

## FINDINGS OF FACT

An opportunity to be heard having been afforded the parties and evidence having been considered, it is hereby found:

1.      A██████ B. (born █████████ 2002) was placed in the Appellant's kinship foster home (A██████ is the Appellant's grandniece), by the Agency on September 24, 2004. The Appellant also has two adopted children, D██████ age six and C██████ age eleven.

2.      On June 6, 2005, the Agency issued a 10 day notice informing the Appellant of its determination to remove A██████ B. from her foster home. As stated therein, on June 23, 2005, A██████ was to be removed based on an Office of Confidential Investigations (OCI) recommendation and as requested by the Appellant. (Agency Exhibit #5).

3.      On June 10, 2005, prior to the June 23, 2005 Agency review conference, the Agency removed A██████ from the Appellant's foster care home. The removal was not based on any emergency circumstances.

4.      Just prior to the removal, the Agency had approved homemaking services to help the Appellant with household chores while she received "treatment for medical problems."

P.03
P.03
Mar 15 2006 13:19
Mar 15 2006 16:15
Fax:212-341-2700
ACS

**ALICE HAYNES**                                    3

(Agency Exhibit #4). The Agency discontinued the homemaking services upon the removal of A███████.

5.    On June 23, 2005 the Appellant participated in the Agency conference wherein the Agency's determination to remove A███████ was affirmed. In its Decision After Independent Review, the Agency concluded that (1) the condition of the Appellant's foster home posed a risk of safety to A███████ (2) the removal was in A███████ best interest – the child has been in foster care for three years and she needs a stable and permanent home – "[the Appellant's] home is not a pre-adoptive home"[1]; and (3) Appellant's home has not been certified for foster care.  The issues cited by the Agency are not related to the adequacy of the care A███████ B., who is developmentally delayed, received in the Appellant's home. The Appellant diligently pursued early intervention services for A███████ and in a short period of time the child made remarkable improvements in her social and communication skills.

6.    During A███████ placement in the Appellant's foster care home, Gemma Bascom – the foster care social worker, conducted "mandated home visits."   She visited Appellant's home on October 21, 2004, November 24, 2004, December 16, 2004, January 18, 2005, March 9, 2005, April 14, 2005, April 19, 2004, and May 18, 2005. (Agency Exhibit #1) After each and every visit Ms. Bascom recorded in her progress notes that A███████ including her hair and clothing, was 'clean and tidy' and or "well groomed".   With respect to the Appellant's home, Ms. Bascom noted that the Appellant's apartment was either "clean and tidy" or a "bit clean and bit untidy" – except for one occasion, (April 14, 2005 where Ms. Bascom noted that the

---

[1] However the Independent Review Officer in her Decision After Independent Review decision dated July 11, 2005 p.2 under the heading Placement History/Permanency Planning stated – "On September 24, 2004, A███████ B███████ was placed in the Kinship home of Ms. Haynes. Her permanency plan is adoption but this goal might be changed to return to birth parents. The agency reported that the birth mother is diligently planning for this child."

**ALICE HAYNES**                              **4**

Appellant's apartment was untidy and unsanitary - but five days later Ms. Bascom noted that the Appellant's apartment was a bit tidy but 'cluster' (sic).

7.     On or about April 12, 2005, OCI became involved in this case to investigate a call regarding a rash on the Appellant's adopted daughter, D███████ face.   Subsequently, OCI determined that the rash on D█████ face was not caused by child maltreatment or abuse (it appears that the child had an allergic reaction to shrimp) and on June 24, 2005 OCI notified the Appellant that the maltreatment allegations were "unfounded." (Appellant Exhibit J) During the OCI investigation, two additional reports of suspected child maltreatment, the substance of which is unknown, were made and those reports were also determined to be "unfounded" by OCI. (See Appellant Exhibits I-M).

8.     After the removal, A██████ was returned to the Agency and placed in new foster home.

9.     The Appellant requested this hearing to contest the removal determination.

### ISSUE

Was the determination to remove A█████ B. from the Appellant's foster care home a proper exercise of discretion?

### DISCUSSION

The determination to remove A█████ B. from the Appellant's foster home was arbitrary and capricious and was not a proper exercise of discretion. The Agency is directed to take action as outlined below in this decision.

The New York City Administration for Children Services (Agency) and other authorized agencies have the legal responsibility for the well being of the foster children in their custody

**ALICE HAYNES**                                    5

and may make appropriate placements in order to discharge this responsibility. Section 400 of

the Social Services Law (SSL) provides:

> 1.        When any child shall have been placed in an institution or in a family
> home by a social services official, the social services official may remove such
> child from such institution or family home and make such disposition of such
> child as is provided by law....
>
> 2.        Any person aggrieved by such decision of a social services official may
> appeal to the [Office of Children and Family Services] pursuant to the provisions
> of section twenty-two of this chapter.

SSL§ 383(2) provides:

> 2.        The custody of a child placed out or boarded out and not legally adopted
> or for whom legal guardianship has not been granted shall be vested during his
> minority, or until discharged by such authorized agency from its care and
> supervision, in the authorized agency placing out or boarding out such child and
> any such authorized agency may in its discretion remove such child from the
> home where placed or boarded.

Since removal of a foster child is within the discretion of the Agency and other

authorized child care agencies, only if a removal is found to be an abuse of that discretion will

the removal be reversed by an administrative hearing decision.

At the hearing, Agency's sole witness, the foster care case worker – Gemma Bascom,

testified that the Agency made a determination to remove A███████from the Appellant's foster

home based on an Office Of Confidential Investigations (OCI) recommendation. Ms. Bascom

further testified that she was not privy to the underlying rationale that led to OCI's removal

recommendation. When she spoke to the OCI case worker, Ms. Irene Rendon, by telephone on

June 6, 2005 the reasons for the OCI recommendation were never discussed. Thereafter, OCI

completed its investigation of the allegations of child maltreatment made against the Appellant

and OCI determined that the reports were "unfounded." The Agency made it clear that, in this

case, there were never any circumstances that required it to conduct an "emergency" removal of

**ALICE HAYNES**                                           6

A▮▮▮▮▮   Also, there is no evidence that the Agency was aware of the reasons why OCI

recommended removal of A▮▮▮▮▮  Thus it is unclear as to what the Agency relied on when it

determined to remove A▮▮▮▮from the Appellant's foster home.  After OCI completed its

investigation, "unfounding" the maltreatment reports, its involvement in the case ceased.

According to the evidence presented at the hearing, OCI Child Protective Services (CPS)

became involved in this case on or about April 12, 2005 when allegations were made that the

Appellant maltreatment her adopted daughter D▮▮▮▮ The school observed a rash on six year

old D▮▮▮▮ face.  As a result of an OCI investigation it was determined that the source of the

rash was not related to any child abuse or maltreatment (it appears that the child ate shrimp and

had an allergic reaction) and therefore the report was "unfounded"  Thereafter, two additional

reports were made, but, no evidence was presented, at the hearing, as to the specific allegations.

All three of the reports that were called in against the Appellant were determined by OCI to be to

be "unfounded." (*See* Appellant Exhibits I-M).  It therefore appears that OCI's conclusions that

the maltreatment reports were "unfounded" would negate its prior removal recommendation

especially since the removal recommendation was not deemed an "emergency." It is also

important to note that the maltreatment allegations and the OCI investigations overlap the actual

removal and the Independent Review Conference, thus, the ongoing activities could have been

conflicting and may have confused and clouded the issues.

At the hearing, Ms. Bascom testified that the Appellant's home was cluttered and untidy

and that the Appellant refused to accept homemaking services. Ms. Bascom further testified that

during her routine foster home visits, A▮▮▮▮was unkempt – her hair was knotted together and

dirty and the child had a slight odor.  Ms. Bascom's testimony was not credited because her

testimony at the hearing was inconsistent with earlier observations made by her and recorded in

ALICE HAYNES                                    7

her progress notes. In Ms. Bascom's progress notes she stated that Ameena was "appropriately dressed, clean and neat" and or "well groomed." On every occasion except for one Ms. Bascom recorded that the Appellant's home was "clean and tidy" or "tidy and organized." The exception was on April 14, 2005 (two days after the first CPS maltreatment report was made) where Ms. Bascom described the Appellant's home as "untidy and unsanitary," however, several days later, on April 19, 2005 Ms. Bascom noted that the Appellant's home was "tidy and organized." This Administrative Law Judge deemed her progress notes more reliable than the testimony at the hearing because the notes were recorded contemporaneously with Ms. Bascom's observations.

Ms. Bascom further testified that A▅▅▅ who is developmentally delayed was placed in an early intervention program. The Agency provided occupational, speech and physical therapy for A▅▅▅ and the Appellant fully cooperated. As a result, A▅▅▅ made remarkable progress and was developing in an age appropriate manner. A▅▅▅ substantially improved, especially with respect to her communication and social skills. During her testimony, Ms. Bascom described the Appellant as a loving foster parent and pointed out that the Appellant and A▅▅▅ had a good relationship. Ms. Bascom's testimony in this regard was consistent with her progress notes. The Agency concurred that the Appellant is a nurturing foster parent and that A▅▅▅ made remarkable progress under her care.

In the determination affirming its removal decision, the Agency's Independent Review Officer substantially relied on testimony regarding the condition of the Appellant's apartment concluding that conditions in the Appellant's home "posed a risk to the safety of [A▅▅▅]." However, at the hearing, the Agency did not present evidence that substantiated those findings. There was testimony that the Appellant kept two bicycles in her living room and that her apartment was cluttered, but it is unclear as to how such posed a "safety risk" especially when

**ALICE HAYNES**                                      8

those conditions existed throughout two former foster care placements, two adoptions and the placement of A████ in the Appellant's home by the Agency. On one occasion, due to a medical issue that was being treated by a doctor, the Appellant may have slipped a bit in her housekeeping chores – however within five days and without the assistance of a homemaker, Ms. Bascom noted that the Appellant's apartment was "tidy." In any event, Ms. Bascom did order homemaking services for the Appellant to assist while being treated by her doctor. The Appellant credibly testified that the bicycles had been in her living room for several years. Her birth son used the bicycle when he lived in the home and currently her adopted son and daughter use them. The bicycles had been in her living room even when the Agency conducted its home studies for her two adopted children and was never an issue.

Based on the facts in this case, the Agency's decision to remove A████ B., when made, was at least premature. The Agency expressed concern that it would be in A████'s best interest to have a stable environment, stating that, "A████ has been in foster care for three years and she needs a stable and permanent home," however, A████ has not been freed for adoption; and the Agency continued to work with the birth parents for the return of A████ Under these circumstances, where there is a non-emergency situation, it would appear that the best interest of the child might dictate that the child be to allow to remain with the Appellant to minimize the number of placements until a concrete "permanent planning goal" is established. In this case there were two possible goals for A████ 1) returned to parents and (2) adoption.

The Agency also expressed concern that the Appellant's foster care home had not been fully certified. However, there was a lot of OCI activity with respect to the "unfounded" reports and confusion with respect to conflicting accounts given by Ms Bascom regarding the condition of the Appellant's home. It defies reason to presume that the Appellant's home posed a "safety

**ALICE HAYNES**                                                      9

risk" to children, especially when, with two other children in the home and through ongoing OCI investigations, (all reports were "unfounded") the OCI never recommended removal of all of the children and or changed the status of its recommendation to "emergency." Therefore Agency's conclusion that a "safety risk" existed in the Appellant's home was not credited because that conclusion is inconsistent with its OCI activities and conclusions. It is more plausible that the outstanding OCI reports and activity could have caused the Agency to halt the processing of the paperwork necessary for the certification of the Appellant's foster home. The Appellant's prior certification had expired on September 12, 2004, several days prior to A███████'s placement on September 24, 2004. The Appellant had been certified to care for a maximum of three children. To place A██████, the Agency conducted an emergency review of the Appellant's home. Thereafter, it appears that the OCI investigation interfered with the certification process and therefore, under the circumstances here, where OCI determined that the reports were unfounded and thereafter OCI's involvement in the case ceased, the Appellant should have been given the opportunity to complete the certification of her foster home.

In determining to reverse the Agency's removal of A██████ B. from the Appellant's foster care home, it has been concluded that the Agency failed to substantiate its removal determination. At the hearing, the Agency did not provide any reasonable explanation for its removal determination. There was an OCI "non-emergency" recommendation that A██████ be removed from the Appellant's home however Agency is unaware of the supporting factors for such recommendation.

The Agency articulated concerns with respect to A██████ ultimate permanent placement, however as stated in the Independent review decision, the child had not been freed for adoption and the Agency continues to work with the birth mother. Accordingly, as of yet,

ALICE HAYNES                              10

A█████ does not have a concrete permanent planning goal and therefore the Agency's decision to move the child from the Appellant's home was contrary to its conclusion that the removal was in A█████ best interest. It seems that, the removal acted to increase rather than to decrease the total number of placements of A█████ (in the event the child is returned to her parents or the new foster parents chose not to adopt) thereby causing more instability for the child. The Agency was also concerned about certification of the Appellant's home. As discussed above, her home had been certified on an emergency basis to allow for the placement of A█████ It appears that the certification process was interrupted when a CPS report was called in against the Appellant when her adopted daughter suffered a rash on her face from an allergic reaction to shrimp. The OCI investigation escalated and prior to making its determinations and findings, OCI recommended a non-emergency removal of A█████ OCI "unfounded" the reports and was no longer involved in the case. As such, the OCI concerns – which are basically unknown – are insufficient and do not justify the Agency's hasty actions.

In sum, it is concluded that there was no rational basis for the removal of A█████ B. and that the Agency abused its discretion in acting as it did.

It is important to clearly state that had the Agency used care in the assessment of the situation, A█████ B.'s best interests could have been more accurately evaluated prior to her removal from the Appellant's foster home. However, she was removed from the Appellant foster care more than six months ago. She has spent time in another foster care placement, and her future is uncertain. What is in the child's best interests is obviously what the foster care program must focus on. At this juncture, therefore, the Agency must forthwith commence a complete and comprehensive independent evaluation of A█████ B., in her current placement.

**ALICE HAYNES**                                11

and the appropriateness of her replacement in the Appellant's home.   Visitation between the
Appellant and A██████B. should also be encouraged, pending this evaluation.

<u>DECISION:</u>         The determination of the New York City Administration for Children's
                    Services to remove Ameena B. from the foster care home of Alice Haynes
                    was not correct.

                    The matter is remanded for the Agency to forthwith commence a complete
                    and comprehensive independent evaluation of A██████B., in her current
                    placement, and determine the appropriateness of her replacement in the
                    Appellant's home.

                    The Agency is to complete its evaluation of A██████B. and reach its
                    determination as to the appropriateness of the child's replacement in the
                    Appellant's home within 60 days of its receipt of this decision.

                    The New York City Administration for Children's Services is directed to
                    forthwith comply with the foregoing decision.

ALICE HAYNES                                     12

This decision is made by John Franklin Udochi, Bureau of Special Hearings, who has been designated by the Commissioner to make such decisions.

DATED:  Albany, New York

FEB 0 2 2006

John Franklin Udochi
Bureau of Special Hearings

# EXHIBIT 9



## Administration for Children's Services
CHILD WELFARE PROGRAMS
FAMILY PERMANENCY SERVICES
DIRECT FOSTER CARE SERVICES
151 LAWRENCE ST. 4ᵗʰ FLOOR
BROOKLYN, NEW YORK 11201

JOHN B. MATTINGLY
Commissioner

JEANETTE RUIZ
Deputy Commissioner

YOLANDA DILLARD
*Assistant Commissioner*

JAMES B. HARRIS III

*Borough Director*

NANCY KERNISANT
*Site Director*

April 4, 2006

In the Matter of:    A█████████B███████DOB█████████
Docket Number:    N-16057/03, Brooklyn Family Court
Case Name:    C███B████████
ACS Case Number: S5371293

## BACKGROUND :

Ameena was born to C████B███████, a teenage mother with a diagnosis of mild mental retardation. C███was in foster care at the time of Ameena's birth. A████came into care on April 28, 2003. C███was found by Brooklyn Family Court to be neglecting A███████'s needs and failing to provide her with adequate care. The current goal for A███is adoption.

A████is a four-year-old African American female child. She is of average height and weight for her age: 40.5 inches and 37 pounds, and is in good health generally. She is also a special needs child with developmental delays. According to a psychological evaluation dated January 27, 2005, she "presents with mental, communicative and social delays requiring immediate intervention as she presents developmental delays in major areas of development." There are some slight delays in her receptive language, and her responses to questions are not often spontaneous. She is able to maintain eye contact, but often times drifts off and has to be re-directed to the task at hand. Her letter, shape and word recognition are not age appropriate and she has difficulty with matching similar patterns (i.e. chair to table). She is diagnosed with Hypotonia (loss of muscle control), and is currently wearing braces on both of her legs.

At a very young age, A███████was observed to have global developmental delays. She did not meet her developmental milestones at the appropriate age, such as (sitting up, crawling, walking, and talking). She was also observed to be walking on her toes and not making appropriate eye contact or relating to others. She was referred for Early Intervention services through Thera Care to address these deficits. She has made great strides but still requires many ongoing services. Her caretaker is required to be available to make sure that the child is in receipt of all of these services and is physically capable of providing structure, attention and participates in all of her daily activities.

## FOSTER CARE:

On March 13, 2002, C████ B███████gave birth to Ameena at New York Presbyterian Hospital. At that time, C███ was residing at Inwood House Maternity Residence, which recommended placement of C███ and A███████in a mother/child placement or a foster boarding home. A████ remained at the hospital until April 16, 2002, at which time she was placed for two days in a non-kinship foster boarding home. On April 18, 2002, C███and A███████were placed together in a non-kinship foster boarding home. Unfortunately, mother and daughter were only able to remain together for approximately 13 months due to C████poor behavior. According to the foster mother, C████frequently went AWOL; was verbally abusive to the foster parent; and physically abused A███ The foster parent ultimately requested that C███be removed from the foster home. As a result, C███was removed on May 30, 2003. A███████however, remained in that home for approximately 16 more months. On September 24, 2004, A███████was placed in the kinship foster home of Alice Haynes. On June 10, 2005, A███████was removed from Ms. Haynes based upon the recommendation of the Office of Confidential Investigation. A███████was placed in the pre-adoptive foster home of Ms. D████T████on that date.

## ALICE HAYNES' FOSTER HOME

Ms. Haynes resides at 1470 Amsterdam Avenue, New York, New York, in the Manhattanville Housing Projects with her two adopted children, D████S███████(DOB███-99), and C███ P███(DOB███-93). Both children have special needs which were not identified. Mr. Eli Haynes (DOB███-35), the husband of Ms. Haynes, is said to be residing in the Poconos at a family owned home.

Ms. Haynes is a sixty-six year old African American female. She is approximately 5'5 in height and weights 247 pounds. Ms. Haynes has problems with mobility and requires a cane for ambulation.

On 3/3/06, ACS medical consultant Jonathan Horwitz, M.D., F.A.A.P. reviewed Ms. Haynes' medical records. He described her as "an obese, hypertensive 66 year old woman with associated coronary artery disease and ulcerative colitis. She has peripheral edema (suggestive of cardiac failure) and is at risk for diabetes." **In Dr. Horwitz's opinion "it would be difficult to adequately look after a four year old child. She would not have sufficient mobility nor the stamina to give ideal care."**

2

On 3/29/06, Dr. Horwitz, reviewed further medical information from St. Luke's Hospital. He indicated: "The Medical Record of 3/23/06 reveals the following additional medical problems. Her current EKG shows that she has a right bundle branch block and left atrial enlargement which reflect previous heart damage. She was admitted for a debridement of a left leg venous ulcer which results from chronic cardiac failure. She was admitted to St. Lukes' Hospital on 3/27/06."

"Her history shows that in 1992, she had two myocardial infarcts and as a result she has chronic moderate cardiac failure. This latter condition causes exercise induced shortness of breath and other circulatory problems. In fact, she cannot walk more than one block without being tired and breathless. She has osteoarthritis of the hands, knees and feet which prevents her from doing much heavy physical work, (such as picking up children). She has had renal stones in the past with some residual renal damage." And, Dr. Horwitz once again concluded that "It would be very difficult for Ms. Hayes to look after a four year old without the help of a full time aide."

Ms. Gemma Bascom, the prior caseworker, was informed by Ms. Haynes that she was seen by Dr. Razon on January 28, 2005. Dr. Razon informed Ms. Haynes that she will require assistance in her home, due to her medical problem with her legs. According to the Medical Request for Home Care, Ms. Haynes required the following chore services: cleaning, laundry, reheating meals, meal preparation and shopping. Homemaking services were placed in Ms. Haynes' home from May 23, 2005 to June 10, 2005.

According to Ms. Bascom, Ms. Haynes did not comply with agency guidelines in obtaining medical appointments for A████Ms. Haynes was required to take A████to the doctor every six months, but in fact never took A████for a medical examination during the entire period the child was placed in her home. Ms. Bascom, took Ameena for an overdue medical examination on May 18, 2005.

On March 15, 2006, Ms. Carmen Nazario, the home assessment caseworker visited Ms. Haynes' apartment to assess its condition. When Ms. Nazario arrived, Ms. Haynes introduced her to her adoptive children, C███and D████Both children appeared to be well provided for, healthy and content. The first area visible upon entering the home is the home's kitchen, located immediately to the left after the entrance. The kitchen has a rather large dinette table set placed in the middle of the room. Turning left at the entrance of the kitchen and following a small hallway that separates the areas is the living room. The room was somewhat dark; a lone lamp is the only source of artificial illumination in the room. To the left of the living room, if standing with the back towards the entrance door, are the livings room sofas. They were covered with dolls, clean clothes and other toys and belongings. On top of the sofas, there is a window that runs the length of the living room's back and there are window guards securing it. To the opposite side, towards the right side of the area, there is a large collection of books not necessarily in great order, which gives the appearance of disorder. In front of the sofas, there are two children's bicycles: one a two-wheeler and another a big-wheeler that belongs to D████and A████respectively. Other toys litter the floor in a rather organized manner, overwhelming the space.

After leaving the living room area, there is another hallway that goes toward to the bathroom and bedroom areas of the home and which measures approximately seven feet in length and approximately four feet wide. In the midst of the hallway, to the right, there is a small bookcase with books and souvenirs. Further down towards the right is the bathroom. Across the hall from the bathroom, is D████s bedroom. There are two beds positioned in an L shape and there are high windows secured with window guards in the back of the beds, located opposite to the entrance door. As in the living room, the room is also overwhelmed with organized belongings, also giving the immediate appearance of chaos in an otherwise pretty setting. Turning left at the entrance of D████s room and towards the end of the hallway, Q████room. The room has a twin bed set in the middle of the room; there is a tall bureau placed immediately to the left at the entrance to the room; and there is a small television located at the side of the bed. The windows are located behind the bed and as with the other windows of the household. The windows are secured with window guards. Q████also has plenty of toys and belongings in his room.

Turning right at the entrance of C████ room and towards the end of a small hallway, is Ms. Haynes' room. It is furnished with a full sized bed and two dressers, but throughout the room were organized little bundles of belongings such as bags with clean and /or used clothing, small boxes with decorations and crates with numerous little things seemingly evidencing years of accumulation. These small bundles were all over the room and some in front of the bed. Only one side of the bed is accessible as the other, the right side if standing by the entrance door, is obstructed.

When interviewed during the home inspection, Ms. Haynes conceded that she could be "hard headed" at times and that it is difficult for her to dispose of belongings, as she usually finds ways to recycle things, by handing down toys and clothes to other family members or family friends and finding new uses for seemingly old belongings. Regarding the amount of books in her living room, she stated that the children would benefit from them, as there are all kinds of books in her collection; she also stated that most of the books she acquired, belonged to her son, a school teacher who died four years ago at the age of thirty- nine. Regarding the grouping of belongings in small containers in all areas of the room, she stated that some she was in the process of putting away in their rightful place.

Ms. Nazario explained to Ms. Haynes that due to the overwhelming collection of things, her home could be a fire hazard and that in the event of an emergency, if the family needed to exit the home in haste, the many things on the floor could obstruct them.

**EARLY INTERVENTION PROGRAM:**

On December 8, 2003, due to cognitive, social and expressive speech delay and concerns about her comprehension, A████was referred by Children's Services to Thera Care for Early Intervention Services. A████received occupational therapy, speech therapy and physical therapy in Ms.Haynes' home. She was not enrolled in any other educational program. Ms. Haynes indicated that if A████were returned, she would enroll her in the Mary Merricat's

4

Castle School, located at 315 East 88th Street, New York, New York 10128, a special education program.

## INTERACTION OF MS. HAYNES AND AMEENA

The agency had a limited opportunity to observe the interactions between Ms. Haynes and A███████ However, a two-hour visit took place in Ms. Haynes' home and was observed by Ms. Hernandez, MSW, the current caseworker on the case. A█████ was able to walk around, playing with various items in the apartment. She went to Ms. Haynes at times to play with her. However, due to Ms. Haynes' leg problems, she was not able to interact actively with A███████

## D.████ T██████'S FOSTER HOME

Ms. T██████ lives in the Canarsie section of Brooklyn, New York in a residential section of South Brooklyn. She resides in a basement apartment of a two family house. The home is well furnished. The housekeeping standards are good. A██████ has her own bedroom, which was decorated child friendly. There is an open clothes rack in the bedroom, which contains A███████s clothes. There is good ventilation in the room and the room is well lit.

The living room area contains antique furniture. There is a Victorian figure sofa, a black leather sofa. There is also a dining table with four matching chairs. There are four place settings on the dining table that contain china, napkin holders, and crystal glasses. There is a breakfront that contains figurines. There are numerous antique ornaments all over the living room. This room also serves as Ms. Turner's bedroom.

The kitchen is spacious, neat and very clean. There is an operational stove and refrigerator in the kitchen. There is a microwave and cupboards. There is a second exit located to the rear of the kitchen.

Ms. D██████T██████D.O.B July 10, 1947, is a 58-year-old female. She was born in Panama City, Panama. Ms. T█████was married to Orlando J██████ in 1964. Ms.T██████was divorced in 1973. Ms. T██████s height is 5'4 and her weight is 212 pounds. According the medical records ACS has reviewed, she has no health problems. She worked for Brooklyn Hospital for 20 years as a Nurse Technician in the Neonatal Intensive care unit. She retired from the Brooklyn Hospital in the year 2000.

After she was moved to Ms. T█████s home on June 10, 2005, A██████continued to receive Early Intervention services. She received Speech Therapy at a Day Care Center that Ms. T█████ enrolled her in. She also received physical and occupational therapy in Ms. T█████r's home. According to Ms. T██████although A██████ had been receiving physical therapy while with Ms. Haynes, she had not been progressing. She was not walking properly and fell frequently.

Based on A██████s continued difficulties walking, Ms. T██████decided to take A██████ to her pediatrician, Dr. Dua, whom she informed A██████s problems with ambulation. She wanted A██████to be evaluated by a specialist.

A████ was referred to Dr. Friedman, Chief of Pediatrics Neurology. She was then diagnosed with Hypotonia. A████was referred to the Brooklyn Orthopedics Clinic where she was fitted for braces for both legs. According to Ms. T████Ameena's ambulation has improved greatly and she is no longer falling. Ms.T███states that this diagnosis should be made when a child starts walking. A████will need braces for a long period of time.

Ms. T████ enrolled Ameena in the Coconut Grove Daycare, which is located at 9010 Avenue A, Brooklyn, New York, and is a full time program. Ms. T████realized that due to A████'s delays, she required an educational program. She also enrolled A████in ballet to assist her with her ambulation. She attends the ballet school, Pazaz Studios, in Brooklyn once a week. A████ is also enrolled in her Church choir as Ms. T███feels that singing will also help her with her speech delays. Ms. T███states that A████has numerous appointments which she must take her to due to her global delays.

A████has improved dramatically, particularly since coming to Ms. T████s home. She has aged out of Thera Care Early Intervention Program and Ms. T████plans to enroll her in The Infant and Child Learning Center which is affiliated with SUNY Health Science Center at Brooklyn, located at 450 Clarkson Avenue, Box 1203, Brooklyn, New York 11203. A████ will be obtaining a Developmental/Psychological evaluation on April 13, 2006 leading to her enrollment in the program.

## INTERACTION OF MS. T████AND A████

Child Evaluation Specialist (CES) Eileen Richards observed A████nd Ms. T████. interaction during an office visit. A████appeared bonded to Ms. T████ and the interaction between the two was positive. A████called Ms. T████"Mommy." CES Richards observed A████playing in the play area. Ms. T████at one point informed A████that it was time to go home. A████responded by asking Ms. T████o wait as she was not ready to leave yet. It was clear that there was a rapport between the two and that A████felt comfortable voicing her needs and wants. Also, during a home visit, A████recited her ABC's for Ms Richards and used sign language to sign the alphabet. Ms.████indicated that A████learned sign language at the ballet school.    *T*

## VISIT TO COCONUT GROVE DAYCARE:

On March 21, 2006, Ms. Richards visited the Coconut Grove Daycare to speak to Ms. Mason A████s teacher. According to Ms. Mason, A████has improved in speech, ambulation and cognitive skills. She stated that when A████ first enrolled in the school on June 20, 2005, she was talking in sentences. Ms. Mason indicated that although she could understand her, she had to listen to her very carefully to fully understand what she was saying. She stated that since that time, A████speech has improved. She receives Speech Therapy at the daycare. Her cognitive skills also seem to have improved. Ms. Mason said that when A████first enrolled, she could not identify the difference between an orange and an apple. Ms. Mason also had some

concerns about her ambulation. The Daycare staff would take the children to the park which is near the daycare Center, and A████would wobble when walking and walk extremely slowly. Ms. Mason stated that now that A████is wearing braces, her ambulation has improved.

Ms. Mason reported that A████ has come a long way since her enrollment in the daycare but she still has a long way to go. A████is in a class which only has 4 children, therefore she is able to give her the special individualized attention that she requires. She stated that A████still tunes things out at times and has to be re-directed back to her work. Ms. Mason stated that Ms. T████is a very concerned foster parent who meets with her often to ascertain A████'s progress.

## RECOMMENDATION:

A████has shown improvement in all of the areas of development, but continues to require services such as Speech, Physical Therapy and Occupational Therapy. She is able to recite her ABC'S, use sign language, and shows a greater level of confidence and independence.

Although Ms. Haynes cares about A████it is unclear whether she has A████s best interests in mind. She already has two special needs children in her care for whom she appears to provide adequate care. It would be difficult for any one person to care for three special needs children. Mrs. Haynes' has numerous health issues and requires the assistance of a homemaker. While she did participate in the Thera Care program with A████ she did not seek out any additional or related services which would assist A████with her delays.

It is also important to note that while A████resided in Ms. Haynes' foster boarding home, Ms. Haynes never once took her for a medical examination. Due to Ms. Haynes' limited mobility and lack of stamina, she was unable to meet A████s need for medical intervention. She relied on others to escort A████to her scheduled medical appointments.

Ms. Haynes cannot walk more than one block without being tired and breathless. She also has osteoarthritis of the hands, knees and feet, which would prevent her picking up A████, or interacting actively with her. There is also some concern as to how Ms. Haynes' health would be affected with the difficulties of caring for an additional special needs child. Therefore, due to A████diagnosis of Hyportonia, speech delays and learning disabilities, her caretaker must be physically capable of meeting all her medical and other related appointments. A████required more aggressive intervention during her stay in Ms. Haynes' home, such as she now receives.

A████is the only child in Ms. T████household. In addition to participating in the Thera Care program, Ms. T████sought out medical intervention so that A████was finally diagnosed with Hypotonia. A████now wears braces to correct this condition. Ms. T████also obtained daycare services and other activities which improved A████level of functioning. A████ will continue to require many services in the future, for which Ms. T████has demonstrated that she can and will advocate.

7

Ms T█████s foster home is a pre-adoptive home. She has signed the "Intent-to-Adopt" form. A██████ has already been in four foster homes, including her current one. She clearly needs a permanent living arrangement. Ms. T█████provides Ameena with a caring, loving, supportive and structured home environment. She shows great insight and excellent judgment by seeking services which meet A████████ needs. Ms. T██████ability to recognize A████████ special needs was critical in obtaining the services to address those needs. Further, Ms. Mason, A██████s day care teacher, also noted Ms. T██████ total involvement with A███████s educational progress. It should be noted that at an early age, A████████was separated from her birth mother and placed with a different caretaker, and this has been a pattern throughout her young life. The replacements could have a long term effect on A████████ ability to bond and form attachments. It is very traumatic for a child to be continuously uprooted from a home where she feels comfortable, loved and bonded. The emotional and physical well being of this child can only be ensured at this point by having her remain with Ms. T███████

**Therefore, Children's Services strongly recommends that Ameena remain in the pre-adoptive foster home of Ms. D██████R██████**

**Eileen Richards, CES**
**LMSW**

8

# EXHIBIT 10

THAT PORTION OF THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

ALICE HAYNES individually and on behalf of
A███████B., infant,

                                    Plaintiffs,              06 Civ 1383

        -against-                                   **ORDER GRANTING IN
                                                    PART MOTION FOR
JOHN MATTINGLY, individually and as                 RECONSIDERATION
Commissioner, GEMMA BASCOM, individually and as     OF ORDER DENYING
caseworker, GARY DECRAINE, individually and as      PRELIMINARY
supervisor, IRENE RENDON, individually and as       INJUNCTION**
caseworker, MINA SHAH, individually and as review
officer, CITY OF NEW YORK and JOHN JOHNSON,
individually and as Commissioner,

                                    Defendants.

------------------------------------------------------------------ x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/25/06
```

        PLAINTIFFS having moved in this action for a preliminary injunction directing certain

relief including the return of the infant plaintiff to reside in the home of the adult plaintiff,

        AND the Court having denied on the record Plaintiffs' motion for a preliminary

injunction on April 11, 2006,

        AND the Plaintiffs having moved for reconsideration and reargument of the denial of

their motion for a preliminary injunction,

        AND said motion having been heard before the Court on May 23, 2006,

        NOW, on consideration of the above and on all of the proceedings heretofore had herein,

it is herby

        ORDERED that plaintiffs' motion for reconsideration is granted in part to the extent

noted below, and it is further

ORDERED that this matter is referred to United States Magistrate Judge Theodore Katz

to hold an evidentiary hearing and to issue a report and recommendation to this Court, to

determine whether that portion of the application for a preliminary injunction that seeks the

return of the infant A███ B. to plaintiff Alice Haynes' care should be granted, and it is further

ORDERED that in making such recommendation, the Magistrate Judge shall consider the

relative benefit or detriment involved in returning the infant to Alice Haynes' care, versus

keeping the child in the care of the current non related foster parent.

ENTERED this 25th day of May, 2006

HON. THOMAS P. GRIESA
UNITED STATES DISTRICT JUDGE

# EXHIBIT 11



**ADMINISTRATION FOR CHILDREN'S SERVICES**
OFFICE OF EXTERNAL AFFAIRS
150 WILLIAM STREET - 18TH FLOOR
NEW YORK, N.Y. 10038

**William C. Bell**
*Commissioner*

**Anne Williams-Isom**
Special Counsel/*Associate Commissioner*

**Viviane DeMilly**
*Director, Office of Advocacy*

**Estee Léger**
*Deputy Director, Office of Advocacy*

<u>In the matter of the Independent Review of</u>                          **DECISION
AFTER
INDEPENDENT
REVIEW**

**Deborah Graham**

<u>From a determination by</u>

**St. Vincent's Children's Services**

<u>Hereinafter called "The Agency"</u>

An Independent Review was held at <u>150 Williams Street, New York City</u> on July 8, 2004
before Mina Shah, Independent Review Officer, at which the foster parent(s), and the
representatives of the agency and ACS appeared. The appeal is from a determination by the
agency relating to children in foster care placement in this home, in that the agency did not
issue the foster parent a Removal Notice but removed Tyquill, Taquan and Tymeek
J▓▓▓▓▓ from this home.

An opportunity to be heard having been accorded all interested parties and the evidence
having been taken and due deliberation having been had, it is hereby found:

CS 1a
Rev. 03/02

## ATTENDEES

Deborah Graham, Kinship Foster Mother/Paternal Grandmother
Kim Brown, Witness/Friend of kinship Foster Mother
Catherine Myers, Witness/Maternal Great Grandmother of the Foster Children
Lisa Porrs, Attorney for Kinship Foster Mother
Shoshana Eisenberg, Attorney for Kinship Foster Mother
Charlotte Owens, Legal Intern, New York Legal Assistant Group
Charissa Squicciariri, Legal Intern, New York Legal Assistant Group
Steven Lam, Caseworker, St. Vincent's Children's Services
Beasant Chojar, Supervisor, St. Vincent's Children's Services
Tawana Gary, CPSS/ACS/Brooklyn Field Office
Charlotte Boivert, CES/ACS/Central Sibling Unit

## REASON FOR INDEPENDENT REVIEW

This appeal is from a determination made by St. Vincent's Children's Services relating to Tyquill
J██████ DOB ███████████ 1996, Taquan J█████DOB██████████████ 1997, and Tymeek
J██████ DOB ████████████ 1999 in foster care placement in the foster home of their paternal
grandmother, Ms. Graham. On May 25, 2004, ACS/CPS removed these children due to an
allegation of lack of supervision and medical neglect against the kinship foster mother, and CPS
informed the agency about the removal. The agency did not issue a Removal Notice to Ms.
Graham. The kinship foster mother objected to the removal of the children and requested an
Independent Review.

## PLACEMENT HISTORY/PERMANENCY PLANNING

Tyquill, Taquan and Tymeek J█████had resided in the home of their paternal grandmother,
Ms. Graham, prior to coming into foster care placement with her in February of 2003. Their
permanency plan is return to their birth mother.

## ACCOUNT OF AGENCY

Mr. Chojar, the agency supervisor, and Mr. Lam, the agency worker, stated that Ms. Bernard, the
ACS/Child Protective Services worker removed the children from this home and informed the
agency about their removal, therefore, the agency was not able to issue a Removal Notice to the
kinship foster mother.

Mr. Chojar stated that on May 25, 2004, Ms. Graham's twelve-year old niece, N██████who is in
her legal custody, made an allegation of physical abuse against Ms. Graham's twenty-two year old
daughter. N██████ school reported that she was seen with shoe prints on her face and bruises on
her body. N██████was taken to the hospital by her school staff. Mr. Chojar stated that the CPSS
removed the children from this home and placed them with their one-year old half-sibling, K█████
B█████n a non-kinship foster home. Mr. Chojar stated that OCI unfounded the case against the
kinship foster mother and her daughter.

Mr. Lam stated that he recently received this case. Mr. Lam stated that during this time period,
he visited Ms. Graham's home only once and her home was in compliance. Mr. Chojar stated that
the agency did not have any major concerns regarding Ms. Graham's care and/or supervision of
her grandchildren.

Mr. Chojar stated that the children have adjusted well in their current placement. The children
are interacting well with the current foster parents. Mr. Lam stated that he visited the children at
the current foster home immediately after the removal and he did not observe any separation

anxiety. Mr. Chojar stated that the siblings are enjoying being reunited with their baby-brother.

## ACCOUNT OF THE FOSTER PARENT

Ms. Graham stated that she lives in a triplex apartment with six bedrooms. Ms. Graham stated that she had resided with three of her grand children as foster children, five adopted children, her twenty two-year old daughter, N██████, and her twelve-year old niece, N█████ in her home. She had a legal custody of N█████

Ms. Graham stated that on May 24, 2004, around 9:30 PM, her twelve-year old niece, N██████ had a fight with other children in the home. Ms. Graham stated that she asked N█████ to go to bed, which she did; but later on that evening she went downstairs and resumed fighting with the children. N█████ hit J█████ her adopted child, with a pair of shoes and out of anger he hit her back with the shoes. Ms. Graham stated that she was in her bedroom on third level when the boys and N█████ were fighting on the second level. Ms. Graham stated that her grandson's mother, Shameeka who was present in the home, made N█████ go back upstairs. Ms. Graham stated that Shameeka, who is a birth mother of her grandson and is a frequent visitor of her house, is not cleared by the agency. According to Ms. Graham, that night, nobody noticed any bruises or marks on N█████ Ms. Graham stated that the next day in the morning when N█████ left for school, she did not see her, therefore did not notice any marks on her face and body. Ms. Graham stated that she learned about the bruises and shoe prints on N█████ face and body when the school informed her.

Ms. Graham stated that N█████ reported to the school that her daughter, L█████ hit her. Ms. Graham stated that L█████ does not live with her and she was not present in the home at the time of the fight. Ms. Graham stated that N█████ stole L█████ son's walkie-talkie that same afternoon and L█████ questioned N█████ and demanded that she produce the walkie-talkie the next day. N█████ became upset with L█████ and made false allegations against her. Later on, N█████ recanted her story about how she received bruises and shoe marks on her face and the case against L█████ was dismissed in court and her child was paroled to her. Ms. Graham presented a certificate of disposition of the criminal case against L█████ Ms. Graham stated that all of her adopted children were also removed due to the allegations but the court ordered their parole to Ms. Graham. N█████ was placed in a foster home by the court.

N█████ has a severe behavior problem. She has a habit of stealing things from the people. Currently, N█████ has been placed in a therapeutic foster home and she has been attending a day treatment school in Harlem Hospital. Ms. Graham stated that prior to receiving custody of N█████ about a four years ago, she had several foster care placements and a psychiatric hospitalization. Ms. Graham stated that N█████ needs closer supervision and attention and her home might not be able to provide appropriate attention and services that she needed. Ms. Graham stated that her sister from North Carolina is planning to have N█████ in her care.

Ms. Graham stated that she has visited the children at the agency on a weekly basis and the visits are going well. Ms. Graham is concerned because she just learned from the children's current foster mother that recently T█████ had a bowel movement on himself and T█████ wet his bed. Ms. Graham claimed that these children did not have these sort of the problems when they were in her care. Mr. Lam stated that the foster parents have not reported these problems with children to the agency.

Ms. Graham stated that N█████ had a tumultuous relationship with Ms. Graham's adopted children and these boys were resentful towards N█████ Ms. Graham stated that one of her adopted sons, J█████ who was involved in the fight with N█████ is currently receiving counseling

3

and attending an Anger Management Program. Ms. Graham stated that if and when her grandchildren return to her, she would like to get counseling services for them.

Ms. Graham presented a few character reference letters from friends, stating that she is a caring and loving parent and that she is involved and dedicated to ensuring her grandchildren are properly educated. Further, these letters stated that the best interest of these children is with Ms. Graham and that she is the most logical placement for ensuring a healthy and stable environment.

<u>Witness:</u>

Ms. Brown, a friend and witness, stated that she had known Ms. Graham for several years and never witnessed her abusing any one of these children. Ms. Brown stated that Ms. Graham is a caring person. Ms. Graham has taken care of so many children in her home; many of them had special needs and were thriving after being in her care.

Ms. Myers, maternal great grandmother of the ███████ children and witness, stated that she had witnessed N█████s behavior and outbursts. She strongly believes that N█████hould be placed separately due to her problems and needs. Ms. Myers stated that Ms. Graham is an excellent foster mother and children should be returned to her.

## CLOSING STATEMENT OF FOSTER MOTHER'S ATTORNEY

Ms. Eisenberg, New York Legal Assistant Group/attorney for Ms. Graham, stated that Ms. Graham is an exceptional parent, who had been doing an outstanding job of raising her nieces, nephews and grandchildren for years prior to the children's removal from her care. She had been parenting nine children: she was a kinship foster mother of three of her grandchildren, a mother to her five nieces and nephews whom she had adopted, and she had legal custody of her twelve year old niece. Ms. Graham's grandchildren, T█████and T█████initially came to live with her when they were infants and T█████ had been in her care since he was two years-old. Ms. Graham testified that T█████ was malnourished and underweight at the time he left his birth mother's care and Ms. Graham nursed him back to health and he thrived after he was placed in her care.

Ms. Eisenberg stated that Ms. Graham's daughter; l████J█████as not present when an incident with N█████ccurred. N█████alleged that L█████hit her and kicked her in the face causing bruises. These allegations were investigated both by the criminal court and by child protective services and the criminal court dismissed the case and the CPS investigation determined the allegations to be unfounded. On June 7, 2004, all of Ms. Graham's adopted children were returned to her by court order. N█████was not returned, as she needed to be in a home where she could receive one on one attention. Ms. Eisenberg stated that Ms. Graham's grandchildren were replaced with their half-sibling.

Ms. Eisenberg stated that Ms. Graham's grandchildren were residing with her prior to February of 2003 and the children were not removed because the agency was concerned about the number of children living in the home. The major reason for the removal was that N█████made an allegation of physical abuse. Ms. Eisenberg stated that no evidence was presented by the agency to support the claim that she was not capable of taking care of all of the children in her home. Ms. Graham has sought out and secured additional services for the children in her care for years with no assistance from the agency. Ms. Graham also testified that she has additional support from her family.

Ms. Eisenberg stated that the agency presented conflicting and limited testimony as to how the children are functioning in their current placement. The agency claimed that the children are doing well while Ms. Graham had heard reports of the children wetting their beds and defecating

4

on themselves. Ms. Eisenberg stated that the agency did not explain how the children could be considered to be in a stable environment, and should not be uprooted, when they had only lived in that home for less than two months, as compared to the Graham's home where they had spent their entire lives. Even, the agency worker testified that the children were doing well in Ms. Graham's home. Further, the agency stated that they did not want to move the ████████children because they had been reunited with their half-sibling. Ms. Eisenberg stated that if it were a genuine concern for the agency, they would have attempted to replace these children with their half-sibling long before the incident with N███████happened. Instead, prior to removal, the agency was arranging for the sibling visits between the ████████ children and K████

Ms. Eisenberg stated that in ACS/CES' opinion based on a conversation that she had with the J███████ children who are all seven year-old or younger, that the children appeared to be happy and excited in their current home. Ms. Eisenberg stated that the children are in this home during "honeymoon" period. Ms. Eisenberg stated that the children's law guardian stated that these children are too young to state their interest. Ms. Eisenberg stated that K████s great grandmother stated in her testimony that the J███████ children should be returned to Ms. Graham.

In conclusion, the best interests of the children necessitate that the J███████ children be returned to Ms. Graham. Neither the number of children Ms. Graham has parented, nor their vast and exceptional needs, have ever prevented the kinship foster mother from providing support and supervision for each of her grandchildren. In fact, the size of the family Ms. Graham has forged is the source of its strength. The J████ children have been raised in Ms. Graham's home as an integral part of a larger family, including five of their older cousins, with whom they have developed strong ties. Moreover, the initial reasons, which led to the removal, have been determined to be unfounded. Apparently, Ms. Graham has performed her parenting duties in an exemplary manner. After a brief, but traumatic month of separation from their home and their family, it is incumbent upon the agency/ACS to promote the best interests of these children by restoring them to the care of Ms. Graham.

## ACCOUNT OF CHILD PROTECTIVE SERVICE SPECIALIST

Ms. Gary, ACS/ Brooklyn Field Office/ CPS, stated that her office was not involved directly with the case or with the removal, therefore she is not in a position to make a statement regarding the appropriateness of this removal or stating her position to return the children back to Ms. Graham.

## ACCOUNT OF SIBLING UNIFICATION SPECIALIST

Ms. Boivert, sibling unification specialist, stated that she visited the home of the paternal grand mother, Ms. Graham and she interviewed the J███████children at their current placement.

Ms. Boivert stated that based on all resources, she concludes that the children could derive· benefits from both potential foster care placements. Ms. Graham is the paternal grandmother of the J████ children. The children have been comfortable with their paternal grandmother and have adapted easily within her home, a familiar environment. Ms. Boivert stated that the allegations against Ms. Graham's daughter were unfounded, eliminating the reason for the J████ siblings' removal.

Currently, the J████siblings are reunited with their brother, K███B████in a non-kinship foster home. K████has been placed in this home since his birth and he is not related to Ms. Graham. Ms. Boivert stated that their current foster parents are open to adopting all these siblings, as is their paternal grandmother, Ms. Graham. Ms. Boivert stated that there are no other children in this foster home in contrast to the eight children in Ms. Graham's home.

Ms. Boivert stated that when the children were questioned, they indicated that they would like to remain in their current placement with their brother. Ms. Boivert stated that these children could receive more attention in their current foster home as opposed to Ms. Graham's kinship foster home, therefore she would like to see this sibling group remain together in their current non-kinship foster home. However, Ms. Graham is and will always remains their paternal grandmother.

## ACCOUNT OF LAW GUARDIAN

Ms. Tyson, the Law Guardian for the J███████ children, stated in her written statement, dated July 16, 2004, that she interviewed the J██████ children on July 14, 2004. Ms. Tyson stated that the J██████ children have lived with their paternal grandmother most of their lives. They had enjoyed a stable home environment with the other children, who reside in that home. Ms. Tyson stated that she had known Ms. Graham to be a nurturing caregiver and a reliable foster mother. Ms. Graham had honored the appointments made by the law guardian for the children while they were in her care and the children had always appeared to be well taken care of. The children had regular contact with their father while they were in her care.

Ms. Tyson stated that while the children are enjoying living with their brother, K████ they also liked living with their paternal grandmother. The children have never reported any unsafe or otherwise inappropriate conditions. Regarding the incident which led to their removal, the children as well as Ms. Graham have stated accounts which support the conclusion that the children were not placed in imminent risk prior to their removal and even during the physical altercation.

Ms. Tyson stated that the non-kinship foster care is necessary for situations where family members or guardians are either unavailable to care for the children or have been deemed inappropriate. According to Ms. Tyson, Ms. Graham has not shown herself to be inappropriate. In fact, she has demonstrated a commitment to the children and her family by adopting her five nieces and nephews, caring for her niece, and three of her grandchildren. Ms. Graham has also petitioned the court for custody of the children and she had attended all court hearings until disposition.

For all these above-mentioned reasons, Ms. Tyson strongly believes that there are no impediments to the children being returned to Ms. Graham. It is in their best interests to continue in the familial, stable environment that they have grown accustomed to. It is Ms. Tyson's position that the children should be returned to their paternal grandmother, Ms. Graham.

## ACCOUNT OF OFFICE OF CONFIDENTIAL INVESTIGATION (OCI)

The OCI report stated that the case against Ms. Graham for the allegations of inadequate guardianship concerning the foster children in her care is unfounded. There is no credible evidence to substantiate the report. Further, this report stated that CPS interviewed T████ who reported that he was sleeping and he did not see L████ throwing shoes or things at N████. He stated that his cousins were fighting. He also stated that N████ told police that L████ hit her but she was lying. He stated that L████ never hit N████ or any other children in the home. CPS interviewed T████ who stated that he was a sleep when the alleged incident with N████ happened. He stated that N████ went into the foster mother's adopted children's room and she threw shoes at the boys, then the boys started beating her. T████ stated that N████ fights with everybody. CPS interviewed T████ who said he was sleeping and did not witness anything. T████ stated that N████ used to hit him and fight with him. He also stated that N████ always fights with Ms. Graham's adopted children. T████ stated that L████ never hit N████ or any other children in the home. CPS interviewed Ms. Graham who denied the allegations. Ms.

Graham told OCI that L▓▓▓was not present in the home when the incident with N▓▓▓ occurred. Ms. Graham said that N▓▓▓ is emotionally disturbed and she has made false allegations in the past and then has recanted. Ms. Graham stated that N▓▓▓changed her story several times. CPS interviewed Manhattan District Attorney who stated that the charges against L▓▓▓have been dropped because N▓▓▓ statement has not been consistent. Further, CPS stated that two of N▓▓▓ siblings told CPS that they were fighting with N▓▓▓and caused injuries.

## CONCLUSION

The written and oral information presented at the Independent Review indicated that the agency was justified in removing the J▓▓▓ children from the home of their paternal grandmother, Ms. Graham.

This Review Officer is concerned that there are some frequent visitors on a regular basis in the home of Ms. Graham and the agency has not cleared all of them. It is the responsibility of Ms. Graham to report these visitors to the agency.

This Review Officer understands that the agency was not directly involved with the removal but the agency should have issued a Removal Notice to this foster mother, even after the children were removed from her home.

This Review Officer understands that the child, who caused the removal, is no longer residing in the home of Ms. Graham. As per the court order, this child needs closer supervision and attention, and a structured environment. She needs to be placed in a higher level of care. This Review Officer understands that Ms. Graham's adopted children were returned to her care after her niece recanted her story and the court dropped criminal charges against her daughter. It appears that N▓▓▓ statement was not consistent. This Review Officer also acknowledges that OCI's investigation was determined to be "unfounded" against Ms. Graham.

This Review Officer understands that since May 25, 2004, Ms. Graham's grandchildren were placed with their half-sibling in a non-kinship foster home. This Review Officer also understands that the agency had contact with the children on a weekly basis at the agency; however, for unknown reasons, the agency did not have enough information regarding the children's functioning and adjustment in their current home. This Review Officer acknowledges that prior to the removal, the agency had no major concerns regarding the safety, care and supervision provided to the children at their paternal grandmother's home. It appears that the children were thriving in the care of Ms. Graham.

This Review Officer understands that Ms. Boivert recommended that the J▓▓▓children remain with their half sibling in their current foster home because the siblings are united and the children could potentially get closer attention as opposed to Ms. Graham's home where there are too many children in the home. This Review Officer is aware that the J▓▓▓ children and their sibling have lived together in their current home for less than two months, whereas they lived their entire lives with their grandmother as an integral part of a larger family. These children were not removed because the home was crowded with too many children and their needs were not being met. This Review Officer understands that the children were removed because N▓▓▓ made allegations of abuse; however, these allegations have been determined to be unfounded. This Review Officer recognizes that the agency did not present any evidence to support the claim that Ms. Graham was unable of taking care of all the children in her care and that the children were at imminent risk. On the contrary, the agency was arranging for the sibling visits between the J▓▓▓children and K▓▓▓until they were united in the same home.

This Review Officer understands that recently Ms. Tyson, the Law Guardian, interviewed the children and the children have expressed that while they enjoy living with their half-brother, they

also liked living with their paternal grandmother and their nieces and nephews with whom they have developed strong ties. Ms. Tyson stated that the children never reported any unsafe or inappropriate conditions of their paternal grandmother's home. Ms. Tyson reported that Ms. Graham is committed and has always provided a stable home environment. This Review Officer understands that Ms. Tyson is concerned that currently the children are with their half-sibling but in a non-kinship foster home when their paternal grandmother is appropriate and available to provide a safe, stable, and loving home to these children. Ms. Tyson strongly recommends the return of these children to Ms. Graham.

For all the above reasons, this Review Officer has determined that the J███████children be returned to the home of their paternal grandmother, Ms. Graham.

This Review Officer strongly recommends that the agency immediately clear all the visitors at the foster home who are frequently visiting the home on a regular basis. This Review Officer strongly recommends that the agency continue sibling visits on a regular basis.

Mina Shah, MSW
Independent Review Officer
July 20, 2004

Cc:    S. Lam
        B. Chojar
        A. Grossinger
        B. Trawer
        E. Billings
        P. Rigaud
        A. Boivert
        S. Springer
        O. Mat
        A. Tyson, Esq.,

# EXHIBIT 12



**ADMINISTRATION FOR CHILDREN'S SERVICES**
Office of Advocacy/Division of Community Affairs
150 WILLIAM STREET – 1st FLOOR
NEW YORK, N.Y. 10038

**John B. Mattingly**
*Commissioner*

**Anne Williams-Isom**
Special Counsel/*Associate Commissioner*

**Dana Guyet**
Director, Office of Advocacy

---

<u>In the matter of the Independent Review of</u> _____

**DECISION
AFTER
INDEPENDENT
REVIEW**

**Mable Rivera**

<u>From a determination by</u>

**Family Support System**

<u>Hereinafter called "The Agency"</u>

An Independent Review was held at <u>150 William Street, New York City</u> on April 18, 2006 before Mina Shah, Independent Review Officer, at which the foster parent(s), and the representatives of the agency, ACS and the Legal Aid Society appeared. The appeal is from a determination by the agency relating to children in foster care placement in this home, in that the agency has not given a Notice of Removal and removed B███████ C████████, E██████ S███████, L██████ S███████, A████ S███████ and J████ C██████ from this home on an emergency basis.

An opportunity to be heard having been accorded all interested parties and the evidence having been taken and due deliberation having been had, it is hereby found:

CS 1a
Rev. 03/02

## ATTENDEES

Mable Rivera, Kinship Foster Mother/Maternal Aunt
Anthony Rivera, Kinship Foster Father
Timmey Clark, Emotional Supporter/Caseworker, Cobra Case Management
Lucy Gonzalez, Emotional Supporter/Caseworker, Cobra Case Management
Rochelle Gilbert, Emotional Supporter/Caseworker/CASA/Ledbetter Children
Leondro Johnson, Witness/ Alleged Perpetrator/Boyfriend of Ms. Rivera's Daughter
Veta Deering, Witness
Ramona Chapman, Witness/ Birth Mother
Ms. Chapman, Witness/ Jada's Birth Mother
Anny Garcia, Caseworker, Family Support System
Fabian Njoku, Caseworker, Family Support System
Catherine Anagbose, OCI/Fair Hearing Liaison, Family Support System
Michael Warren, Case Manager/OCM/ACS
Ruth Thomas, Case Manager/ OCM/ACS
Daria Muhammad, CPS/OCI/ACS
Norah Bowler, Law Guardian

## REASON FOR INDEPENDENT REVIEW

This appeal is from a determination by Family Support System Inc. relating to B███████ C███████ DOB █████████ 1999, E███ S███████ DOB J███████ 1998, L███ S███ DOB █████████ 1994, A███ S███████ █████████, 1993, and J███ C███████ DOB █████████ 1997 in foster care placement in the kinship home of Mr. & Mrs. Rivera. On March 31, 2006, the agency did not issue a Notice of Removal but removed these children due to sexual abuse allegations against the foster parents' daughter's boyfriend on an emergency basis. The foster parents objected to the removal of these children and requested this Independent Review.

## PLACEMENT HISTORY/PERMANENCY PLANNING

The C███████/S███████ siblings were placed with the maternal aunt in December 1999. Their permanency plan is return to their birth mother.

J███ C███████ is cousin of these four C███████/S███████ siblings. She was placed with her maternal aunt on December 11, 1998. Her permanency plan is adoption and she is conditionally freed.

## ACCOUNT OF AGENCY

Ms. Garcia, the agency worker for the C███████/S███████ siblings, stated that on March 31, 2006, the birth mother of the C███████ S███████ siblings reported to the agency that the children were left unsupervised. She reported that Mr. Johnson, the boyfriend of Ms. Rivera's daughter Rhonda, had sexual contact with L███████ A████████ reported that there was sexual activity going on between Mr. Johnson and ████████ while she was upstairs in Rhonda's apartment. Ms. Garcia called the foster mother but she was not at home. Later, Ms. Garcia and her supervisor, Ms. Cummings visited the home and spoke with Ms. Rivera who denied the allegations and she alleged that the children were lying. Ms. Garcia suggested taking the child to the hospital to verify if she was sexually active and Ms. Rivera started screaming and yelling in front of the children. Ms. Garcia stated that Ms. Rivera was continuously denying the allegations and repeatedly said that the girls were lying.

Ms. Garcia explained that Rhonda lives upstairs in the same home; however, she was unsure if her boyfriend lives with her. Since Mr. Johnson was in constant contact with the children, the agency

suggested clearing him. However, Ms. Rivera and Rhonda denied that he lives in the home and claimed that he is just a regular visitor of Rhonda's home. Rhonda told the agency that usually the children were never left alone with Mr. Johnson. This was the first incident in which the girls were upstairs alone with him.

Ms. Garcia and her supervisor spoke with the children separately. [redacted]nd [redacted] reported to the agency that Mr. Rivera was in the backyard with the three younger girls while they were upstairs at Rhonda's apartment.

[redacted] reported that she did not see anything unusual but [redacted] told her that she had sex with Mr. Johnson. [redacted]old that when she asked [redacted] what they were doing back in that room, [redacted] and Mr. Johnson both said at the same time that they had sex. [redacted] also said that no one has touched her inappropriately but sometimes Mr. Johnson made comments and showed her porno pictures that made her feel uncomfortable. [redacted] said that sometimes Mr. Johnson played a pornographic movie and made comments to the girls that this is what he likes to do to them. [redacted] said that Mr. Johnson does not live with Rhonda but he visits her almost everyday.

Ms. Garcia stated that she interviewed [redacted] separately and her statements were consistent with [redacted]s. [redacted] stated that in this week, Mr. Johnson once asked [redacted] Rhonda's eight-year old son to leave the room because he was going to help [redacted] with her homework. [redacted] reported that Mr. Johnson never touched her inside her clothes but he often touched and patted her on her thighs and buttocks. Mr. Johnson often asked her why [redacted] does not "fuck" him. [redacted]lso reported that Mr. Johnson played pornographic movie and asked her to do the same with him. Ms. Garcia and Ms. Cummings decided to take the girls to hospital for medical check ups. They also wanted to get body checkups at the agency clinic.

Ms. Garcia stated that Ms. Cummings decided to remove the children from this home because Mr. Johnson was a regular visitor of the home and Ms. Rivera failed to inform the agency about him to clear him and she failed to provide adequate supervision to the children. As soon as the agency informed the foster mother that they were taking the children for medical check up, Ms. Rivera took off with the children in a van to the Franklin General Hospital in Long Island. It was out of the jurisdiction for the police and the agency; however, the agency worker and the supervisor met with the foster mother at the hospital. Ms. Garcia stated that the hospital report indicated that there was no evidence of sexual penetration and the girl had minor bruises on her body. Ms. Rivera's explanation for her abrupt behavior was that she wanted the children to be checked at this particular hospital and obtain first hand facts concerning the allegations.

Ms. Rivera also told the agency that the birth mother was playing a game to get her children back in her care and she was misleading the children by giving them false hope. Ms. Garcia stated that except [redacted] no other children wanted to return to the home of Ms. Rivera because the children reported that she often screams and hits them. Ms. Garcia stated that the agency removed all the children and placed them in two separate foster homes. Although the agency offered the children to call or visit Ms. Rivera, none of them asked except [redacted] Ms. Garcia stated that the agency made a report to the State Central Registry.

Ms. Garcia stated that the agency held a meeting with the foster mother on April 3, 2006. During this meeting, the agency suggested that the foster mother should move her daughter out of her home. Ms. Rivera assured the agency that she would not allow Mr. Johnson in her or her daughter's home. Ms. Rivera repeatedly said that the children were lying.

Ms. Garcia stated that the children were taken to the Queens Children's Advocacy Center (CAC) but the agency was not able to obtain a report from the CAC or the detective.

Mr. Njoku, the agency worker for [redacted] expressed that the agency wished to work with Ms.

Rivera under certain conditions if she would get training about disciplining the children and depending on how she wants to handle the situation with her daughter and her boyfriend.

Ms. Anagbose, the agency OCI liaison, stated that Ms. Rivera admitted that she was leaving the children unsupervised with her daughter and that she was using corporal punishment with the children.

## ACCOUNT OF THE FOSTER PARENT

Ms. Rivera stated that on March 30, 2006 and March 31, 2006, children's school was closed and they were at home. On March 30, 2006, Ms. Rivera had a pre-committed event that she needed to attend. Usually, she takes the children with her except for certain unavoidable circumstances. Mr. Rivera was at home with the children. Ms. Rivera asked ▮▮▮▮and ▮▮▮▮▮▮to wash ▮▮▮▮ hair on Friday morning and the girls were washing ▮▮▮▮ hair in the basement when she left the home. Ms. Rivera stated that she was gone for two to three hours. Ms. Rivera stated that while she was at the event, the birth mother of the four siblings called her and informed her about the incident. The birthmother reported that ▮▮▮▮just called her and said that ▮▮▮▮▮▮ had sex with Mr. Johnson.

According to Ms. Rivera, Mr. Johnson came to pick up L▮▮▮▮Rhonda's son, to go to a movie and he stayed only for a few minutes on that particular day. ▮▮▮▮▮▮ and L▮▮▮▮ were playing on the porch when Mr. Johnson arrived at the home. ▮▮▮▮▮▮followed Mr. Johnson and went upstairs after him, although all the children knew that they were not allowed going to Rhonda's apartment without her permission.

Ms. Rivera stated that after receiving a call from the birth mother, Rhonda came home before Ms. Garcia and Ms. Rivera arrived at the home. Rhonda asked ▮▮▮▮and ▮▮▮▮▮▮ about what happened and ▮▮▮▮▮said that she was playing with L▮▮▮ and ▮▮▮▮lied and said that she had sex with Mr. Johnson.

Ms. Rivera stated that she had given the first chance to the agency to talk to the children. Ms. Rivera stated that she also spoke with the children after the agency finished talking to them. Ms. Rivera stated that she was accused in the past of mistreating the children, therefore she wanted to get the medical check up of the children on her own to make sure that nothing happened and before the agency got it done. So, she took off with the children to the hospital. Ms. Rivera stated that she did not trust the agency, therefore she decided to talk to the children herself and decided to get them checked at the hospital of her choice. Ms. Rivera stated that she was cooperative with the agency and she denied screaming or getting upset with the agency staff on that day.

Ms. Rivera stated that the hospital did not find any evidence of sexual penetration with the two girls. They found minor old bruises. Ms. Rivera stated that she had a chance to talk to the detectives who told her that the children's story was not consistent; however, the girls indicated that Mr. Johnson has often called the girls upstairs and he also made sexually provocative comments to these girls. ▮▮▮▮▮▮ told Ms. Rivera that he was playing with L▮▮▮ and running up and down the stairs on that particular day.

Ms. Rivera stated that she knew Mr. Johnson as her daughter's boyfriend for three years and he never came into her home unless she invited him. Ms. Rivera stated that her daughter's apartment has a separate entrance.

Ms. Rivera strongly felt that the agency did not give enough time to prepare her for the children's removal from her home. Ms. Rivera stated that she knows for sure that ▮▮▮▮▮▮ and▮▮▮▮▮▮ love to talk to her. According to the agency, however only▮▮▮▮has asked to speak to Ms. Rivera.

4

Ms. Rivera stated that since ▅▅▅▅ and ▅▅▅▅▅ entered into puberty, she was keeping close watch on their behavior. Ms. Rivera stated that A▅▅▅and ▅▅▅▅▅ demonstrate sneaky behavior. They are disobedient, untrustworthy and they lie. ▅▅▅and ▅▅▅are curious children and they were minding everybody's personal matters. Ms. Rivera stated that the two young girls fantasized about love and sex. She felt that the children over dramatized the matter. C▅▅▅▅▅ ▅▅▅and ▅▅▅▅were obedient and well behaved children. Ms. Rivera stated that the birth mother was allowing her children to watch pornographic movies when they were in her care.

Ms. Rivera admitted using corporal punishment when the children were misbehaving as she needed to set the disciplinary rules among all the children. She caught ▅▅▅▅ playing with matches and setting fires. If she did not punish ▅▅▅▅ other children would repeat the act. Ms. Rivera stated that recently, ▅▅▅▅ mimicked her while she was on the telephone and she reprimanded her. One time, ▅▅▅▅▅ was wild and hitting another child. Often, ▅▅▅▅▅ used foul language. According to Ms. Rivera, ▅▅▅▅ and ▅▅▅▅ need a strict disciplinary environment. Usually, she takes away television time, takes away cake, ice cream and fun time and does not allow the children to attend birthday parties when they misbehave.

Ms. Rivera stated that she has been a licensed foster parent for eight years. The Riveras wanted all the girls back in their care except if ▅▅▅▅ and ▅▅▅▅▅▅ do not want to return to her. However, Ms. Rivera suggested that the agency needed to work with these two older girls and closely monitor their behavior.

Mr. Rivera stated that he was in the backyard on the day of the incident. According to Mr. Rivera, he checked upon the girls that day every hour or so and he strongly believed that this sort of alleged incident never happened at all. He saw Mr. Johnson coming to the home to pick up L▅▅▅ for a movie and they both left immediately. Mr. Rivera was under the impression on that day that the girls were in the basement washing ▅▅▅▅ hair. When he heard about the alleged incident he was shocked. He stated that Mr. Johnson visits Rhonda but he never came down to their house unless they invited him. Mr. Rivera also stated that he has no pornographic movies in his house.

<u>Witnesses:</u>

Ms. Deering stated that she is a neighbor of the Riveras. She stated that Ms. Rivera is an excellent foster mother. Ms. Deering was not aware of the alleged incident.

Ms. Chapman, Ms. Rivera's other daughter who adopted ▅▅▅▅ brother, stated that ▅▅▅▅ has behavioral issues and a habit of fabricating stories.

Mr. Johnson, the alleged perpetrator/Rhonda's boyfriend, denied the allegations of sexual abuse of ▅▅▅and ▅▅▅▅▅ He stated that he came to the home after 10:30am and L▅▅▅was on the porch with ▅▅▅▅▅ Mr. Johnson stated that when he went upstairs, ▅▅▅and ▅▅▅▅ followed him. He asked the children where the others were and both girls said that nobody was at home. ▅▅▅▅ went up and down while L▅▅▅was getting ready. Mr. Johnson stated that be only spent a few minutes in the house. He claimed that he did not put the television on and he was alone with ▅▅▅▅▅ for less than three to five minutes. In the meantime, Rhonda called him saying that ▅▅▅▅ reported to her birth mother that Mr. Johnson had sex with ▅▅▅▅▅ A few minutes later, ▅▅▅▅also told him that ▅▅▅▅reported to their birth mother that she had sex with him and ▅▅▅▅kept saying that ▅▅▅▅was lying. Mr. Johnson stated that when he heard the allegations, he was shocked and uptight. Mr. Johnson denied showing pornographic material or video to the children. Upon questioned by ACS worker, Mr. Johnson denied having an intimate relationship with Rhonda with an open door or in front of the children, which may have provoked ▅▅▅▅▅ and ▅▅▅▅ He stated that whenever he comes to Rhonda's home, he does not spent much time with these children. Mr. Johnson stated that the children were not allowed to come to Rhonda's apartment and if they do come, Rhonda would send them back. Mr. Johnson also

5

denied that he ever shook hands or did any greeting kiss on the girls' cheek. Mr. Johnson stated that he has no idea why ▮▮▮ made this allegation against him.

## STATEMENT OF THE BIRTHMOTHER:

Ms. Chapman, the birth mother of C▮▮▮/S▮▮▮ siblings, stated that she would not feel comfortable talking in the presence of her aunt, Ms. Rivera. Therefore, Ms. Rivera stayed out of the room while Ms. Chapman was presenting information.

Ms. Chapman stated that on March 31, 2006, ▮▮▮ called her to say that she and ▮▮▮a were being touched on their thigh and buttocks by Mr. Johnson. ▮▮▮ also said to her that Mr. Johnson had sex with ▮▮▮ and Mr. Johnson told ▮▮▮ that he loved her and she was his favorite girl. Ms. Chapman asked ▮▮▮ why she did not report this to her in the past and ▮▮▮ said that she was afraid that nobody would believe her because Ms. Rivera always called her a liar. The birth mother immediately called the agency to report this incident. Ms. Chapman stated that she spoke with ▮▮▮ and ▮▮▮ after their removal and they said that they are scared.

Ms. Chapman stated that she came to know Mr. Johnson at Ms. Rivera's home during major holiday parties. She also stated that she is not sure if Mr. Johnson resides with Rhonda.

Ms. Chapman, ▮▮▮ birth mother, stated that she wished the return of ▮▮▮ to the home of Ms. Rivera. According to her, Ms. Rivera is an excellent foster mother to her child and she feels safe for her daughter.

## ACCOUNT OF ACS CASE MANAGER:

Mr. Warren, ACS case manger, stated that he was aware of ▮▮▮s ability to reconstruct the truth and her behavioral issues. Mr. Warren suggested that the three younger children should return to the home of Ms. Rivera and the agency should explore another kinship resource for the two older children. It appeared to the ACS case manager that ▮▮▮ takes cues from her birth mother who has wild thoughts that have a negative influence on the children.

Ms. Thomas stated the same as Mr. Warren that the children should return to the foster mother.

## ACCOUNT OF LAW GUARDIAN

Ms. Bowler, the Law Guardian, stated that she has been working with these children and the family since the inception of the case.

Ms. Bowler stated that Ms. Rivera is an excellent foster mother. Ms. Bowler stated that ▮▮▮ is a very inappropriately physically affectionate but reserved child. ▮▮▮ is a very provocative young girl and being around a young man in the home she may be seeking attention. Ms. Bowler stated that she is not trying to minimize the incident by saying that it was some sort of mere sexual attraction.

Ms. Bowler stated that she spoke with the children twice last week. Ms. Bowler stated that ▮▮▮ and ▮▮▮ have been very consistent with their stories since the incident on March 30, 2006 and they do not feel comfortable returning to the home of Ms. Rivera. Ms. Bowler stated that she heard very conflicting stories from the other children. It may not be appropriate to return these children to the home of Ms. Rivera. They also strongly expressed their wish not to return to the home of Ms. Rivera. However, ▮▮▮ truly misses Ms. Rivera and expressed her wish to return to her home. Ms. Bowler stated that these children have been placed in two separate foster homes in two different boroughs and two separate schools and this may not be an appropriate situation for them. Therefore, she strongly recommends that ▮▮▮, ▮▮▮ and ▮▮▮ return to the home of

6

Ms. Rivera and ██████ nd l██████ remain in their current placement or the agency should explore another kinship resource. She understands that these children are close to each other and they share a bond. Ms. Bowler stated that the home of Ms. Rivera is safe for the younger children as long as the agency takes extra measures of protection with Mr. Johnson as well as having Ms. Rivera cooperate with the agency to implement those actions. The agency and the foster mother should ensure that Mr. Johnson does not have unsupervised access to the children. Ms. Bowler also stressed that the foster parents are mandated to follow the protocol about using corporal punishment with the children in their care. Ms. Bowler also recommended that the therapist address issues of concern with ██████ and ██████ Ms. Bowler stated that these children are difficult to handle and they have emotional needs. According to Ms. Bowler the children were taken to CAC on April 12, 2006.

Ms. Bowler believes that the birth mother of the four siblings and ██████ birth mother have good working relationships with Ms. Rivera. However, the birth mother of the four siblings was under the impressions that by making false allegations, the children might return to her.

## ACCOUNT OF OFFICE OF CONFIDENTIAL INVESTIGATION (OCI)

Ms. Muhammad, CPS/OCI/ACS, stated that the OCI investigation is still open and the determination has not been made. According to the <u>seven day assessment</u>, OCI worker spoke with the children and learned that the children may have been exposed to material that was inappropriate for them; however, they stated that they have never been physically touched. The children were seen at Franklin General Hospital in Long Island and the medical did not find any evidence of sexual abuse. Currently, the children are replaced in two separate homes.

Ms. Muhammad stated that she spoke with ██████ ██████ reported that on March 30, 2006, Ms. Rivera had gone out and Mr. Rivera was outside in the backyard. In the meantime, Mr. Johnson came in and went upstairs. ██████ stated that Mr. Johnson had a video which was inappropriate. According to ██████ she saw a man kissing a woman on her "pussy". They were an African American couple, probably naked. ██████ stated that she went to the bathroom and Mr. Johnson stopped the movie and followed her into the bathroom. ██████ stated that while she was going downstairs, Mr. Johnson tried to touch her rear part of the body and asked her to come back but she ignore him and he did not force her. ██████ was going up and down. ██████ stated that ██████ and ██████ were downstairs. ██████ reported that she never saw Mr. Johnson touching any other girls.

Ms. Muhammad stated that she spoke with ██████ ██████ stated that Mr. Johnson never touched her nor had she seen him touching her sister. First, ██████ said that she did not go upstairs. Then, she changed her story saying that she went upstairs looking for ██████ She found ██████ and Mr. Johnson in the bathroom but they did not answer her. ██████ also reported that when she went upstairs, she saw naked white couple on a video. ██████ stated that ██████ told her that she had a sex with Mr. Johnson but she did not believe her. ██████ said that Mr. Johnson does not live in the home but he often visits Rhonda.

Ms. Muhammad stated that she spoke with ██████ ██████ told OCI that she never saw Mr. Johnson touching her or other girls in the home. She did not know about the alleged incident until ██████ told her. Ms. Muhammad stated that ██████ and ██████ said at the same that Mr. Johnson never touched them inappropriately. ██████ said that ██████ often went upstairs playing hide and seek with l██████ ██████ said that Mr. Johnson often called ██████ and ██████ on the telephone to come upstairs, if they refused, he would come down to get them. ██████ stated that Mr. Johnson allowed her sisters to watch "Sex and City" and once she saw a man's private part on television while she was upstairs with them. ██████ stated that once Mr. Johnson told her that he loves her and asked her to come closer to him, and she got scared of him and she ran downstairs and hid under the bed.

Ms. Muhammad stated that when ▓▓▓ said that ▓▓▓▓▓ had sex with Mr. Johnson, Rhonda became upset with her. Rhonda asked ▓▓▓▓▓ if it was true and ▓▓▓▓▓ denied.

Ms. Muhammad stated that Mr. Johnson denied the allegations and denied watching a video with the girls on that day. He claimed that he left immediately. He denied watching pornographic movies with the girls.

Ms. Muhammad stated that she just learned about a report from CAC and a Detective but she did not have access to it. According to Ms. Muhammad, OCI did not give any directives for the removal of the children from this home. The agency clarified that it was agency's decision for the removal.

## CONCLUSION

The written and oral information presented at the Independent Review indicated that the agency was justified in removing the children from the home of Ms. Rivera.

It is the understanding of this Review Officer that the alleged incident with ▓▓▓▓▓ occurred when Ms. Rivera and Rhonda were not present at the home. It appears that Mr. Rivera was at home and supposed to be supervising the children. This Review Officer understands as Mr. Johnson claimed that he came to pick up L▓▓▓ and he stayed for a few minutes; however, he admitted that ▓▓▓▓ and ▓▓▓▓ followed him upstairs. There are many contradictions between the stories about the incident; however, the accounts of OCI and their interviews with the children reflect that the children were exposed to pornographic material/ movie and/or he may have made sexual remarks to the children, which placed the children at imminent risk. This Review Officer is not sure why ▓▓▓▓▓ did not report the incident to Mr. Rivera or get his help when ▓▓▓▓▓ was having sex with Mr. Johnson but instead she called her birth mother to report this incident.

This Review Officer is concerned that Ms. Rivera constantly said that ▓▓▓▓ and ▓▓▓▓▓ were lying and are not trustworthy. According to Ms. Rivera, these girls are fantasizing about love and sex and they dramatize matters. It is the understanding of this Review Officer that they are teenage girls with behavioral issues. It appears that Mr. and Mrs. Rivera do not believe the girls and minimize the situation by saying that the girls are lying.

This Review Officer is concerned by the way Ms. Rivera reacted in the presence of the children and took off with the children to the hospital. Ms. Rivera failed to follow the protocol of the agency. It appears that Ms. Rivera uses corporal punishment with the children which is against the New York State Foster care Guidelines.

This Review Officer acknowledges that currently the children are placed in two separate foster homes in two different boroughs and two separate schools. This Review Officer acknowledges that these girls have stayed together all their lives and they are bonded; however, now they are separated and it may not be an ideal situation for them. This Review Officer strongly believes in keeping the siblings together, possibly with another kinship resource. This Review Officer understands that ▓▓▓▓ misses Ms. Rivera and she expressed her wish to return to the home of Ms. Rivera. This Review Officer acknowledges that ▓▓▓▓s worker also supports ▓▓▓▓s return to the home of Ms. Rivera. This Review Officer acknowledges that the children's Law Guardian supports the return of the three young children to the home of Ms. Rivera and that other two older children either remain in their current placement or another kinship resource be explored. However, this Review Officer is extremely concerned about the safety of all the children in this home. This Review Officer strongly believes that if the home is not safe for the two older girls, it may not be safe for all the girls.

8

This Review Officer understands that OCI investigation is still open and their determination is not complete. It is the understanding of this Review Officer that the children were seen at Children's Advocate Center and the detectives interviewed the children; however, these reports are not available to this Review Officer.

This Review Officer has determined in the best interest of all the children that they remain in their current placement until the agency explores another kinship resource for them. This Review Officer strongly recommends that the agency expedite exploring another kinship resource for all the girls; if not, then the agency should find another foster home where they can accommodate all the girls together. In the meantime, the agency should facilitate sibling visits. This Review Officer recommends that the agency continue with the therapy to address their separation anxiety and behavioral issues. This Review Officer recommends that the therapist should address issues with ▉▉▉ and ▉▉▉▉▉ concerning their inappropriate sexual ideas.

The foster parent, Mable Rivera, has the right to appeal this decision under Section 400 of the Social Services Law and may request a New York State Fair Hearing within sixty (60) days of the date of this decision.

Write to:     Bureau of Special hearings
P.O. Box 1930
Albany, New York 12201

*Mina Shah, LMSW*
Independent Review Officer
May 8, 2006

Cc:     A. Garcia
F. Njoku
C. Anagbose
A. Cummings
F. Madu
R. Bukemia
M. Warren
R. Thomas
C. Williams
S. Sealey
D. Muhammad
D. Lara
J. Morales
N. Bowler, Esq.,

9

# EXHIBIT 13

**STATE OF NEW YORK**
**OFFICE OF CHILDREN & FAMILY SERVICES**

---

| | |
|---|---|
| In the Matter of the Appeal of | : |
| | :    **DECISION** |
| **MABLE RIVERA** | :    **AFTER** |
| | :    **HEARING** |
| from a determination by the New York City | : |
| Administration for Children's Services and the Family | : |
| Support Systems to remove foster children from her home | :    **FH#: 40829** |

---

Before:

Debra A. Bettis
Administrative Law Judge

Held At:

New York State Office of
Children and Family Services
163 West 125th Street
New York, NY 10027
On October 2, 2006, October 11, 2006,
  October 26, 2006 & November 7, 2006

Parties:

Family Support Systems
2530 Grand Concourse
Brooklyn, NY 11201
By:  John Eyerman, Esq.
    36 West 44th Street
    Suite 1212
    New York, NY 10036

New York City Administration
For Children's Services
220 Church Street
New York, NY 10013
No Appearance

Mable Rivera
120-03 219th Street
Cambria Heights, NY 11411
By:  Darius Charney, Esq.
    Lansner & Kubitschek
    325 Broadway
    Suite 201
    New York, NY 10007

MABLE RIVERA                                              2.

## JURISDICTION

The New York City Administration for Children's Services (the City) and the Family Support Systems (the Agency), removed foster children, B██████C., E██ S. and J██C. from the kinship foster care home of Mable Rivera (the Appellant) on March 31, 2006.

Pursuant to § 400 of the Social Services Law, any person who is aggrieved by a Social Services official's determination to remove a child from a foster care placement in a family home may appeal that determination to the New York State Office of Children and Family Services. The Appellant requested this hearing to contest the removal of ██████, ████ and ████ from her home.

## FINDINGS OF FACT

An opportunity to be heard having been afforded the parties and evidence having been considered, it is hereby found that:

1.       ████ (born ██████, 1997) was placed by the City through the Agency in the kinship foster home of the Appellant in or about December 1998. The Appellant is the child's maternal great aunt. The biological mother of ██ is ████ Ch████ n Y████

2.       ████ (born ██████, 1999) and ████ (born J██████ 1998) were placed by the City through the Agency in the kinship foster home of the Appellant in or about December 1999. The biological mother of ████ nd ████ is Ramona Ledbetter.

3.       There were two foster children in the Appellant's home, to wit: ████ (born ████ 1993) and ████ (born ████ 1994). The biological mother of ████ and ████ is Ramona Ledbetter.

4.       The Permanency Planning Goal for ████ is adoption. At the time of the removal, the Appellant was in the process of adopting the child.

MABLE RIVERA                                     3

5.    The Permanency Planning Goal for ███████ and ███████ to be returned to their parent.

6.    The Appellant, her husband, Anthony Rivera, and the foster children occupied the first floor and basement of a two-family home.

7.    The Appellant's daughter, Rhonda Goddard, and her two sons, Lawrence (age 16) and Lance (age 9), reside in a separate second-floor apartment. The Agency has always treated Ms. Goddard's apartment as a separate residence, and the Agency worker has never visited Ms. Goddard's home.

8.    On March 30, 2006, Agency supervisor Andrea Cummings received a telephone call from Ramona Ledbetter, the biological mother of ███████ ███████, ███████ and ███████ She said that ███████ told her ███████ was having sex with Leandro Johnson, the boyfriend of Rhonda Goddard.

9.    At the time of the alleged incident, the Appellant and her daughter were away from the home. The Appellant's husband, Anthony Rivera, was at home and caring for the foster children.

10.    On March 30, 2006, Agency Supervisor Andrea Cummings and caseworker Annie Garcia interviewed the Appellant, Rhonda Goddard and the foster children at the Appellant's foster home. They did not interview Anthony Rivera, although he was present and available in the home at the time of the Agency workers' visit.

11.    During the initial interview, the child ███████ told the Agency workers that ███████ old her ███████ was having sex with Leandro Johnson. ███████ denied having sex and said that ███████ was just trying to get her into trouble. The children said Leandro Johnson

MABLE RIVERA                                    4

had shown them pornographic movies, and ▬▬▬▬▬ said he had touched her and made

suggestive comments.

12.    Physical examination of the children at Franklin General Hospital showed no

evidence of sexual abuse.

13.    Detective Beame of the police Special Victims Unit interviewed the children at

the hospital.    The detective advised Ms. Cummings not to let the children return to the

Appellant's home that night, and to bring them to the police station on Monday, April 3, 2006.

14.    On March 31, 2006, acting upon the detective's recommendation, Agency

workers removed the children from the Appellant's home.    Agency workers took clothing

sufficient for only one night, as the removal was deemed "temporary."

15.    On March 31, 2006, Agency workers made a report to the State Central Register

of Child Abuse and Maltreatment (SCR), alleging maltreatment by Leandro Johnson and the

Appellant, in the form of "Inadequate Guardianship" and "Sexual Abuse," of foster children

▬▬▬▬▬ ▬▬▬▬▬, ▬▬▬▬ and ▬▬▬ (Agency Exhibit # 1; Appellant's Exhibit D.) The reports

were investigated by the City Office of Confidential Investigations (OCI).

16.    On April 1, 2006, Agency Supervisor Cummings telephoned City ACS

caseworker Michael Warren and told him the Agency was temporarily placing the children in

other foster homes while OCI investigated the allegations.

17.    On Monday, April 3, 2006, the children were interviewed at the Child Advocacy

Center (CAC). The CAC interview determined that the children obtained pornography on their

own and watched it by themselves. This determination was reported to OCI on April 26, 2006.

(Agency Exhibit # 1, page 15.)

MABLE RIVERA                                5

18.    On Monday, April 3, 2006, the children were interviewed at the police station.
No criminal charges were brought against Leandro Johnson.

19.    An "Independent Review" conference was conducted on April 18, 2006, pursuant
to 18 NYCRR § 443.5. (ALJ Exhibit # 1.)

20.    At the Independent Review conference, the children's Law Guardian, Nora
Bowler, stated, "Ms. Rivera is an excellent foster mother," and recommended that "████████
████ and ████ return to the home of Ms. Rivera and ████ and ████ remain in their current
placement." (ALJ Exhibit # 1.)

21.    City ACS caseworker Michael Warren testified at this administrative hearing,
affirming the opinion he presented to the Independent Review conference, that the child ████
is not credible, as she tends to "fabricate stories," taking "cues from her birth mother who has
wild thoughts" and has "a negative influence on the children."

22.    In a Decision After Independent Review, dated May 8, 2006, the City affirmed
the removal determination. The Review Decision emphasized the need to keep siblings together
and concluded it was "in the best interest of all the children that they remain in their current
placement until the agency explores another kinship resource for them." (ALJ Exhibit # 1.)

23.    The Decision After Independent Review was issued before the OCI investigation
was complete and without the reports of the Children's Advocacy Center or the detective who
interviewed the children. (ALJ Exhibit # 1.)

24.    On or about July 14, 2006, the City OCI completed its investigation and
determined the allegations of "Inadequate Guardianship" and "Sexual Abuse" against both the
Appellant and Leandro Johnson to be "unfounded" or "unsubstantiated." The City concluded:

OCI has unfounded this case against Mable Rivera. No evidence has been uncovered to
substantiate the allegations. On 3/31/06, the children were medically examined and there

was no evidence of any physical and/or sexual abuse. All appropriate contact, including collaterals, were contacted.

OCI has unfounded this case against Leandro Johnson. No evidence has been uncovered to substantiate the allegations. On 3/31/06, the children were medically examined and there was no evidence of any physical and/or sexual abuse. All appropriate contact, including collaterals, were contacted.
(Agency Exhibit # 1; Appellant's Exhibit D.)

25.    On August 23, 2006, Agency workers visited the Appellant's home to conduct a safety assessment. The Agency determined that the children would be safe in the Appellant's home and that ██████ ███ and ███should be returned to the Appellant's kinship foster home on August 25, 2006.

26.    On August 25, 2006, the Appellant and children █████, ████nd █ went to the Agency office in order to effectuate the return of the children to the Appellant's kinship foster home.

27.    On August 25, 2006, Agency supervisor Andrea Cummings telephoned City ACS caseworker Michael Warren and requested permission to return children ██████ ███ and ███ to the Appellant's kinship foster home. Mr. Warren told her the children could not be returned, because he had not received notice from OCI that the SCR report was unfounded.

28.    City ACS caseworker Michael Warren testified at this hearing that it was and still is the City's intention to return the children ██████, ████and ███to the Appellant's foster home if OCI determines the allegations to be unfounded.

29.    City ACS caseworker Michael Warren never attempted to obtain the Investigation Conclusion from OCI directly. He was presented with a copy of the OCI Investigation Conclusion (Agency Exhibit # 1) at this hearing.

30.    City ACS caseworker Michael Warren testified at this hearing that, having seen the OCI Investigation Conclusion, he still considers that investigation incomplete, as he does not

believe OCI addressed all of the allegations.    He testified that he is aware there is no investigation pending at this time.

## ISSUE

Was the determination to remove ~~████~~ ~~████~~ and ~~████~~ from the Appellant's kinship foster care home a proper exercise of discretion?

## DISCUSSION

The City and the Agency acted arbitrarily and capriciously in removing the children ~~████~~, ~~████~~ and ~~████~~ from the Appellant's kinship foster care home.    The determination to remove the children was an improper exercise of the Agency's discretion.

The Agency, as an authorized childcare agency, has legal responsibility for the well-being of the foster children in its custody and may make appropriate placements in order to discharge that responsibility.    Social Services Law § 400 provides that:

1.  When any child shall have been placed in an institution or in a family home by a social services official, the social services official may remove such child from such institution or family home and make such disposition of such child as is provided by law....

2.  Any person aggrieved by such decision of a social services official may appeal to the department pursuant to the provisions of section twenty-two of this chapter.

Social Services Law § 383(2) further provides that:

The custody of a child placed out or boarded out and not legally adopted or for whom legal guardianship has not been granted shall be vested during his minority, or until discharged by such authorized Agency from its care and supervision, in the authorized agency placing out or boarding out such child, and any such authorized agency may in its discretion remove such child from the home where placed or boarded.

Since removal of a foster child is within the discretion of the City and its authorized agencies, only if a removal is an abuse of discretion will the removal be reversed by an administrative hearing decision.    However, pursuant to 18 NYCRR 443.5(a) of the New York

regulations with regard to removal from foster family care:

> Whenever a social services official or another authorized agency acting on his or her behalf proposes to remove a child in foster family care from the foster family home, he/she or such other authorized agency, as may be appropriate, must notify the foster family parents of the intention to remove such child. This notice must be in writing.
>
>> (1) Such notification must be given at least 10 days prior to the proposed effective date of the removal, except where the health or safety of the child requires that the child be removed immediately from the foster family home.
>> (2) Such notification must further advise the foster family parents that they may request a conference with the social services official or a designated employee of the social services district at which time the foster parents, with or without a representative, may appear to have the proposed action reviewed, be advised of the reasons therefor and be afforded an opportunity to submit reasons why the child should not be removed.
>> (3) Each social services official must instruct and require any authorized agency acting on the official's behalf to furnish notice in accordance with the provisions of this section.
>> (4) Foster parents who do not object to the removal of the child from their home may waive in writing their right to the 10-day notice, provided, that such waiver shall not be executed prior to the social services official's or authorized agency's determination to remove the child from the foster home and the receipt by the foster parents of notification of such determination.

Further, pursuant to 18 NYCRR 443.5(d):

> In the event there is a request for a conference, the child shall not be removed from the foster family home until at least three days after the notice of decision is sent, or prior to the proposed effective date of removal, whichever occurs later.

The Appellant was not given the required 10-day prior notice of the Agency's intention to remove the children from her foster home, nor did she sign a waiver of such notice. Agency personnel came to the Appellant's home and removed the children on March 31, 2006, stating that the removal was merely temporary – until allegations of sexual abuse were investigated. At that time, the hospital had already determined that there was no physical evidence of sexual abuse. Thus, the Agency had already established that the initial report was unfounded. The Agency presented no evidence of a finding that the health or safety of the children required that the children be removed immediately from the foster family home.

Additional allegations of inadequate guardianship and sexual abuse were made after the Agency conducted its initial interviews with the children and were reported to the State Central Register (SCR). The subsequent OCI investigation produced no further evidence to substantiate those allegations. The Agency also determined the allegations were not credible, and continues to maintain that the Appellant's home was an appropriate placement for the children. Thus, there is no evidence of an imminent threat requiring immediate removal on March 31, 2006, or continued removal to this date.

The children were interviewed by the Children's Advocacy Center and by the police. There, again, the allegations were determined to be unfounded. The children subsequently admitted that their original stories were untrue, and they had been told to lie.

By his own testimony, the City ACS caseworker failed to inquire as to the results of interviews by the CAC or Special Victims Unit, and he failed to contact the OCI investigator or obtain the OCI Investigation Conclusion. Essentially, he failed to make any effort to ascertain the facts of the case. Yet, the City ACS caseworker refused to allow the children to be returned to the Appellant's foster home, despite the Agency's determination that the children would be safe.

The City ACS caseworker repeatedly stated that the children would be returned to the Appellant's foster home if the allegations against the Appellant were unfounded. Nevertheless, he refused to allow their return, even after being notified that the completed OCI report determined the allegations were "unsubstantiated," as the City ACS caseworker then determined that the OCI investigation was insufficient. He believes, without a rational basis for that belief, that all the allegations (specifically those regarding pornography) were not investigated.

The City ACS caseworker stated his position that the removal of the children from the

MABLE RIVERA                              10

Appellant's kinship foster home is still temporary, pending full investigation of allegations of Inadequate Guardianship and Sexual Abuse by the Appellant and Leandro Johnson. If those allegations are unfounded, the City intends to return the children. In taking that position, he ignores the full and complete investigation of allegations by the City's own Office of Confidential Investigations, which found "no evidence" of abuse or maltreatment. No further investigation is pending.

At this hearing, Andrea Cummings, a Supervisor at Family Support Systems, testified for the Agency as to her own initial investigation of the allegations, the making of the SCR report and her decision to remove the children temporarily. She testified that no decision was ever made to permanently remove the children. In fact, a safety assessment was conducted on August 23, 2006, and the Agency intended to return the children ███████, ███████ and ██████ to the Appellant's home on August 25, 2006. The return did not take place, solely because City ACS caseworker Michael Warren told the Agency they were bound by the Decision After Independent Review and because he hadn't received the OCI investigation's conclusion.

City ACS caseworker Michael Warren testified, as the Appellant's witness, that Andrea Cummings contacted him on April 4, 2006, to advise that the Agency wanted to remove the children temporarily while OCI investigated the allegations. He testified that he never spoke with the Agency regarding making the removal permanent. When Ms. Cummings contacted him in August 2006, to advise that the Agency intended to return the children, he disapproved the action, as he had not yet received the OCI investigation conclusion. He reaffirmed, however, that the children would be returned if the report were unfounded. Mr. Warren was represented at this hearing by City ACS counsel, Harry Pacht, Esq.

Deborah Mason, Adoption Supervisor for Family Support Systems, testified on behalf of

MABLE RIVERA                                 11

the Appellant that she was in the process of arranging the Appellant's adoption of the child

Ms. Mason testified that she had no safety concerns prior to March 31, 2006, and she conducted

a safety assessment on August 23, 2006, and determined the home to be safe.

Aminata Yarteh, the caseworker for ███████ and ███ at Family Support Systems,

testified on behalf of the Appellant that children ███████ and ███████ were moved to a third

foster home on September 28, 2006, without prior court approval or subsequent court

notification (even though the case was before the Court again on October 24, 2006). This was in

response to a possible issue raised by the Permanency Hearing Order (dated August 9, 2006) of

Referee Amy Rood of the Queens County Family Court. (ALJ Exhibit # 3.) The Order directs

that the children continue in their current placement until the next permanency hearing. This

Order was conceivably not considered by the City or the Agency to require further court

involvement before the transfer of ███████ and ███████ to another foster home.

Ms. Yarteh, on cross examination, testified that ███████ told her in court, on October

24, 2006, that Leandro Johnson had touched her inappropriately. Although Ms. Yarteh was

involved in the case since August 2006, this was the first time ███████ made these allegations

to her. ███████ also told Ms. Yarteh she couldn't say if they had sex, because she didn't know

what sex was. Given the child's previous statements in this case, it is simply not credible that the

11-year-old did not know the meaning of the word. It is determined that the child's recent

statement to Ms. Yarteh is not credible.

David S███████ the biological father of ███████ and ███████, testified on behalf of the

Appellant that the children told him they were never sexually abused, and that their mother told

them to lie and say they had been. Rhonda Goddard, the Appellant's daughter, also testified that

the child ███████ told her (and repeated to the caseworker) that ███████ instructed ███████ to lie.

MABLE RIVERA                                    12

*A.S.    L.S.    E.S.*

██████ ██████ and ██████ statements regarding alleged abuse and maltreatment were

inconsistent and contradictory.  (Agency Exhibit # 1.)


### CONCLUSION

Allegations of Inadequate Guardianship and Sexual Abuse by the Appellant and Leandro

Johnson are not supported by a preponderance of the evidence and did not provide a sound basis

for the Agency's removal of the children.    Given the Agency's prior and subsequent

determination that the children were safe and properly cared for in the Appellant's home,

*B.C.    E.S.    J.C.*

removal of ██████ and ██████ from the Appellant's foster home was not a reasonable

exercise of the Agency's discretion.

The Agency failed to comply with the requirements of 18 NYCRR 443.5 regarding

removal of children from foster care placements, and there was no rational basis for an

*B.C.    E.S.    J.C.*

immediate removal of the children ██████ ██████ and ██████ based upon risk to the health and

safety of the children. The underlying SCR report, which served as the basis of the "temporary"

removal, is not sustained by a preponderance of the evidence. Therefore, the removal was

improper as it was arbitrary and capricious.

The matter is hereby remanded to the New York City Administration for Children's

Services and the Family Support Systems for a re-evaluation of the removal determination. The

New York City Administration for Children's Services and Family Support Systems in re-

evaluating the removal determination is directed to consider the appropriate placement of the

*B.C.    E.S.    J.C.*

children (██████ ██████ and ██████ in light of all of the facts and circumstances that currently

exist in their current placement and prior placement with the Appellant. The New York City

Administration for Children's Services and the Family Support Systems are further directed, to

MABLE RIVERA                                    13

factor in·all the applicable statutory and regulatory standards governing kinship foster home placements in considering the children's placement when re-evaluating the removal determination upon the remand of this matter.

**DECISION:**   The determination of the New York City Administration for Children's Services and Family Support Systems to remove children B████C., E███S. and J██C. from the foster home of the Appellant, Mable Rivera, was improper as it was arbitrary and capricious and is hereby remanded.

The New York City Administration for Children's Services and Family Support Systems are directed to consider the appropriate placement of the children (████, ████and ████ in light of all of the facts and circumstances that presently exist in their current placement and prior placement with the Appellant. The New York City Administration for Children's Services and the Family Support Systems are further directed, to factor in all the applicable statutory and regulatory standards governing kinship foster home placements in considering the children's placement when re-evaluating its removal determination upon the remand of this matter.

The New York City Administration for Children's Services and Family Support Systems is to complete its re-evaluation of its removal determination upon the remand of this matter and reach its determination as to the appropriateness of the children's placement within 60 days of its receipt of this decision.

MABLE RIVERA                                  14

This decision is made by John Franklin Udochi, Bureau of Special Hearings, who has been designated by the Commissioner to make such decisions.

DATED:   Albany, New York

DEC 1 3 2006

_____
John Franklin Udochi
Bureau of Special Hearings

# EXHIBIT 14

ᴇK

GRIEAS.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—————————————————————————————X

JEANETTE JONES, individually and on behalf
of S███████ S. and K███████,
S., infants,

                               04 Civ. 8331 (TPG)

             Plaintiffs,

      -against-

JOHN MATTINGLY, individually and as Commissioner,
SUSAN GRUNDBERG, individually and as Director,
PAULINE WASHINGTON, individually and as caseworker,
POSTAL VALDEZ, individually and as supervisor,
H. AURELIA JEMMOTT, individually and as reviewer,
KATHY GUERTIN, individually and as supervisor,
PIUS XII YOUTH AND FAMILY SERVICES,
JOHN J. MANCUSO, individually and as director,
SUSAN ARAUJO, individually and a supervisor,
RAQUEL WALKER, individually and as caseworker,
and CITY OF NEW YORK,

             Defendants.

—————————————————————————————X

**STIPULATION
AND ORDER
OF SETTLEMENT**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY  FILED
DOC #: _____
DATE FILED: 11/6/06
```

      WHEREAS, plaintiffs JEANETTE JONES, individually and on behalf of S███████ S.

and K███████ S., commenced this action by filing a complaint on October 20, 2004 against

JOHN MATTINGLY, as JOHN MATTINGLY, individually and as Commissioner of the

Administration for Children's Services of the City of New York, SUSAN GRUNDBERG,

individually and as Director, PAULINE WASHINGTON, individually and as caseworker,

POSTAL VALDEZ, individually and as supervisor, H. AURELIA JEMMOTT, individually and

as reviewer, KATHY GUERTIN, individually and as supervisor, PIUS XII YOUTH AND

FAMILY SERVICES, JOHN J. MANCUSO, individually and as director, SUSAN ARAUJO,

individually and a supervisor, RAQUEL WALKER, individually and as caseworker, and CITY

OF NEW YORK (hereinafter "defendants"), alleging that defendants' actions in removing infant

plaintiffs S███████A S. and K████████S. from the home of plaintiff JEANETTE JONES

violated their rights under federal and state law; and

WHEREAS, the court granted a temporary restraining order returning infant plaintiffs

S████████S. and K████████S. to the home of plaintiff JEANETTE JONES by order dated

October 22, 2004; and

WHEREAS, upon the order of the Court on October 22, 2004, The Legal Aid Society

was substituted as counsel for infant plaintiffs S████████ S. and K████████S.; and

WHEREAS, plaintiffs sought declaratory and injunctive relief against all defendants and

monetary damages from defendants; and

WHEREAS, the parties agree that the Court has jurisdiction over this action and the

parties, and that the Court has the authority to order the relief set forth in this Stipulation; and

WHEREAS, the infant plaintiffs S████████ S. and K████████ S. now desire to resolve

any remaining issues raised in this claim, without further proceedings and without defendants

admitting any fault or liability; and

WHEREAS, The Legal Aid Society, as counsel for infant plaintiffs S████████A S. and

K████████ S., has incurred attorneys' fees and expenses in connection with this action in the

amount of approximately $20,000.00;

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and among the

parties as represented below as follows:

1.     All claims brought on behalf of infant plaintiffs S████████S. and K████████S.

against defendants in the above-referenced action, including all claims for reasonable costs and

2

attorneys' fees, are dismissed with prejudice.

2.      Defendant the City of New York hereby agrees to pay infant plaintiffs S███████

S. and K███████ S., the sum of $120,000 ("one hundred twenty thousand dollars") in full

satisfaction of all claims that were or could have been raised in this case because of the removal

of the plaintiffs from their grandmother's care, inclusive of attorneys' fees and costs. The Legal

Aid Society will accept $5,000 of this amount as legal fees. In consideration for the payment of

this sum, infant plaintiffs S███████ S. and K███████ S. agree to dismissal of all the claims

against all defendants in this case and to release all defendants, any present or former employees,

officials or agents of the Administration for Children's Services of the City of New York and

Pius XII Youth and Family Services, John J. Mancuso, Susan Araujo and Raquel Walker and

their past, present or future officers, directors, agents, officials; servants, employees, affiliates,

parents, subsidiaries, predecessors, successors, assigns, insurers, officials, attorneys, legal

representatives, heirs, executors and administrators from any and all liability, claims, or rights of

action, of any kind whatsoever arising from and contained in the complaint in this action,

inclusive of attorneys' fees and costs. The parties will agree on the form of the release to be used

for this purpose.

3.      The parties contemplate that, pursuant to Federal Rule of Civil Procedure 17 ( c)

and Local Civil Rule 83.2, the Court, will upon motion by infant plaintiffs S███████ S. and

K███████ S., appoint a guardian ad litem with authority to approve this settlement and to

execute any documents necessary to ensure that the money paid to the infant plaintiffs pursuant

to this Stipulation and Order is used solely for the benefit of the infant plaintiffs, in accordance

with the arrangement set forth in Paragraph 5 below.

3

4. Defendant the City of New York shall make the payment required by Paragraph 2 above to The Legal Aid Society to the attention of Karen Fisher Gutheil within 90 days from a fully executed, so ordered Stipulation of Settlement. Plaintiffs' counsel and the Guardian Ad Litem will deliver to Defendants all documents necessary to execute the settlement, including releases.

5. Upon receipt of payment, The Legal Aid Society will place $115,000 in an escrow account and will hold that money until such time as a court of competent jurisdiction appoints a guardian over the property so that the money is used solely to benefit the infant plaintiffs S██████ S. and K██████ S. Once a guardian over the property has been appointed, The Legal Aid Society shall make payment to the guardian over the property in the amount of $115,000.00.

6. The City of New York Defendants agree that, to the extent that it holds liens against infant plaintiffs S██████S. or K██████S. for public assistance or Medicaid, or for treatment at any New York City Health & Hospitals Corporation facility, such liens will not be asserted against the proceeds of this settlement.

7. Nothing contained herein shall be deemed to be an admission by defendants that they have in any manner or way violated infant plaintiffs S██████S. and K██████S.' rights, or the rights of any other person or entity, as defined in the constitutions, statutes ordinances, rules or regulations of the United States, the State of New York or the City of New York. This Stipulation shall not be admissible in, nor is it related to, any other litigation or grievance procedure or settlement negotiations, except that this Stipulation is admissible in this Court for enforcement of its terms.

4

8.   It is understood that the terms and conditions contained herein do not constitute an

official policy or practice of defendants.

9.   This Stipulation and Order contains all the terms and conditions agreed upon by

the parties hereto, and no oral agreement entered into at anytime nor any written agreement

entered into prior to the execution of this Stipulation and Order regarding the subject matter of

the instant proceeding shall be deemed to exist, or to bind the parties hereto, or to vary the terms

and conditions contained herein.

10.   This Court shall retain jurisdiction and enforcement power over the terms and

conditions of the settlement of this action.

Dated: New York, New York
       March 28, 2006

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
100 Church Street
New York, New York 10007
By: _____
    Martha Calhoun  ( MC5009)
    Assistant Corporation Counsel
    *Attorneys for City Defendants*

STEVEN BANKS
The Legal Aid Society, Juvenile Rights Division
199  Water Street, 3rd Floor
New York, NY 10038
By: _____
    Karen Fisher Gutheil (KG 2414)
    *Attorneys for Infant Plaintiffs*
    S██████ S. And K███████ S.

5

**TRAUB EGLIN LEBERMAN STRAUS LLP**
Mid-Westchester Executive Park
Seven Skyline Drive
Hawthorne, New York 10532
By: _____
    Jonathan R. Harwood (JH 9060)
    *Attorneys for Defendants*
    Pius XII Youth and Family Services,
    Raquel Walker and Susan Araujo

SO ORDERED:

The Hon. Thomas P. Griesa
U.S. District Judge
~~March~~    ~~,2006~~
~~September~~
November 3, 2006

6